UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Dustin T. Duncan, ScD,<br><br>                       Plaintiff,<br><br>             -against-<br><br>Elle Lett, PhD,<br><br>                   Defendant. | **VERIFIED COMPLAINT<br>AND JURY DEMAND** |

Plaintiff Dustin T. Duncan ("Plaintiff" or "Professor Duncan") by and through his attorneys Lewis & Lin, LLC, for his complaint for damages and injunctive relief against Defendant Elle Lett, PhD ("Defendant") alleges as follows:

## STATEMENT OF CASE

1.      Plaintiff brings this action for recovery of damages and injunctive relief arising from the claims of defamation and intentional infliction of emotional distress alleged herein.

2.      As a result of conduct alleged herein, Plaintiff has been, is being, and will continue to be substantially and irreparably harmed.  The harm to Plaintiff includes injury and harm to his reputation by being: (A) falsely accused of serious crimes and (B) falsely accused of targeting members of the transgender community—a particular focus of Professor Duncan's academic research, study and volunteer work–which resulted in a loss of specific professional opportunities.

## PARTIES

3.      Plaintiff is a private individual and citizen residing in the State of New York, County of New York.  Professor Duncan is neither a public official nor a public figure. Professor Duncan is an associate professor of epidemiology at Columbia University whose fields

of respected research concentrate predominantly on intersectional and health equity-based research focusing on gay, bisexual and other sexually minoritized men and transgender people, across the African diaspora, using a social and spatial epidemiologic lens.  In addition to his extensive research work, Professor Duncan does significant mentoring work.  In light of Professor Duncan's dedication to researching and working with underrepresented or marginalized communities, his integrity and reputation in the Columbia University-area community are integral to Professor Duncan's overall profession, research, teaching and publishing work.

4.      Upon information and belief, Defendant's legal name is Elle Lett.  Upon information and belief, Defendant is a Clinical Assistant Professor at the University of Washington School of Public Health, and a Postdoctoral Fellow at Harvard Medical School and the University of Pennsylvania, with affiliations at the nationwide Center for Applied Transgender Studies. Defendant is also currently an M.D. candidate at the University of Pennsylvania and is an individual residing in this District.  Upon information and belief, all of the actions of Defendant complained of herein were committed by Defendant while Defendant was located in this District.

<u>**JURISDICTION AND VENUE**</u>

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as this is an action between citizens of different states and the amount in controversy exceeds $75,0000.

6.      This Court has personal jurisdiction over Defendant because Defendant has subjected herself to this Court's jurisdiction by invoking the benefits and protections of this State and District in an attempt to cause harm while within the State and District.  The statements

made by Defendant that are the subject of this lawsuit, specifically targeting Plaintiff, were made, upon information and belief, while Defendant was a resident of and located within this State and District, and at least part of the injury those statements caused occurred within this State and District.

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (2).

## BACKGROUND COMMON TO ALL CLAIMS

8.     Professor Duncan and Defendant both work in academia.  In or about 2021, Professor Duncan and Defendant consulted with one another in a professional capacity.  Over the ensuing years, Professor Duncan and Defendant would occasionally cross paths in a professional capacity because there was some overlap in their fields of areas of interest in connection with their respective areas of academic research and study.

9.     During their occasional professional encounters, Professor Duncan tried to encourage and support Defendant, again because there was some overlap in the respective fields of academic research and study.

10.     For example, in 2021, Defendant wrote to request a name change for an article Defendant had published previously under a different name.  Professor Duncan expressed his unequivocal support for that request.  On November 5, 2021, Defendant wrote to Professor Duncan thanking him for his support.  This email exchange is attached as Exhibit 1.

11.     In April 2023, Professor Duncan met Sawyer Allen, a/k/a Sawyer Quinn ("Sawyer"), at a Blick Art Materials store in Harlem, New York (the "Harlem Blick Store").  At all times, Professor Duncan's interactions with Sawyer were professional, cordial and limited to Professor Duncan's efforts to have artworks professionally mounted and framed by Sawyer's employer, Dick Blick Holdings, d/b/a Blick Art Materials.

12.     Despite Professor Duncan's efforts, however, Sawyer used Professor Duncan's interest in obtaining art framing services to engage in overly-friendly, personal communications with Professor Duncan via Instagram and direct message.  Notwithstanding Sawyer's overtures, Professor Duncan's interactions with Sawyer were limited to cordial, professional communications.

13.     On June 9, 2023, Professor Duncan returned to the Harlem Blick Store to pick up artwork that he had brought to be framed there.  It was during this June 9 visit to the Harlem Blick Store that Professor Duncan was approached by an individual holding herself out as the manager of the Harlem Blick Store (the "Blick Manager").  The Blick Manager approached Professor Duncan and publicly stated that Professor Duncan would not be able to have any additional artwork framed at the Harlem Blick Store.  The Blick Manager publicly repeated false accusations started by Sawyer (but, as of June 9, 2023, unbeknownst to Professor Duncan) that Professor Duncan had harassed Sawyer.  She further stated that he would therefore not be permitted to visit the Harlem Blick Store as a pretext to engage in further harassment of Sawyer.

14.     Specifically, as Professor Duncan recounted in the email attached as Exhibit 2, from which Professor Duncan's personal contact information has been redacted, on June 9, 2023, at approximately 5:20 p.m., Professor Duncan was at the Harlem Blick Store.  On that date, the Blick Manager falsely, publicly and specifically told Professor Duncan, in front of other customers at the Harlem Blick Store:  "You will not be allowed to get any other art work framed at this location because an employee mentioned you harassed them."  The Blick Manager's false statement that Professor Duncan "harassed" an employee at the Harlem Blick Store was made publicly and at a time and place where the Blick Manager's false accusations were publicized to other customers of the Harlem Blick Store.  The Blick Manager's publication of the false

accusations of Professor Duncan harassing Sawyer was particularly harmful to Professor

Duncan's reputation because the Harlem Blick Store is located in the Harlem neighborhood

where Professor Duncan has extensive personal and professional connections by virtue of

Professor Duncan's volunteer, outreach, research and teaching work in Harlem.

15.    It was after the Blick Manager effectively banned Professor Duncan from the

Harlem Blick Store that Professor Duncan discovered that Sawyer had been widely and publicly

accusing Professor Duncan of serious criminal conduct on social media.

16.    Using at least Facebook and Instagram, Sawyer falsely accused Professor Duncan

of engaging in such serious and persistent harassing and stalking that Professor Duncan was

banned from the Harlem Blick Store.  As can be seen in Exhibit 3, Sawyer used social media to

appeal for "help," falsely accusing "this man," identifying Professor Duncan, of:

> **stalking & harassing me for nearly three weeks now**.  He was a
> customer that came into my job to get some of his artwork framed.
> since that day he would come to the store asking for me.  After he
> picked up his artwork, they banned him from coming back to the
> store. Since then he has been messaging me nonstop! I have
> already blocked him off four accounts.

(Emphasis added.)

17.    Defendant picked up on Sawyer's false accusations and further amplified them on

her "X" (previously known as "Twitter") social media platform, which has approximately 15,000

followers, many of whom are in the same academic circles as Plaintiff and Defendant.  As shown

in Exhibit 4, on June 30 Defendant posted the following comments on X regarding Sawyer's

fundraising page on the website GoFundMe.com (the "GoFundMe Post"), using the name

"Transsexual Negress, PhD AM":

> Found out that a trusted colleague who studies trans people has
> done horrible things and **victimized a vulnerable trans person**
> and I'm really struggling on what Justice and courage looks like
> here.  Like amplifying would put me at risk but not feels dirty.  **I**

**know it to be true** . . . .

(Emphasis added).

18.     It is clear that the post attached as Exhibit 4 is specifically about Professor Duncan because a full copy of the GoFundMe Post that Defendant is commenting on and reposting is attached as Exhibit 4-A.  As Exhibit 4-A shows, Sawyer explicitly accused Dustin T. Duncan and clearly displayed as part of his funding appeal the logo of Professor Duncan's employer, Columbia University.

19.     Defendant's post, as quoted above, repeats Sawyer's false accusations against Professor Duncan as statements of fact in unequivocally stating that "horrible things" had been done and that Defendant "know[s] it to be true . . . ."  Moreover, the GoFundMe Post written by Sawyer and reposted by Defendant accuses Professor Duncan of serious criminal conduct, including at least harassment and stalking.

20.     Defendant's post, as quoted above, was widely viewed by thousands of people (Exhibit 4), and it was Defendant's stated intent to reach as wide of an audience as possible because Defendant refers to a desire to "amplify[]" the accusations.

21.     In a different post on the same day (Exhibit 4), Defendant further amplified Sawyer's false accusations by stating:

> I'm rarely pulled to post for mutual aid people I am not directly linked to.  I am two trans people removed from this person.  I will not share details for other reasons but if you believe in mutual aid and want to support someone **who has been harmed** . . . .

(Emphasis added.)

22.     This post, like the post quoted above in paragraph 17, repeats the substance of the false claim that Sawyer had been "harmed" by Professor Duncan.  It also repeats the substance of the false claim as a statement of fact in referring to supporting "details" that would support the

false claim.

23.    In yet another post on June 30 (Exhibit 4), Defendant stated:

> There are **public details and evidence out there if you want to**
> **investigate** but I'm more interested in supporting Sawyer so I
> decided not to link those.

(Emphasis added.)

24.    This post further amplifies Sawyer's false accusation and again gives the

impression that Sawyer's false claims are fact by referencing "public details and evidence"

purportedly supporting Sawyer's false claims.

25.    To make crystal clear that Defendant was deliberately and/or with reckless

disregard for the truth supporting Sawyer's false claims and amplifying them through social

media, on the same day as the posts quoted above, June 30, Defendant sent Professor Duncan the

email attached as Exhibit 5, from which Professor Duncan's personal information has been

redacted, which states:

> In the period of transparency , I am publicly supporting Sawyers
> [sic] gofundme based on the harms you have done to him. I
> am in community with people only a few degrees removed from
> him since o [sic] I am not doing so without comfortably
> verifying the situation. I don't expect you to respond or reach out,
> but should you wish to, in honesty and transparency, I
> am here. Be well, and be accountable .

26.    Upon information and belief, Defendant did not take reasonable steps to

"comfortably verify[] the situation," as stated in the email quoted above (Exhibit 5), nor could

she have, because there is no truth to the accusations Sawyer made against Professor Duncan.

Furthermore, as alleged above, Professor Duncan and Defendant have known each other in a

professional capacity at least as far back as 2021.  Defendant could easily have asked Professor

Duncan about Sawyer's accusations in an effort to "verify[]" the situation before publicly

repeating, amplifying and lending additional credibility to Sawyer's false claims.  Defendant did

not do so.  Had Defendant given him the opportunity, Professor Duncan would readily and easily have disputed Sawyer's accusations.

27.     On or about June 28, Sawyer broadened the audience for his false accusations against Professor Duncan beyond social media to Professor Duncan's employer, Columbia University.  On at least June 28, Sawyer repeated his false accusations of harassment and stalking against Professor Duncan to the public safety office of Columbia University.  In light of the intentional publication and seriousness of the false accusations about Professor Duncan, which both accused Professor Duncan of serious criminal behavior and directly injured Professor Duncan's professional reputation, Columbia University opened a formal investigation.

28.     Upon information and belief, Defendant was also involved with—if not the initiating force behind—the decision of Columbia University to open an investigation into Professor Duncan because, among other reasons, as an academic herself, Defendant was familiar with a university's procedures for investigating complaints against university personnel and/or faculty.  Moreover, in light of:  (A) the unequivocal support Defendant voiced in public on social media (Exhibit 4) and in private to Professor Duncan (Exhibit 5); (B) Defendant's pointed threat to Professor Duncan to "be accountable" (Exhibit 5); and (C) the fact that, just a few days later, Columbia University informed Professor Duncan that it was investigating him, upon information and belief, Defendant was a driving force behind Columbia University's decision to begin investigating Professor Duncan.

29.     Defendant willingly and enthusiastically amplified Sawyer's false accusations against Professor Duncan and promoted Sawyer's attempt to raise funds in connection with those false accusations.  Defendant did so intentionally, or, at a minimum, with reckless disregard for the truth.  On June 30 (Exhibit 6), Defendant encouraged donations to Sawyer's GoFundMe

appeal, stating: "I'd really like to see this goal reached today. I gave 100. Can you match?"

30.     Defendant's efforts to amplify Sawyer's false accusations and efforts to promote Sawyer's ability to raise money off of them as quoted above (paragraphs 17-24) and Exhibits 4, 4-A, 6), had the effect of falsely accusing Professor Duncan of serious criminal behavior, including at least harassing and stalking and were thus defamatory *per se*. In addition, because Defendant's posts clearly referenced Professor Duncan's employer, Columbia University, and because Defendant falsely accused Professor Duncan of harassing a "vulnerable trans person," Defendant's false accusations were also defamatory *per se* by causing injury to Professor Duncan's profession. The false accusations initially made by Sawyer and amplified and added to by Defendant, falsely accusing Professor Duncan of behavior that was actively hostile to Professor Duncan's work within the transgender community (Exhibit 4 (accusing Professor Duncan of "victimize[ing] a vulnerable trans person") and making specific reference to Professor's Duncan's work regarding and study of "trans people" were defamatory *per se* in causing harm to Professor Duncan's ability to research and work within the transgender community. As shown in Exhibit 4, Defendant explains that her "amplifying" Sawyer's accusations was because a "trusted colleague who studies trans people," referring to Professor Duncan, had purportedly "done horrible things and victimized a vulnerable trans person . . . ." This statement is defamatory *per se* because it is not simply a reflection on Professor Duncan's general character; the statement takes direct aim at Professor Duncan's ability and integrity to conduct the work Defendant knows Professor Duncan does within the transgender community.

31.     In a letter dated July 7, 2023, attached as Exhibit 7, the Office of Equal Opportunity and Affirmative Action (the "EOAA") at Columbia University informed Professor Duncan that Sawyer falsely claimed that Professor Duncan had engaged in a series of actions in violation of Columbia University's policies and that constituted the serious criminal conduct of harassing, intimidating and threatening by, among other things, continuously sending messages via Instagram, intentionally making unwanted physical contact and stalking.  As set forth in the July 7 letter, Sawyer falsely told Columbia University that Professor Duncan had done the following:

a)      continuously sending him messages of a harassing, intimidating, and threatening nature via Instagram since on or about April 18, 2023 to the present, despite telling you to stop. The messages included, but are not limited to the following: "After that day. [sic] I couldn't stop thinking about you[.] Your smile[,] [y]our energy, [e]verything[.] And you are so damn handsome;" "I hope now you're really scared because once I find you. [sic] Trust me, you would have wanted to pick just talking to me;" "I know exactly where you live as well;" "I have eyes on you everywhere;" and "You are literally just another trans person crying out for help;"

b)      while discussing artwork at his place of employment in or around April 2023, you pointed out the genital area in the images without any legitimate purpose;

c)      intentionally made physical contact with his hand and shoulder at his place of employment in or around April 2023;

d)      coming into and calling his place of employment, specifically asking to speak with him, and when you were banned from his place of employment on or about

June 9, 2023, you passed by his place of employment during his lunch break and continuously contacted him via Instagram thereafter;

e)  following him on the subway on more than one occasion, including on the L train to Brooklyn while possessing a knife on or about June 15, 2023;

f)  lurking, walking by, and/or standing on the driveway of his home on or about June 24, 2023, June 25, 2023, and June 27, 2023; and

g)  sending him flowers to two distinct places of employment on or about June 28, 2023 or June 29, 2023 and asking him on Instagram whether he liked the flowers.

32.    The accusations outlined in paragraph 31 are false, and, upon information and belief, Defendant was at least involved with Columbia University's decision to investigate the baseless claims above.  As an academic, Defendant would have known that Columbia University had policies prohibiting the types of behaviors outlined above, particularly by faculty members.

33.    In addition to the social media posts, and, upon information and belief, Defendant's involvement with Columbia University's decision to open an investigation into Professor Duncan, Defendant made additional false statements about Professor Duncan in connection with the editorial review process for a manuscript submitted by him to an academic journal.  As shown in Exhibit 8, on July 17, 2023, Defendant "comfortably recommend[ed]" rejection of Professor Duncan's manuscript, specifically referencing "the unsavory but [sic] allegations that have been shared with me as well as communiques from Dustin's lawyers."

34.    Upon information and belief, the "allegations" and "communiques" Defendant referred to in the email attached as Exhibit 8 are Sawyer's false claims against Professor Duncan and the courtesy copy of the complaint Professor Duncan filed against Sawyer in New York State Supreme Court, which Professor Duncan's counsel sent to Defendant three days earlier, on

July 14.  Despite the fact Professor Duncan's complaint stated clearly and repeatedly that Sawyer's accusations were false, Defendant referred to them again, and again in a professional context to injure Professor Duncan's professional reputation.

35.     After a months-long investigation, on September 22, Columbia University concluded its investigation and notified Professor Duncan of the results.  Those results, attached as Exhibit 9, are quoted in part below:

> EOAA **did not** find, by a preponderance of the evidence standard, that you engaged in conduct amounting to sexual harassment, stalking, and discriminatory harassment in violation of the Policy. Based on the investigation, EOAA did not find Complainant's allegations to be supported by the evidence.
>
> There was insufficient evidence to corroborate that the harassing, intimidating, and threatening Instagram messages Complainant received were sent by you. In addition, the evidence gathered demonstrated that you were not in New York during particular alleged incidents, and there was no other evidence to support Complainant's claims.

(Emphasis in original.)  Had Defendant attempted to contact Professor Duncan about the false accusations by Sawyer *before* Defendant repeated them in the ways outlined above, Professor Duncan would have willingly provided his side of the story demonstrating that the accusations Sawyer was making lacked factual basis, as Columbia University concluded.  Instead, while Columbia University was investigating the false claims against Professor Duncan, Defendant continued repeating Sawyer's false claims.

36.     Defendant continued her efforts to harm Professor Duncan professionally by repeating Sawyer's false accusations about Professor Duncan to additional professional colleagues.  Upon information and belief, colleagues who previously served with Professor Duncan on the board for a conference, the Interdisciplinary Association for Population Health Sciences ("IAPHS") Conference, emailed the IAPHS calling for Professor Duncan's resignation

because of the false, defamatory accusations of "harassing and threatening" made by Sawyer and repeated by Defendant. Defendant has a close working relationship with one of the chairs of the IAPHS conference, and, upon information and belief, Defendant spread Sawyer's false accusations about Professor Duncan in an effort to harm his professional reputation with the IAPHS. In August 2023, Professor Duncan was indeed forced to resign from the IAPHS board, which severely and negatively impacted his ability to promote his research, his publications, and his ability to network professionally to obtain further research and grant opportunities. One effect Professor Duncan's forced resignation from the IAPHS Conference board has had is on Professor Duncan's ability to promote his forthcoming book, which is to be published in January 2024, entitled "The Social Epidemiology of the COVID-19 Pandemic." His previous position on the IAPHS conference board would have been a valuable opportunity to promote that upcoming book, but, as a result of Defendant repeating Sawyer's false accusations about Professor Duncan to other board members, Professor Duncan has lost that valuable opportunity.

37.    The harm Defendant has caused Professor Duncan's reputation, particularly his professional reputation, was done with intent and/or a reckless disregard for the truth. Defendant had multiple opportunities to verify Sawyer's false accusations.

38.    Specifically, Defendant could have simply asked Professor Duncan about them before making her public statements. As alleged above, Professor Duncan has tried to support Defendant since at least as early as 2021, when Professor Duncan supported Defendant's name change. At that time, Defendant thanked Professor Duncan for his support and advocacy on Defendant's behalf. (Exhibit 1.)

39.    Professor Duncan's professional support of Defendant continued periodically over the years. For example, in late 2022 and early 2023, Professor Duncan sought Defendant's

research expertise for a project Professor Duncan was helming. When Sawyer began his campaign of defaming Professor Duncan just a few months later in 2023, Defendant made no attempt contact Professor Duncan to determine the truth of Sawyer's accusations, even though Defendant had had a professional acquaintance with Professor Duncan on an ongoing basis that continued into early 2023.

40.    For example, part of Columbia University's investigation of Professor Duncan included the false accusation that Professor Duncan had allegedly followed Sawyer on the subway on more than one occasion, including on the L train to Brooklyn, while wielding a knife, on or about June 15, 2023. On June 10, 2023, Professor Duncan was traveling thousands of miles from New York to the West Coast, to attend a conference for the Society for Epidemiologic Research in Portland, Oregon, and Professor Duncan did not return to New York until the early morning hours of June 17. Notably, Defendant saw and spoke with Professor Duncan at the epidemiology meeting in Portland, ensuring that she knew at least some of the claims were false. Professor Duncan also learned that he was being accused of lurking, walking by, and/or standing in the driveway of Defendant Sawyer's home on or about June 24, June 25, and 27, 2023; once again, those accusations are demonstrably false. On June 24 and 25, Professor Duncan was traveling from the island of Saint Kitts and Nevis, through Atlanta, back to New York. On June 27, Professor Duncan had multiple professional engagements and meetings that can be verified by colleagues. Upon information and belief, Sawyer lives somewhere in Brooklyn, and Professor Duncan has never been to or near Sawyer's home. These are just a few examples of information Professor Duncan could and would have easily provided to Defendant if Defendant had just contacted Professor Duncan prior to repeating and amplifying Sawyer's false accusations.

41.    In July 2023, Professor Duncan filed his original complaint against Sawyer, in which Professor Duncan verified under penalty of perjury that Sawyer's false accusations against him were false.  Defendant was sent a courtesy copy of that complaint, and Defendant persisted in repeating and amplifying Sawyer's false accusations, which she knew were inaccurate and contested under oath by Plaintiff.

42.    Since Professor Duncan filed his original complaint against Sawyer in July 2023, he has accumulated additional information demonstrating that Sawyer's accusations are false. As part of Sawyer's June 2023 fundraising appeal, Sawyer included messages he claimed he had received from Professor Duncan's "alternative accounts showing him harassing and threatening [Sawyer]."  Those purported messages were sent from an Instagram account with the username "@d.d._can."  That is not and has never been Professor Duncan's account.  Pursuant to a subpoena served on Meta (Instagram's parent company), Meta provided information showing that the phone number used to set up the @d.d._can account was Sawyer's (347) area code phone number ending in 2492.  Professor Duncan's phone number does not have a (347) area code and does not end in 2492.  The number that, according to Meta's records, was used to set up the @d.d._can account is not Professor Duncan's phone number; the (347) area code number ending in 2492 used to set up the @d.d._can account is in fact Sawyer's phone number.

43.    Despite:  (A) the professional acquaintanceship Professor Duncan has had with Defendant; (B) his attempts to support Defendant professionally; (C) the willingness he had to defend himself against Sawyer's false accusations, had Defendant ever inquired; (D) Professor Duncan's own efforts to dispute Sawyer's false accusations, including filing suit against Sawyer and sending a courtesy copy of that complaint to Defendant, Defendant persisted in repeating Sawyer's false accusations.  For example, in a series of July social media posts attached as

Exhibit 10, Defendant insisted:

> There seems to be some confusion about where I stand on a recent
> incident involving a professor and a community member.  To be
> unambiguous I donated to their fundraiser because I support them
> as a victim of harm.  I deleted some tweets to reduce my exposure
> for a lawsuit but my support hasn't waned.  I also note that their
> [sic] are questions about the voracity [sic] of claims.  I'll share that
> being a perfect historian about dates of traumatic events is hard
> when in distress and that huge power imbalances facilitate doubt in
> victims . . . .
>
> I don't want to jump to conclusions nor change my convictions
> easily.  We all have the capacity to be wrong but I haven't been
> convinced of that just yet.

44.     The series of July posts quoted above show at least the following:  (A) Defendant
was well aware in July 2023 that there were "questions about the voracity [sic] of [Sawyer's]
claims"; (B) Defendant recognized that continued social media posts might be unwise because of
potential "exposure for a lawsuit" and (C) Defendant was willing to double-down on her support
and amplification of Sawyer's false accusations against Professor Duncan.  Shortly after the July
posts quoted above (Exhibit 10), Defendant moved from defaming Professor Duncan to a wide
audience through social media to defaming Professor Duncan in a more targeted but still public
manner, directing Defendant's accusations specifically to Professor Duncan's professional
colleagues.  Shortly after posting in July 2023 (Exhibit 10), Defendant advocated rejection of a
manuscript of Professor Duncan's, deliberately and unnecessarily alluding to "unsavory"
allegations against Professor Duncan (Exhibit 8).  In addition, upon information and belief,
Defendant lobbied a member or members of the IAPHS Conference board to force Professor
Duncan out.

45.     Damage to Professor Duncan's reputation has been done, and the damage is
ongoing.  Professor Duncan has lost multiple professional opportunities, including but not

limited to:  (A) being forced to resign from the IAPHS Conference board, which in turn is a loss of a significant opportunity to both promote his research and his publications, including but not limited to Professor Duncan's upcoming book scheduled for publication in January 2024, and to develop additional professional contacts; (B) losing two full-time members of Professor Duncan's research team who, upon information and belief, resigned in light of the false accusations about Professor Duncan, which in turn diminishes the amount of research and publication work Professor Duncan can produce; (C) being forced to take an emergency four-week medical leave from August to September while Columbia University's investigation was ongoing due to extreme emotional distress and the attendant physical effects, including but not limited to significant, unintentional weight loss, during which Professor Duncan was incapacitated and unable to apply for millions of dollars of research grants that would have funded several significant research projects and staff members.

46.    In addition, the false accusations of criminal conduct resulted in Professor Duncan being arrested on September 18 and held in custody for three hours.  Accordingly, the ongoing harm to Professor Duncan includes unexpected and significant medical bills in connection with emergency medical leave he was forced to take, as well unexpected and significant legal bills to defense himself in criminal court and to try to restore his reputation in civil courts.

**FIRST CAUSE OF ACTION**

**[Defamation *Per Se* Against Defendant]**

47.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 46, with the same force and effect as if set forth in detail herein again.

48.     As alleged above, Professor Duncan has suffered defamation *per se* because Defendant's defamatory statements have injured his professional reputation and because they accuse him of the serious crimes of harassment and/or stalking.

49.     As alleged above, Defendant publicly repeated and amplified via social media false accusations about Professor Duncan engaging in behaviors that would constitute the serious crimes of at least harassment and/or stalking, crimes so serious that Professor Duncan was in fact arrested in September.

50.     As alleged above, a significant portion of Professor Duncan's work involves researching, mentoring and working with marginalized communities.  Accordingly, Defendant's false accusations that Professor Duncan "had done horrible things and victimized a vulnerable trans person" directly harm Professor Duncan's professional reputation and integrity in the community, which in turn harms Professor Duncan's trade, business and profession, as well as planned volunteer work in arts education for minoritized communities in Harlem.

51.     Defendant has intentionally made knowingly false statements of fact about Plaintiff via the defamatory statements.

52.     Defendant published these false and defamatory statements with a reckless and wanton disregard for the truth or falsity of such statements.

53.     The actions of Defendant in making and publishing these false and defamatory statements were knowing, willful, wanton, and motivated solely by actual malice.

54.     These false and defamatory statements were made and published for the purpose of causing harm to Plaintiff.  That harm—which is intentionally directed at Plaintiff's professional reputation, Plaintiff's standing in the community, Plaintiff's integrity and Plaintiff's character—is irreparable and unable to be adequately redressed through damages.  Furthermore,

the false and defamatory statements were made and published to accuse Professor Duncan falsely of committing the serious crimes of at least harassment and/or stalking.

55.     Defendant acted with the intent to cause harm to Professor Duncan's standing and reputation in the community, by injuring his trade, business, and professional reputation, by impeaching his character, honesty, and integrity and by accusing Professor Duncan of serious crimes.  These false and defamatory statements constitute defamation *per se* because they impugn the Plaintiff's honesty, trustworthiness, dependability, and professional fitness and accuse him falsely and specifically of the serious crimes of harassment and stalking.

56.     The aforementioned statements were made of and concerning Plaintiff and were so understood by those who read, saw, or heard the publication of them.  As alleged above and as shown in the attached exhibits, the statements at issue clearly identify Plaintiff as the target of the defamatory accusations, including specifically referencing Professor Duncan's position as a professor at Columbia University.  The harm to Professor Duncan is concrete and current, negatively affecting Professor Duncan's reputation, integrity and character in irreparable ways.

57.     As a result of the willful and malicious nature of the defamation, Plaintiff is also entitled to damages, including exemplary and/or punitive damages from Defendant in an amount to be determined at trial but reasonably believed to be not less than $1,000,000.  Those damages include but are not limited to:  loss and/or disruption of professional opportunities; a criminal arrest, requiring Professor Duncan to defend himself on an ongoing basis in a criminal proceeding; an emergency medical leave that Professor Duncan was forced to take to treat the extreme emotional distress and attendant physical effects he has suffered, including significant and unintentional weight loss, for which he has incurred significant medical expenses and the significant legal fees Professor Duncan has incurred and will continue to incur.

## SECOND CAUSE OF ACTION

### [Intentional Infliction of Emotional Distress
### Against Defendant]

58.    Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraph 1 through 57, with the same force and effect as if set forth in detail herein again.

59.    Defendant's conduct as alleged above was extreme, outrageous and exceeds all reasonable bounds of decency tolerated by the average member of the community.  The false, serious accusations publicized via on social media and deliberately directed at and targeted to Professor Duncan's employer, Columbia University, as well as Professor Duncan's professional colleagues evaluating Professor Duncan's manuscripts (Exhibit 8) and Professor Duncan's colleagues on the board of the IAPHS Conference board, were unjustified, outrageous and extreme.

60.    As a result of the distress inflicted on Professor Duncan, Professor Duncan was forced to take an emergency medical leave lasting approximately one month, also forcing Professor Duncan to incur significant medical expenses and forcing Professor Duncan to forfeit valuable opportunities to obtain millions of dollars in research grants.

61.    The extreme and outrageous conduct alleged above was undertaken with, at a minimum, reckless disregard for the truth and/or intentionally, and was undertaken with either a desire or intent to cause at least mental distress, or, under circumstances known to them, with reasonable certainty that the conduct would cause such mental distress to Plaintiff.

62.    As a direct and proximate result of Defendant's conduct, Plaintiff has indeed suffered intentional infliction of emotional distress, anguish, depression, humiliation, legal expenses, medical expenses and irreparable damage to his reputation and standing within the

academic research and LGBTQ community, and that emotional distress has also caused Plaintiff serious physical effects.

63.     Plaintiff is also entitled to damages, including exemplary and/or punitive damages from Defendant in an amount to be determined at trial but reasonably believed to be no less than $1,000,000.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant awarding Plaintiff:

1. Preliminary and permanent injunctive relief enjoining and restraining Defendant and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendant, from disparaging or otherwise publishing or posting defamatory statements about Plaintiff;

2. Actual damages in an amount to be determined at trial;

3. Exemplary or punitive damages in an amount reasonably tailored to punish Defendant and to make an example of Defendant;

4. An Order at the conclusion of the present matter directing Defendant to undertake such remedial efforts as the Court deems reasonably necessary to restore Plaintiff's reputation, including, but not limited to a public apology and/or retraction;

5. Attorneys' fees and costs as permitted by law; and

6. Such other and further relief as the Court deems just and equitable under the circumstances.

Respectfully submitted,

Dated:  November 3, 2023

WOLF, BALDWIN & ASSOCIATES, P.C.

By:

_____
Alexis I. Roth, Esq.
800 E. High St.
Pottstown, PA 19464
Phone: 610-323-7436
Direct : 610-365-1548
Fax: 610-970-1595
aroth@wolfbaldwin.com

Dated:  Brooklyn, New York
October 25, 2022

**LEWIS & LIN LLC**

*/s/ David D. Lin*
DAVID D. LIN
77 Sands Street, 6th Floor
Brooklyn, NY 11201
David@iLawco.com
Tel: (718) 243-9323
Fax: (718) 243-9326
*Attorneys for Plaintiff*
*(Pro Hac Vice to be submitted)*

## VERIFICATION

I, Dustin T. Duncan, ScD, under penalty of perjury under the laws of the United States, declare:

I am the Plaintiff in this action. I have read, am familiar with and have personal knowledge of the contents of the Complaint filed in this matter, and the allegations in the Complaint are true and correct or, to the extent that certain matters were not within my personal knowledge, the facts stated have been assembled by authorized personnel, including counsel, and I am informed that the facts stated in the Complaint are true and correct.
Executed on this ___ day of October 2023.

Dustin T. Duncan, ScD

State of New York    County of BRONX
Subscribed and sworn to (or affirmed) before me on this 23ᴿᴰ day
of OCTOBER, 20 23 by DUSTIN DUNCAN.

Notary Public Signature

TERENCE BAKSMATY
Notary Public - State of New York
No. 01BA6362142
Qualified in Bronx County
My Comm. Expires July 24, 2025

# Exhibit 1

From: **Lett, Elle** Elle.Lett@pennmedicine.upenn.edu 📎
Subject: Re: [EXTERNAL] Name Change Request
Date: November 5, 2021 at 17:01
To: Duncan, Dustin T. dd3018@cumc.columbia.edu

EL

Hello Dr. Duncan,

I just wanted to follow-up and thank you for your advocacy. I also look into you a bit and thought it might be nice to connect as scholars who both think about intersectionality and transgender health. For background, I completed my master's degree in biostatistics at duke and just finished my phd in epidemiology at the University of Pennsylvania (got a concurrent masters in statistics from Wharton) as part of an MD PhD program. I'm taking a year away from the MD training to do a post doc just to wrap up some projects and also pivot a bit. Broadly, my work falls into three buckets, 1) transgender health equity from an intersectional framework, 2) structural racism, policing, and mass incarceration and 3) fairness in prediction modeling (my postdocs focus). I've attached my CV and some exemplary papers of my work. If there is an opportunity to collaborate, I'd love to think through that with you. I'm particularly interested in thinking about using Bayesian models for estimation of prevalence of HIV in transgender populations globally, but I'm also looking to apply spatial methods to health equity questions in either of the first two buckets. Regardless, even if there is no bandwidth to connect for research purposes, I'm thankful for your support with IJERPH.


Kindest Regards,

Elle Lett, MBiostat MA PhD [pronouns: they/she]
Postdoctoral Fellow, Palliative and Advanced Illness Research (PAIR) Center l University of Pennsylvania
MD Candidate l Perelman School of Medicine, University of Pennsylvania
Senior Fellow, Center for Applied Transgender Studies
Email: ellel@upenn.edu
Phone: (330) 503-7038
Twitter: @madblqscientist
Google Scholar


**From:** Duncan, Dustin T. <dd3018@cumc.columbia.edu>
**Date:** Friday, November 5, 2021 at 12:07 AM
**To:** Lett, Elle <Elle.Lett@pennmedicine.upenn.edu>
**Subject:** [External] Re: [EXTERNAL] Name Change Request

Great, thank you.

Onwards,
Dustin

On Nov 5, 2021, at 12:01 AM, Lett, Elle

On Nov 5, 2021, at 12:01 AM, Lett, Elle
<Elle.Lett@pennmedicine.upenn.edu> wrote:

Hello Dr. Duncan,

Thank you for your support. It is greatly appreciated. I will certainly get back to you if I don't receive a reply.

Elle

Kindest Regards,

Elle Lett, MBiostat MA PhD [pronouns: they/she]
Postdoctoral Fellow, Palliative and Advanced Illness Research (PAIR) Center
l University of Pennsylvania
MD Candidate l Perelman School of Medicine, University of Pennsylvania
Senior Fellow, Center for Applied Transgender Studies
Email: ellel@upenn.edu
Phone: (330) 503-7038
Twitter: @madblqscientist
Google Scholar
*sent from my mobile device-Please excuse typos

**From:** Duncan, Dustin T. <dd3018@cumc.columbia.edu>
**Sent:** Thursday, November 4, 2021 11:46:13 PM
**To:** Lett, Elle <Elle.Lett@pennmedicine.upenn.edu>
**Subject:** [External] Re: [EXTERNAL] Name Change Request

Hi Elle,

If you do not receive a response in a day or so, can you please email me again?

In solidarity,
Dustin

On Nov 4, 2021, at 11:41 PM, Duncan, Dustin T.
<dd3018@cumc.columbia.edu> wrote:

Hi Elle, I sincerely appreciate you bringing this name change issue to my attention. I stand by you firmly. If there is anything that I can do to facilitate this process (beyond my note below), please let me know.

IJERPH Leadership, It is important that we, as a journal, take issues of diversity, equity, inclusion and belonging (DEBI) seriously. Name change requests should be honored as soon as they are be requested out of respect for our wonderful authors

but also as a sign that we take DEIB issues seriously, including belonging. This also demonstrates that we are leaders on these important issues that we care about. Do you have a sense of when the name change can happen?

Thank you,
Dustin


> On Nov 4, 2021, at 2:35 PM, Lett, Elle <Elle.Lett@pennmedicine.upenn.edu> wrote:
>
> Hello,
>
> I'm following up to this email I sent over a week ago. This matter is of importance to me so I would appreciate a response consistent with MDPI policies. I'm cc'ing a member of the editorial board who may be able to speak to the importance of this matter.
>
> Kindest Regards,
>
> Elle Lett, MBiostat MA PhD [pronouns: they/she]
> Postdoctoral Fellow, Palliative and Advanced Illness Research (PAIR) Center I University of Pennsylvania
> MD Candidate I Perelman School of Medicine, University of Pennsylvania
> Senior Fellow, Center for Applied Transgender Studies
> Email: ellel@upenn.edu
> Phone: (330) 503-7038
> Twitter: @madblqscientist
> Google Scholar

---

**From:** Lett, Elle <Elle.Lett@pennmedicine.upenn.edu>
**Date:** Monday, October 25, 2021 at 11:27 PM
**To:** ijerph@mdpi.com <ijerph@mdpi.com>
**Subject:** Name Change Request

Hello,

I hope this email finds you well. Per MDPI published policy here: https://blog.mdpi.com/2021/09/03/mdpis-author-name-change-policy/ I'm requesting a name change for my article published under my deadname, here:https://www.mdpi.com/1660-4601/14/11/1295

_____

My deadname: Lanair Amaad Lett
My affirmed (and legal) name: Elle Lett

Thank you for your time, please let me know when
this process can be completed.

Kindest Regards,

Elle Lett, MBiostat MA PhD [pronouns: they/she]
Postdoctoral Fellow, Palliative and Advanced Illness
Research (PAIR) Center I University of Pennsylvania
MD Candidate I Perelman School of Medicine,
University of Pennsylvania
Senior Fellow, Center for Applied Transgender
Studies
Email: ellel@upenn.edu
Phone: (330) 503-7038
Twitter: @madblqscientist
Google Scholar

Elle Lett_CV.pdf      2021 -           2020 -          Lett et al. - 2021      2021 -
              Consid...gy.pdf   Interse...ve.pdf   – Racia...15.pdf   Charac...ste.pdf
                                     252 KB

Exhibit 2



**David Lin <david@ilawco.com>**

---

## Fwd: Filing formal complaints

**Dustin Duncan** ██████████████ >                                    Mon, Jul 3, 2023 at 1:36 PM
To: "David D. Lin" <david@ilawco.com>

---------- Forwarded message ---------
From: **Dustin Duncan** <██████████████ >
Date: Tue, Jun 20, 2023 at 1:13 PM
Subject: Re: Filing formal complaints
To: <█████@dickblick.com>
Cc: Mom <dionnejjones███████ >

Hi Martha,

I am following up on our phone conversation last week and my email. I look forward to receiving an update and working towards a resolution.

Best wishes,
Dustin

--
Dustin Duncan
████████████████

On Jun 13, 2023, at 15:40, Dustin Duncan <██████████████ > wrote:

To Whom It May Concern:

I am writing regarding a recent experience in Blick Art. My goal is to first understand Blick Art's employee relations policies and secondly file formal complaints. By way of context, I picked up my second set of artwork from Blick Art in Harlem on Friday, June 9th around 5:20 pm. While picking up my artwork, I was told that I am unable to get any work framed at the Harlem location by the assistant manager on-site, Ricki, who also closely monitored my whereabouts while I was in the store. This did not feel comfortable at the human level but also as a paying customer who has patronized this establishment. When I sought to gain clarity and context, Ricki noted that I had harassed an employee. When I inquired, I was asked if I was connected to any employee via social media. As I was recently connected with Sawyer Quinn (a current employee) via Instagram at their request, I assumed this was who she was referring to. Not only do I have documentation of Sawyer's request, but my mother, Dr. Dionne Jones, was present during the exchange with the employee (documentation can also be provided). This allegation caught me by surprise and completely caused embarrassment, confusion, and a sense of disappointment.

For additional context, when I first dropped off my painting in March of 2023 with my mother (Dr. Jones), Sawyer Quinn was the employee who assisted me. While receiving my order during this visit Sawyer asked for my Instagram (documented evidence can be provided). The employee initiated all communication and even proactively called me. Moreover, they requested me to call them, which occurred once at their request. Despite the informal communication displayed by the employee [i.e. complimenting my physical appearance, calling me "dope", etc.], in all of my communication, I only discussed the artwork and the service being rendered. I engaged in a professional manner at all times given that this was a business transaction. As you can imagine, being publicly accused of harassment by a member of your management team when I arrived was a complete shock, especially because I am a paying customer, I violated no boundaries, and there was no attempt to seek perspective or better understand my experience. I felt targeted, falsy accused, uncomfortable, and hurt by the allegations and behavior I experienced on behalf of your staff.

Given this context and my experience with your staff, I am seeking the following:

- First, I'd like to meet with a member of the senior leadership to discuss my experience
- Secondly, please let me know the company policies regarding Blink Art staff's engagement with customers [i.e. fraternization policy, etc.].
- Thirdly, I'd like to formally document that I was never asked for my perspective or for any documentation. I was excused and banned from the location. As my documentation demonstrates, not only did the employee comment on my looks via Instagram, but they also asked me out on a date when I came to pick up a piece of my work. Not only was this inappropriate, but it was also unconstitutional and a form of harassment.
- Lastly, while I cannot say with certainty if the false allegation made by your employee is a form of retaliation against me for not returning the flirting and sexual advances made by your employee (which have all been documented), at the minimum, the allegation and experience I had with several of your employees fall under defamation, which is punishable by law.


Given the information captured in this correspondence coupled with my professional and Harlem-based community roles, I am deeply concerned and would like to file formal complaints against two of your employees referred above. I would appreciate immediate attention to this matter, as you can imagine this is a grave situation. Thank you in advance for your attention to this matter; I look forward to hearing from a representative soon.


Best wishes,
Dustin


--
Dustin Duncan
███████████████


--

Dustin Duncan
█████████████

Exhibit 3

Page 1
Sawyer Quinn on Instagram: "I need help!! This man has been stalking & harassing me for nearly three weeks now. He was a customer that came into my job to get some of..."
https://www.instagram.com/p/Ct2vRRItXnI/
Captured: 04 July 2023, 15:15:12



## Instagram

- Home
- Search
- Explore
- Reels
- Messages
- Notifications
- Create
- Profile

extraterrestrialmind • Follow
...

extraterrestrialmind I need help!!
This man has been stalking & harassing me for nearly three weeks now. He was a customer that came into my job to get some of his artwork framed..
since that day he would come to the store asking for me. After he picked up his artwork, they banned him from coming back to the store. Since then he has been messaging me nonstop! I have already blocked him off four accounts. I tried getting an order of protection, but they denied it. Because he hasn't done any physical harm to me.

Here are just a few messages he has sent me.
- this man needs to be stopped!!
#columbiauniversity

248 likes
JUNE 23

Add a comment...    Post

More posts from extraterrestrialmind



Meta  About  Blog  Jobs  Help  API  Privacy  Terms  Top Accounts  Locations  Instagram Lite  Contact Uploading & Non-Users  Meta Verified

English ∨    © 2023 Instagram from Meta

Exhibit 4

Page 1
(1) Transsexual Negress, PhD AM on Twitter: "wheelhouse of a academic privilege, please donate to this gofundme by Sawyer. https://t.co/W7feQXS1xZ" / Twitter
https://twitter.com/ElleLettMDPhD/status/1674798065281274056



Exhibit 4A

Page 1
Fundraiser by Sawyer Allen : Columbia University professor harassment
https://www.gofundme.com/f/columbia-university-professor-harassment?utm_campaign=p_nacp+share-sheet&utm_medium=copy_link&utm_source=customer
Captured: 04 July 2023, 15:38:43



ᯤ Search    How it works ⌄    Start a GoFundMe          gofundme                    Sign in    Share    Donate

# Columbia University professor harassment





$2,135 raised of $2,500 goal

33 donations

**Share**

**Donate now**

🔒 This fundraiser is located near you

Anonymous
$100 • 1 d

Anonymous
$10 • 1 d

Dielle Lundberg
$50 • 2 d

Anonymous
$10 • 3 d

Anonymous
$20 • 3 d

See all      ☆ See top donations

👤 Sawyer Allen is organizing this fundraiser.

Created 5 days ago • 🏷 Community

My name is Sawyer Allen, I am a 29-year-old trans man working in a frame shop/ design center. There I was approached by Dustin T. Duncan. He came with his mother looking to get his artwork framed. I performed my duties respectfully and with exemplary customer service. I thought nothing of it at the time, but unbeknownst to me this would be the start of what I could only call a nightmare. The next day he found me on Instagram (which I did not provide him with as I do not use my work to forge relationships.) He started to message me about his order, which is not the method or place to do so. My Instagram is not a part of customer services, he'd also ask about the times and dates that I'd be working at that location in a way that hinted that he was aware of me working at multiple locations. He'd visit regularly and ask for me in particular when I was not there. This made me uncomfortable, but I still had no idea how far he would go. During our last interaction in the store, he was banned from the store and stated he would "see me later." Once that happened, he started to message me on my Instagram non-stop. I blocked his account and at least three other alt accounts however, this only egged him on more to continue to message and harass me. He made it clear he was watching my every move. While I blocked his main account before I thought to screenshot, below I will provide messages from his alternative accounts showing him harassing and threatening me. At this point, I am unable to leave my house as I fear whatever he has planned for me. I have missed many days of work because of this and my mental health has taken a dive. When I sought legal help he mocked me for doing so and claimed that there was no way I could protect myself from him and that I'd eventually regret my attempts to avoid and ignore him. I have messages of other victims claiming that this is his M.O. and I hope that you will take steps to help stop this from continuing.Due to feeling unsafe to leave my house, it has taken a huge toll on me finically! & I was already in a horrible finical bind. I am begging for any form of help. Please, I just want to live my life in peace

## Updates (4)

**July 2, 2023** by Sawyer Allen, Organizer

Sigh



See older updates

Exhibit 5



David Lin <david@ilawco.com>

---

## Fwd: [EXTERNAL] Sawyer

**Du tin Duncan** ███████████████                                    Mon, Jul 3, 2023 at 1 35 PM
To: "David D. Lin" <david@ilawco.com>

> Forwarded me age
> From: **Lett, Elle** <Elle.Lett@pennmedicine.upenn.edu>
> Date: Fri, Jun 30, 2023 at 11:21 AM
> Subject: [EXTERNAL] Sawyer
> To  Duncan, Du tin T    dd3018@cumc columbia edu

Hello Du tin,

In the period of transparency , I am publicly supporting Sawyers gofundme based on the harms you have done to him. I am in community with people only a few degrees removed from him since o I am not doing so without comfortably verifying the ituation  I don't e pect you to re pond or reach out, but  hould you wi h to, in hone ty and tran parency, I am here. Be well, and be accountable .

Kindest Regards,

Elle Lett, PhD, MA, MBiostat [pronouns: Dr./she/her]

Postdoctoral Fellow | Boston Children's Hospital Computational Health Informatics Program (CHIP)

MD Candidate | Perelman School of Medicine at the University of Pennsylvania

Email: elle.lett@pennmedicine.upenn.edu

Phone: (330) 503-7038

Twitter: @ellelettmdphd

Website: ellelett.com

Google Scholar

*sent from my mobile device-Please excuse typos

--

Dustin Duncan

███████████████

Exhibit 6

Page 1
(1) Transsexual Negress, PhD AM on Twitter: "I'd really like to see this goal reached today. I gave 100. Can you match?" / Twitter
https://twitter.com/ElleLettMDPhD/status/1674819502406615040



Exhibit 7

**COLUMBIA UNIVERSITY**
IN THE CITY OF NEW YORK

OFFICE OF EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION

July 7, 2023

Professor Dustin Duncan
Sent electronically to dd3018@cumc.columbia.edu

Dear Professor Dustin Duncan,

The purpose of this letter is to notify you that the Office of Equal Opportunity and Affirmative Action ("EOAA") is initiating a formal investigation into allegations made against you. Sawyer Allen ("Complainant"), who identifies as transgender, alleges that you engaged in conduct amounting to sexual harassment, stalking, and discriminatory harassment on the basis of gender identity in violation of the *EOAA Policies and Procedures* (the "Policy," which is attached). Specifically, Complainant alleges that you engaged in conduct, including but not limited to:

- viewing and/or commenting on his Instagram stories and continuously sending him messages of a harassing, intimidating, and threatening nature via Instagram since on or about April 18, 2023 to the present, despite telling you to stop. The messages included, but are not limited to the following: "After that day. [sic] I couldn't stop thinking about you[.] Your smile[,] [y]our energy, [e]verything[.] And you are so damn handsome;" "I hope now you're really scared because once I find you. [sic] Trust me, you would have wanted to pick just talking to me;" "I know exactly where you live as well;" "I have eyes on you everywhere;" and "You are literally just another trans person crying out for help;"
- while discussing artwork at his place of employment in or around April 2023, you pointed out the genital area in the images without any legitimate purpose;
- intentionally made physical contact with his hand and shoulder at his place of employment in or around April 2023;
- coming into and calling his place of employment, specifically asking to speak with him, and when you were banned from his place of employment on or about June 9, 2023, you passed by his place of employment during his lunch break and continuously contacted him via Instagram thereafter;
- following him on the subway on more than one occasion, including on the L train to Brooklyn while possessing a knife on or about June 15, 2023;
- lurking, walking by, and/or standing on the driveway of his home on or about June 24, 2023, June 25, 2023, and June 27, 2023; and
- sending him flowers to two distinct places of employment on or about June 28, 2023 or June 29, 2023 and asking him on Instagram whether he liked the flowers.

Please be advised that EOAA is implementing a **no-contact directive** in this matter. Accordingly, you are prohibited from engaging in any contact with Complainant including, but not limited to, personal contacts, written communications, text messaging, social media and other electronic communications, or communications through a third-party. Failure to abide by the no-contact directive can result in possible discipline.

Please be advised that EOAA's investigation into the allegations made against you is not an indication that you engaged in a violation of the Policy. A determination will be made at the conclusion of a thorough and impartial investigation. In order to gather facts to make that determination, I, along with Director of Investigations Jazmin Taylor, would like to meet with you to discuss the issues involved and provide you the opportunity to respond to the allegations. Please let me know if you are available to meet with us in person on July 18, 2023 at 10:00 a.m. If this time does not work for your schedule, please suggest other dates and possible times.

Should you choose, you may be accompanied by a single advisor of your choice during any meeting with EOAA. The advisor may be an attorney-advisor, or other advisor, and may provide support and advice. However, the advisor may not present on your behalf or behave in a disruptive manner. If you are a member of a union with whom Columbia University maintains a collective bargaining agreement, you may choose to have a single union representative serve as your advisor.

It is the goal of EOAA to complete its investigation within 120 days from this date of the formal investigation notice. You will receive a status update at 60 days and every 30 days thereafter. In order for EOAA to meet its goal, it is imperative that you promptly respond to all correspondence, provide detailed, complete information and any updated information as soon as you become aware, and alert EOAA to any circumstances that may prolong the process. EOAA may extend the timeframe of its investigation at the request of the parties or the investigator(s) for good cause. If a delay or extension occurs, EOAA will notify the parties in writing of the cause of such delay or extension.

Prior to our meeting, you are encouraged to review the Policy. The Policy prohibits retaliation. Retaliation is any adverse action or threatened action, taken or made, personally or through a third party, against an individual (or group of individuals) because of his, her, or their participation in any manner in an investigation or proceeding under the Policy, including individuals who file a third-person report and those who are interviewed or otherwise provide evidence in the investigation (witnesses). Retaliation is treated very seriously by the University and can result in an additional charge.

I have provided Dean Linda P. Fried and Dr. Anne L. Taylor with notice of this investigation. You should feel free to discuss this matter with your supervisor and/or human resources/faculty affairs.

Finally, if you require accommodations or an interpreter during your meeting with EOAA, please

let me know so that I may make arrangements.

Attached is a list of available resources and a Bill of Rights for your review. Please contact me if you have any questions, or concerns.

Sincerely,


Luisanne Liz
Associate Director, EOAA

CC: Dean Linda P. Fried
     Dr. Anne L. Taylor

Exhibit 8

**From:** **Lett, Elle** Elle.Lett@pennmedicine.upenn.edu
**Subject:** Re: [External] Query regarding: HEQ-2023-0161 and HEQ-2023-0070
**Date:** July 17, 2023 at 20:03
**To:** mclemor@uw.edu, dd3018@cumc.columbia.edu, gm2815@cumc.columbia.edu
**Cc:** heq_eo@liebertpub.com

As an associate editor for the journal I can respond specifically and exclusively about the merit of the manuscript on authorship.

To be brief as I am on clinical rotations;

It does not meet even the most basic standards for publication in the journal. The model offered is not actually consistent with any meaningful definition of health equity and is instead the same capitalist production economy of academia with the word "equity" thrust in front of each of the arms ( funding, papers etc) without any meaningful engagement with what "equity" really is. The positionality statement is underdeveloped and is just a list of identities without any discussion of reflexivity and how they relate to the content. And I struggle to see how the model really adds anything to the literature. In the spirit of transparency, I comfortably recommend desk rejection and am embarrassed that it cites my paper. This would be true without the unsavory but allegations that have been shared with me as well as communiques from Dustin's lawyers.

In sum, the paper is underdeveloped, not theoretically sound, and not one that I would be willing to expend finite reviewer resources on.

Kindest Regards,

Elle Lett, PhD, AM, MBiostat [pronouns: Dr./she/her]

MD Candidate | Perelman School of Medicine at the University of Pennsylvania

Clinical Assistant Professor, Health Systems and Population Health | University of Washington School of Public Health

Scholar-in-Residence | University of Washington School of Public Health

Email: elle.lett@pennmedicine.upenn.edu

Phone: (330) 503-7038

Twitter: @ellelettmdphd

Google Scholar

*sent from my mobile device-Please excuse typos

---

**From:** Health Equity <onbehalfof@manuscriptcentral.com>
**Sent:** Monday, July 17, 2023 10:40:57 PM
**To:** dd3018@cumc.columbia.edu <dd3018@cumc.columbia.edu>;
gm2815@cumc.columbia.edu <gm2815@cumc.columbia.edu>
**Cc:** heq_eo@liebertpub.com <heq_eo@liebertpub.com>
**Subject:** [External] Query regarding: HEQ-2023-0161 and HEQ-2023-0070

17-Jul-2023

HEQ-2023-0161 - Composing Authorship Teams for Health Equity: An Introduction to the Health Equity Research Production Model

Dear Dr. Duncan: I have a 30 minute appointment scheduled with your Vice Dean of Research Strategy and Innovation at the Columbia Mailman School of Public Health who wrote me the following: *"I handle research integrity issues for the School. I have also served as Editor for two academic journals. Dr. Duncan indicated that the journal was taking action based upon unsubstantiated allegations and I would like to discuss this with you."* I have invited Dr. Lett to attend this meeting, since like you, I value transparency and our work together is cited first in HEQ-2023-0161.

My read of both of your manuscripts are attached and my desire to speak with you was related to the fact that two

My read of both of your manuscripts are attached and my desire to speak with you was related to the fact that two associate editors did not want to handle these manuscripts. I wanted to determine if you wanted me to proceed with finding one who did want to manage this and also inform you that there is significant delays at Health Equity because of the volume of manuscripts we receive with 2 current special editions that will be coming out soon.

Also, I've been pretty public about my frustration with finding reviewers and I have been desk rejecting manuscripts once I ask between 12 and 15 people to review. I can appreciate your situation with "unsubstantiated claims" about you, which I'm happy to discuss but also know I read every paper that comes to Health Equity and feel free to read my annotated PDFs attached, which have nothing to do with any claims against you.

I do hope you can find time to join us, so you can recognize that I am both a careful editor and one who does not take my responsibility to the published record lightly. And as a reproductive health, rights, and justice researcher and the daughter of a retired judge/constitutional attorney, I spend a great deal of time with lawyers and have deep appreciation for nuance.

If there remains any question about any of this, perhaps you should speak to your collaborator/co-author Dr. Adam Carrico about me, as our time at UCSF overlapped and he has some sense of how seriously I take my work.

Sincerely,
Dr. Monica McLemore

Exhibit 9

## COLUMBIA UNIVERSITY
### IN THE CITY OF NEW YORK

OFFICE OF EQUAL OPPORTUNITY AND AFFIRMATIVE ACTION

September 22, 2023

Professor Dustin Duncan
Sent electronically to dd3018@cumc.columbia.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2022554003

Dear Professor Dustin Duncan,

The Office of Equal Opportunity and Affirmative Action ("EOAA") received a report wherein Complainant alleged that you subjected him to sexual harassment, stalking, and discriminatory harassment on the basis of gender identity in violation of the *EOAA Policies and Procedures* (the "Policy," which is attached). Specifically, Complainant alleged that you engaged in conduct, such as continuously sending Complainant messages of a harassing, intimidating, and threatening nature via Instagram, intentionally making unwanted physical contact with Complainant at his place of employment, following Complainant on the train while possessing a knife, and lurking, walking by, and/or standing on the driveway of Complainant's residence.

The Policy defines sexual harassment as "a form of sex discrimination. Unwelcome sexual advances, requests for sexual favors, requests for sexual contact, sexual comments, physical or visual conduct of a sexual nature, and sharing or displaying sexual images constitute sexual harassment." The Policy also defines stalking as "unwanted attention that is repeated or obsessive, directed toward an individual or a group and that is reasonably likely to cause alarm, fear or substantial emotional distress[,] . . . including lying in wait for, monitoring, or pursuing contact . . . [and] may occur in person or through communications such as telephone calls, text messages, unwanted gifts, letters, e-mails, surveillance, or other types of observation." Further, the Policy defines discriminatory harassment as "[s]ubjecting an individual to unwelcome conduct, whether verbal or physical, that creates an intimidating, hostile, or abusive working, learning or campus living environment; that alters the conditions of employment or education; or unreasonably interferes with an individual's work or academic performance on the basis of the individual's membership in a protected class. . . ."

EOAA conducted an investigation into the allegations made against you. EOAA **did not** find, by a preponderance of the evidence standard, that you engaged in conduct amounting to sexual harassment, stalking, and discriminatory harassment in violation of the Policy. Based on the investigation, EOAA did not find Complainant's allegations to be supported by the evidence.

There was insufficient evidence to corroborate that the harassing, intimidating, and threatening Instagram messages Complainant received were sent by you. In addition, the evidence gathered demonstrated that you were not in New York during particular alleged incidents, and there was no other evidence to support Complainant's claims.

If you would like to review the full investigative report regarding this matter, please contact EOAA Director of Investigations Jazmin Taylor at jt2903@columbia.edu.

The Policy provides you with specific appeal rights. If you so choose, you must exercise these rights within 10 business days of receiving this notice by following the process and complying with the requirements for appeals as outlined in the Policy. The appeal must be submitted in writing to the attention of Laura Kirschstein, Vice Provost of EOAA, via the EOAA website appeal submission form. The deadline for submitting an appeal is October 6, 2023.

This concludes EOAA's investigation of this matter. You are advised that you are prohibited from engaging in retaliation, on your own or through a third party, against anyone involved in the investigation, including Complainant.

Sincerely,

Luisanne Liz
Associate Director, EOAA

CC: Dean Linda P. Fried
     Dr. Anne L. Taylor

Exhibit 10

21:42

📶 5G 24

 **Elle Lett, PhD AM** @ElleLettMDPhD · 3h    · · ·
There seems to be some confusion about where I stand on a recent incident involving a professor and a community member. To be unambiguous I donated to their fundraiser because I support them as a victim of harm . I deleted some tweets to reduce my exposure for a lawsuit but my

💬 2        ⟲        ♡ 10         2,812        ↑

 **Elle Lett, PhD AM** @ElleLettMDPhD · 3h    · · ·
support hadn't waned. I also note that their are questions about the voracity of claims. I'll share that being a perfect historian about dates of traumatic events is hard when in distress and  that huge power imbalances facilitate doubt in victims . I'm 31 years old , I've seen

💬 1        ⟲        ♡ 6         931        ↑

 **Justin Bullock** @jbullockruns · 1h    · · ·
Was going for a walk by myself in my neighborhood #CentralDistrict in #Seattle, an older black woman across the street says to me "You walk around like you have pockets full of money."

I'm calling that a prophesy 👨🏾‍🦱

💬 1        ⟲        ♡ 25         971        ↑

 **Jon Cooper** ✓ @joncoopertweets · 5h    · · ·
This is the church of _____

 **Christian Nightmares** @Christn...
This is what indoctrination looks like

🏠        🔍        👥        🔔        ✉️

21:43    5G 24

← **Tweet**    ...



**Elle Lett, PhD AM**
@ElleLettMDPhD

support hadn't waned. I also note that their are questions about the voracity of claims. I'll share that being a perfect historian about dates of traumatic events is hard when in distress and  that huge power imbalances facilitate doubt in victims . I'm 31 years old , I've seen

18:13 · 7/18/23 from Earth · **933** Views

**6** Likes  **1** Bookmark

            



**Elle Lett, PhD AM** @ElleLettMDPhD · 3h    ...
And  experienced my own harassment and trauma . I don't jump to conclusions nor change my convictions easily. We all have the capacity to be wrong but I haven't been convinced of that just yet.

     5     754

  Tweet your reply

