**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

Dustin T. Duncan, ScD,

                  Plaintiff,

      -against-

Elle Lett, PhD,

              Defendant.

Civil Action No.: 23-cv-04284 (KBH)

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

*PRELIMINARY STATEMENT* ................................................................................... *1*

*STATEMENT OF FACTS AND PROCEDURAL HISTORY* ....................................... *4*

*ARGUMENT* ........................................................................................................... *12*

    **I.**   **There is No Factual Dispute as To Certain Elements of Plaintiff's Defamation Claim 13**

    **II.**   **Defendant's Statements Convey a Defamatory Meaning as a Matter of Law .......... 14**

    **III.**   **No Privilege Shields Defendant from Liability ......................................................... 17**

*CONCLUSION* ....................................................................................................... *23*

## Table of Authorities

**Cases**

*Albert v. Loksen*, 239 F.3d 256 (2d Cir. 2001) ....................................................... 13, 17

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015)....................................................... 23

*Boehner v. Heise*, 734 F. Supp. 2d 389 (S.D.N.Y. 2010) ........................................... 19

*Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163 (2d Cir. 2000)............................... 13, 15, 16, 20

*Conti v. Doe*, 535 F. Supp. 3d 257 (S.D.N.Y. 2021) ................................................. 18, 19

Fanelle v. Lojack Corp., No. CIV.A. 99-4292, 2000 WL 1801270 (E.D. Pa. Dec. 7, 2000) ....... 12

*Garson v. Hendlin*, 141 A.D.2d 55, 532 N.Y.S.2d 776 (2d Dep't 1988)..................................... 19

*Giuffre v. Maxwell*, 165 F. Supp. 3d 147 (S.D.N.Y. 2016) ......................................... 20

*Golub v. Enquirer/Star Grp., Inc.*, 89 N.Y.2d 1074, 681 N.E.2d 1282 (1997) ........................... 16

*Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989) ........................ 21, 22

*Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149 (S.D.N.Y. 2021)................................... 13

*Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92 (2d Cir. 2000)............................... 19

*Konikoff v. Prudential Ins. Co. of Am.*, No. 94CIV.6863(MBM)(MHD), 1999 WL 688460

　(S.D.N.Y. Sept. 1, 1999), aff'd, 234 F.3d 92 (2d Cir. 2000)............................................. 18, 20

*Lavazza Premium Coffees Corp. v. Prime Line Distributors Inc.*, 575 F. Supp. 3d 445 (S.D.N.Y.

　2021) ............................................................................................................... 16

*Meloff v. New York Life Ins. Co.*, 240 F.3d 138 (2d Cir. 2001)................................... 15

*Moraes v. White*, 571 F. Supp. 3d 77 (S.D.N.Y. 2021) ............................................. 19

*Ryan v. Super Fresh Food Mkts., Inc*., No. Civ. A. 99-CV-1047, 2000 WL 537402 (E.D. Pa. Apr.

　26, 2000) ........................................................................................................... 12

*St. Amant v. Thompson*, 390 U.S. 727 (1968)........................................................ 3, 23

**Statutes**

Federal Rule of Civil Procedure 56(a) ......................................................................... 12

Plaintiff Dustin T. Duncan, ScD ("Plaintiff" or "Professor Duncan"), by and through his undersigned counsel, respectfully submits this memorandum of law in support of his motion for summary judgment (the "Motion"). Professor Duncan also respectfully submits a sworn declaration (the "Duncan Dec."), a statement of facts (the "SOF") and the declaration of David D. Lin (the "Lin Dec.").

## PRELIMINARY STATEMENT

This is a defamation case involving statements Defendant Elle Lett ("Defendant") made about Professor Duncan that falsely accused him of serious criminal conduct and harmed his professional reputation. Defendant's defamation was aimed at amplifying the false accusations of an individual in New York using the name Sawyer Allen ("Sawyer")—a person that Defendant has never met in person and had no knowledge of before the events giving rise to this case. Sawyer falsely accused Professor Duncan of serious crimes, including assault, stalking and harassment.

Defendant's defamation was a two-pronged attack on Professor Duncan—one prong using social media and one prong targeted to specific academics. What should have remained a private dispute in New York between Professor Duncan on the one hand and Sawyer and his employer on the other escalated because of Defendant's actions, including her deliberate targeting of her own defamatory statements about Professor Duncan and Sawyer to a specific audience of academic colleagues and acquaintances of Professor Duncan's who had the ability to affect Professor Duncan's professional life adversely.

Defendant began defaming Professor Duncan almost immediately upon learning of Sawyer's accusations against Professor Duncan, and Defendant made multiple statements about Professor Duncan in June to July 2023. On July 12, 2023, Professor Duncan filed his initial complaint in New York Supreme Court (the "NYS Complaint") against Sawyer and his employer,

the Blick Art Materials store in Harlem ("Blick").  Professor Duncan verified the facts in the NYS Complaint.  This was Professor Duncan's first public step in his efforts to restore his reputation.

After filing the NYS Complaint, Professor Duncan then had to turn to Defendant's defamation of him from this District. On that front, Professor Duncan's first step—before suing Defendant—was to have his counsel provide the NYS Complaint to Defendant so that Defendant would have factual information sworn to by Professor Duncan that disproved Sawyer's false claims. The hope was that, with the verified facts in the NYS Complaint, Defendant would stop defaming Professor Duncan.

Defendant did not stop. Although Defendant did in fact receive the NYS Complaint on July 14, 2023, and reviewed it with enough care to—at a minimum—appreciate that, on certain dates that Sawyer falsely accused Professor Duncan of following and stalking Sawyer in New York City, Professor Duncan was actually traveling miles away from New York State, Defendant was impervious to those facts.  Defendant chose to dismiss those facts and continue defaming Professor Duncan.

This is Professor Duncan's second motion for summary judgment, and he respectfully requests that the Court grant summary judgment finding Defendant's conduct to be defamatory per se. The Court has already held that no state's anti-SLAPP laws apply and that New York substantive defamation law applies, (Dkt. # 83) and thus for the reasons expanded upon below, summary judgment is appropriate here.

*First*, the filings in Defendant's three previous attempts to move for summary judgment make clear that she does not dispute certain elements of Professor Duncan's defamation claim. *Second*, the elements of a defamation claim that Defendant does dispute can be resolved in Professor Duncan's favor as a matter of law.  For example, Defendant's statements do not reflect—

2

as Defendant attempts to argue—non-actionable opinions. Moreover, there is an undisputed factual record supporting a determination that, pursuant to the Court's ruling of what standard applies, Defendant is liable for defamation. Furthermore, any attempt to shield the Defendant's statements behind a claim of privilege is without merit. *Third*, there is no dispute that the accusations initially made by Sawyer against Professor Duncan—which Defendant republished, amplified and/or intentionally directed at professional colleagues of Professor Duncan who were in positions to harm him professionally—are in fact false.

The gravamen of Defendant's defense in this case has been the insistence that Defendant made public statements about Professor Duncan with a belief that Defendant was courageously standing up for Sawyer against Professor Duncan. (Def. 3rd SJ Dkt. # 67 at 3 ("When confronted with these alarming accusations, [Defendant], for the sake of professional and financial gain, could have done the much easier thing: remain silent. Instead, [Defendant] mustered the courage to stand against a well-known colleague by publicly supporting [Sawyer] who [Defendant] believed was harmed.").) Defendant's rhetoric is wholly insufficient to avoid liability.

No defendant in a defamation case can "insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. . . . [R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). The undisputed factual record demonstrates: (1) Defendant acknowledged having a long-standing ill will toward Professor Duncan; (2) within a few hours of learning about Sawyer's accusations about Professor Duncan, Defendant leapt on them *uncritically*, republishing and amplifying them to, *inter alia*, professional colleagues of Professor Duncan and purposefully avoiding an opportunity to verify any of Sawyer's accusations

3

with Sawyer directly; (3) when Defendant was presented with verified facts in the NYS Complaint in July 2023, Defendant understood that they disputed key aspects of Sawyer's story but made the choice to disregard those facts; (4) only when Defendant was sued in this case—and confronted with the possibility of facing real consequences—did Defendant acknowledge that Sawyer had indeed fabricated claims against Professor Duncan. This factual background is dispositive here. Professor Duncan respectfully submits that this Court can and should determine as a matter of law that the Defendant's statements are defamatory *per se*.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Prior to filing this case, Professor Duncan was the victim of false accusations made against him by Sawyer, and those accusations are detailed in the NYS Complaint, which attached the statements Sawyer made about Professor Duncan. (SOF ¶ 1; Lin Dec. Ex. 1.) The initial NYS Complaint was filed on July 12, 2023, and verified by Professor Duncan. (Lin Dec. Ex. 1; Duncan Dec. ¶ 13.)

The NYS Complaint lays out that, following a brief, in-person encounter with Sawyer at Blick, Sawyer began defaming Professor Duncan, falsely accusing him on social media of stalking, harassment and assault. (SOF ¶ 2.) Sawyer's social media campaign against Professor Duncan escalated when Sawyer brought his false accusations against Professor Duncan to Columbia University (the "University"), Professor Duncan's employer. (SOF ¶ 2.)

One key part of Sawyer's defamation of Professor Duncan involved Sawyer's creation of fake messages purporting to be from Professor Duncan, which Professor Duncan did not actually write or send. (SOF ¶ 3.) Another key part was the false claim that, on certain specific dates, Professor Duncan had been following and stalking Sawyer through New York City, but those claims were demonstrably false and impossible because Professor Duncan was miles away from

New York State on those dates. (SOF ¶ 4; Duncan Dec. ¶ 12.) Shortly before the NYS Complaint was filed, the University had also begun an investigation into Sawyer's accusations. (Lin Dec. Ex. 1, NYS Complaint, ¶ 29.)

On November 6, 2023, Professor Duncan filed his initial complaint in this case against Defendant, which Professor Duncan also verified. (Lin Dec. Ex. 3; Duncan Dec. ¶ 17.)  In the process of discovery in this case, Defendant produced information about additional communications Defendant had engaged in about Professor Duncan, including messages exchanged with academics with whom Professor Duncan is acquainted as well.[1]  (Duncan Dec. ¶¶ 9-10.)

Years before Professor Duncan encountered Sawyer at Blick and before this case was filed, Professor Duncan had crossed paths with Defendant on a professional basis. (SOF ¶ 7; Lin Dec. Ex. 3, ¶ 8.)  Although Professor Duncan did cross paths with Defendant and is acquainted with certain academics that Defendant is acquainted with as well, Professor Duncan and Defendant are not peers or friends and have never actually worked together. (Duncan Dec. ¶ 9.)

Defendant first heard of Sawyer and his accusations against Professor Duncan on June 29, 2023, when an individual working for Professor Duncan at the University named Brett Dolotina ("Dolotina") contacted Defendant about Sawyer's accusations by text message initially, followed by a call. (Duncan Dec. ¶ 8; SOF ¶ 10.) According to Defendant, prior to the call with Dolotina on June 29, 2023, Defendant had never heard the name Sawyer Allen and had not known him in any way before June 2023. (SOF ¶ 13.) Dolotina similarly testified that: "We've [Dolotina and Sawyer] never met in person nor formally met in any form."  (SOF ¶ 11.)  Along similar lines, Defendant

---

[1]     The following academics feature in the factual background relevant to this motion:  Dr. Avery Everhart, Dr. Tiffany Green, Dr. Monica McLemore, Dr. Arjee Restar, Dr. Goleen Samari and Dr. Carl Streed, as well as two staff members who previously worked for Professor Duncan, named Brett Dolotina and Krish Bhatt.

testified that, as of June 29, 2023, she knew who Brett Dolotina was and explained that "I only recognize[d] the name because Brett connected it to Columbia. I think . . . they said something in the text message that rang my memory of that's how I knew them. Outside of that, I don't think I would have likely recognized the name."  (SOF ¶ 10.)

Shortly after Sawyer began posting about Professor Duncan in June 2023, falsely accusing him of outrageous criminal conduct, Defendant contacted Professor Duncan by email on June 30, 2023, voicing support for Sawyer. (Duncan Dec. ¶ 8.) Professor Duncan did not respond to Defendant's June 30, 2023, email. (Duncan Dec. ¶¶ 8-9.)  In the course of discovery, Professor Duncan learned that, just a few hours after hearing about Sawyer's accusations from Dolotina, and before emailing Professor Duncan on June 30, 2023, Professor Duncan had already begun republishing and amplifying Sawyer's false accusations to Dr. Avery Everhart and Dr. Arjee Restar.  (Duncan Dec. ¶ 10; SOF ¶ 14.)  Messages between Defendant and Dr. Everhart in June 2023 produced by Defendant included an exchange in which Defendant stated:

> But really the way he [Professor Duncan] courted me . . . like he
> could really help me optimize my career
> Which always felt condescending
> He always tickled my intuition as dangerous
> But couldn't place it
> But what I can say is that it's a special
> Bitch who studies black trans people
> and then preys on them

(SOF ¶ 14.) Also before emailing Professor Duncan on June 30, 2023, Defendant began amplifying Sawyer's accusations against Professor Duncan on social media. (Lin Dec. Ex. 13, Amended Complaint ¶¶ 21-25; Duncan Dec. ¶ 10.)  On June 30, Defendant re-posted on her own Twitter account a copy of Sawyer's GoFundMe page, adding her own comments: "found out that a trusted colleague who studies trans people has done horrible things and **victimized a vulnerable trans person** and I'm really struggling on what Justice and courage looks like here. Like amplifying

6

would put me at risk but not feels dirty. **I know it to be true** ....."  (SOF ¶ 4) (emphasis added). Defendant further posted on June 30, "There are public details and evidence out there if you want to investigate but I'm more interested in supporting Sawyer so I decided not to link those."  (*Id.*)

On June 30, 2023, Defendant was also contacted by two other academics, Dr. Tiffany Green and Dr. Goleen Samari. (Lin Dec. Ex. 13, Amended Complaint, ¶¶ 32-34; Exs. 8-9.)  Dr. Green had seen Defendant's social media posts about Sawyer's accusations, as had Dr. Samari. When Dr. Samari, an editor at the Health Equity Journal, contacted Defendant, Defendant further amplified Sawyer's accusations in the professional context of the Health Equity Journal, telling the Editor that, in light of Sawyer's accusations, she could not "stomach" the publication of a manuscript on which Professor Duncan was listed as one of several authors. (Lin Dec. Ex. 13, Amended Complaint, ¶ 34.) Similarly, Dr. Green messaged Defendant about Sawyer's accusations. (Lin Dec. Ex. 13, Amended Complaint, ¶ 32; Ex. 8.)

Also on June 30, 2023, Defendant contacted Sawyer directly. (SOF ¶ 16.)  Defendant had an opportunity to verify the accusations about Professor Duncan with Sawyer directly, but she did not take that opportunity. Instead, Defendant uncritically accepted Sawyer's accusations and suggested edits or corrections to Sawyer's communications, including correcting obvious typographical errors such as the misspelling of Professor Duncan's last name. (*Id.*)

As Defendant was amplifying false accusations from Sawyer—a person she had never even heard of before June 29, 2023—Professor Duncan was working with legal counsel to vindicate himself against Sawyer's false accusations. (Duncan Dec. ¶ 9.)  Professor Duncan had hoped that, when presented with the factual allegations he had sworn to in the NYS Complaint, Defendant would stop defaming him. (Duncan Dec. ¶ 12.) Defendant did not.

It is undisputed that when Professor Duncan's counsel emailed a copy of the NYS Complaint to Defendant, she received it, because shortly after it was sent to her, she acknowledged receiving it in an email back to Professor Duncan's counsel. (Lin Dec. Ex. 2.)  Not only did Defendant receive the NYS Complaint, but she was also able to understand the importance of the information it contained. Defendant recalled a "timeline" in the NYS Complaint, which Defendant testified she "only skimmed."  (SOF ¶ 19.)  Defendant testified that: "And so *all I got* was that there was some dispute over those dates that Sawyer alleged things in, which I didn't have at the top of my head."  (*Id.* (emphasis added).) Defendant further testified that "a legal document *was not going to persuade me* that all of this other stuff was not worth considering as evidence for Dr. Duncan having committed this crime." (*Id*. (emphasis added).)

In messages exchanged with Dr. Carl Streed on July 14, 2023, Defendant exhibited a greater understanding of the NYS Complaint than she testified to at her deposition. In messages with Dr. Carl Streed dated July 14, 2023, Defendant informed Dr. Streed that Professor Duncan had filed the NYS Complaint, after which Dr. Streed commented that the NYS Complaint "Reads odd.  Doesn't seem to address the origin of the 'false' messages or motivation.  Also why a personal lawyer and not Columbia if this is about personal reputation? Filing alleges Columbia investigation determined it was all false but then no official document included in the appendices?"  In response, Defendant messaged "Yeah, I think he's relying on Sawyer not having resources A tried and true tactic".  (SOF ¶ 20.)  After Dr. Streed went on to comment that the NYS Complaint was "dragging Blick in," Defendant indicated that she understood that fact in the NYS Complaint as well, commenting "small company."  (*Id.*)

By the time Professor Duncan filed the NYS Complaint in July 2023, he was aware of some of Defendant's amplification of Sawyer's false accusations. (Duncan Dec. ¶ 13.)

Accordingly, Professor Duncan's counsel provided a courtesy copy of the complaint filed against Sawyer to Defendant. (Lin Dec. ¶ 3 & Ex. 2.) The purpose of sending the NYS Complaint to Defendant was "to make available . . . information which disputes" Sawyer's accusations so that Defendant would have "all available evidence before making any further public statements on this matter." (*Id.*) Specifically, Professor Duncan, through counsel, made available to Defendant "information which disputes certain accusations that have circulated on social media, and which is, as of now, the only evidence that has been sworn as true in a court of law." (*Id.*)

The evidence that Professor Duncan's counsel specifically put in front of Defendant on July 14, 2023, included at least the following facts sworn to by Professor Duncan: (1) the accusations Sawyer was levying about Professor Duncan following, stalking, and/or harassing Sawyer were all false; (2) Professor Duncan's interaction with Sawyer was extremely limited; (3) the threatening messages Sawyer was claiming were sent from Professor Duncan were not in fact sent from Professor Duncan at all (Lin Dec. Ex. 1, NYS Complaint ¶¶ 33-35) and (4) the University had initiated a formal investigation into the accusations. (*Id.*)

Moreover, discovery in this matter revealed that, by July 2023, Defendant actually had additional information available to her that disputed and/or at least called into question the veracity of Sawyer's accusations against Professor Duncan—over and above what Professor Duncan provided through counsel. On July 5, another staff member working for Professor Duncan, Krish Bhatt ("Bhatt") messaged Defendant about video footage Bhatt had obtained showing Professor Duncan's interaction with Sawyer at Blick. (SOF ¶ 22.) Bhatt, along with Dolotina, were the two people at the University with whom Defendant communicated in 2023 about Sawyer's accusations, but, like Dolotina, Bhatt did not know Sawyer personally either. (SOF ¶ 32.) Defendant then shared the video further with Dr. Streed and acknowledged that the video showed only that Professor

Duncan interacted with Sawyer at Blick; they did not corroborate the serious stalking and/or harassment behavior that Sawyer claimed and that Defendant amplified. (*Id.*)

With access to all of this information, when Dr. Green—who was at the time working with Professor Duncan as a co-chair of the Interdisciplinary Association for Population Health Sciences ("IAPHS") Conference—stated her intention to "express . . . displeasure" with the IAPHS's "lack of response and tell them I'm resigning if needed," Defendant published more statements as well about Plaintiff and her belief in the claims against him. In doing this, Defendant told Dr. Green, "Yeah also like all the trans people will resign if he doesn't." When asked by Dr. Green whether Defendant meant resignations "on his team," Defendant responded "No from the conference." In this exchange, Dr. Green asked Defendant "are you okay with me raising that possibility with leadership," to which Defendant responded "Yes." (SOF ¶ 23.) It is clear from these interactions, Defendant made multiple statements to third parties attempting to harm Plaintiff based on the unsubstantiated and disproven claims against him.

On July 17, 2023, Defendant sent an email commenting on a manuscript in which Professor Duncan was an author, and in that email, which was published to, *inter alia*, Dr. Goleen Samari and Dr. Monica McLemore, Defendant again referenced Sawyer's false accusations against Professor Duncan in her critique of the manuscript. (SOF ¶ 25.) Defendant's email states in part that the manuscript "does not meet even the most basic standards for publication in the journal. . . . In the spirit of transparency, I comfortably recommend desk rejection and am embarrassed that it cites my paper. This would be true without the unsavory but [sic] allegations that have been shared with me as well as communiques from Dustin's lawyers. In sum, the paper is underdeveloped, not theoretically sound, and not one that I would be willing to expend finite reviewer resources on." (*Id.*) This email refers to Sawyer's accusations against Professor Duncan. (*Id.*)

10

On July 18, 2023, Bhatt provided an update to Defendant on the progress of the University's investigation into those accusations, specifically informing Defendant that the University had advised that there was more information surrounding Sawyer's accusations than was available on social media. (SOF ¶ 26.) Nonetheless, in response to Bhatt suggesting that unnamed "others" wondered whether Defendant was still supporting Sawyer's accusations against Professor Duncan, Defendant promptly resumed posting and re-amplifying Sawyer's accusations. Defendant's July 18, 2023, post, states in relevant part:

> There seems to be some confusion about where I stand on a recent incident involving a professor and a community member. To be unambiguous I donated to their fundraiser because I support them as a victim of harm. I deleted some tweets to reduce my exposure for a lawsuit but my support hasn't waned. I also note that their [sic] are questions about the voracity [sic] of claims. I'll share that being a perfect historian about dates of traumatic events is hard when in distress and that huge power imbalances facilitate doubt in victims
> . . . .
> I don't want to jump to conclusions nor change my convictions easily. We all have the capacity to be wrong but I haven't been convinced of that just yet.

(Lin Dec. Ex. 7.)

A few weeks later, Defendant followed with an additional post, dated August 10, 2023, stating: "A couple people have asked me about IAPHS so I'm going to address it again here. There was an alleged harm committed by a senior person involved. I say alleged, not because I doubt the victim, but for legal reasons, I avoid naming that person for similar reasons." (SOF ¶ 29; Lin Dec. Ex. 7.) Defendant testified that the "senior person" referenced is Professor Duncan. (SOF ¶ 30.)

The facts surrounding the statements above demonstrate, as a matter of law, Defendant's recklessness toward the truth. *First*, Defendant's private messages reveal that she has long held a hostile view of Professor Duncan. *Second*, the speed with which Defendant jumped onto Sawyer's accusations—immediately choosing to amplify Sawyer despite never having met him or knowing

much about him—is further evidence of recklessness. *Third*, Defendant had multiple sources of information disputing aspects of Sawyer's accusations, but she chose to disregard them.

In light of the discovery produced in this case, Professor Duncan sought to amend his original complaint to reflect the additional facts that Professor Duncan had not had available to him in November 2023. (Dkt. # 37.) The Amended Complaint was filed on October 16, 2024. (Dkt. # 45.)

For the reasons set forth below, all Defendant's statements regarding Professor Duncan are defamatory *per se*. Defendant's self-serving insistence that she can be absolved of consequences for her reckless statements are wholly insufficient because the objective circumstances surrounding the statements establish intent as a matter of law. Furthermore, because Defendant directed the statements at individuals who could harm Professor Duncan professionally and accused Professor Duncan of serious crimes, Defendant's statements are defamatory *per se*.

## **ARGUMENT**

The Motion is governed by Rule 56 of the Federal Rules of Civil Procedure. Subject matter jurisdiction here is based on diversity, and the Federal Rules of Civil Procedure apply. *See Ryan v. Super Fresh Food Mkts., Inc*., No. Civ. A. 99-CV-1047, 2000 WL 537402, at *1 (E.D. Pa. Apr. 26, 2000); *see also Reynoso v. Tousson,* No. 14CV3564CBAJO, 2019 WL 4393958, at *5 (E.D.N.Y. Sept. 13, 2019). Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Per this Court's Orders (Dkt. #s 83, 86, 100) New York's substantive law on defamation governs Professor Duncan's claim for defamation. The statements at issue here can be divided into two categories: social media statements and more targeted statements made by Defendant to

12

academics who were specifically in a position to have a negative impact on Professor Duncan's professional life. Both categories of statements are defamatory *per se* as a matter of law.

## I.      There is No Factual Dispute as To Certain Elements of Plaintiff's Defamation Claim

New York law sets forth the following elements for a defamation claim: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting [defamation] per se, and (vii) not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001) (internal citations omitted). A claim for defamation *per se* is made when the defamatory statements at issue are statements imputing conduct incompatible with an individual's profession and/or statements regarding criminal activity.  *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 179,180 (2d Cir. 2000) ("One useful general rule is that a writing which tends to disparage a person in the way of his office, profession or trade is defamatory per se and does not require proof of special damages.") (internal quotations and citations omitted); *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 171 (S.D.N.Y. 2021) ("Two such categories of defamatory per se statements are those that charge the plaintiff with a serious crime and those that tend to injure another in his or her trade, business or profession.") (internal citations and quotations omitted).

Defendant does not dispute several of the above requirements for a defamation claim; specifically, she does not dispute that she published the statements at issue; that she published the statements about Professor Duncan; that she intended people seeing her statements to understand them to be about Professor Duncan and that they were so understood.[2]  The lack of dispute with

---

[2]      To be clear, publication to a small group of people and indeed even a single person satisfies the publication elements for liability under defamation law.  *See Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001).

respect to these elements can be seen in the Def. Third Summary Judgment Motion (Dkt. # 67), in which Defendant does not dispute any of these elements. (pgs. 4 – 22) (discussing the claims failures for their inability to prove actual malice, that some are opinions, and their protection under privilege but not disputing the elements). The factual record in this case further supports the lack of dispute on these elements of a defamation claim because Defendant acknowledged that Defendant published her statements about Professor Duncan, with the purpose of making clear that Professor Duncan was the subject of the statements. (Lin Dec. Exs. 7-9, 13.) The parties previously debated the applicable fault standard; however, this has since been resolved by the Court. (Dkt. # 83).

The parties differ primarily on the defamatory character of certain statements and whether the statements are covered by any applicable conditional privilege. However, there is ample basis upon which to determine as a matter of law that all of Defendant's statements are defamatory based on the context of the statements. Furthermore, applying the appropriate level of fault or intent—negligence—the undisputed factual record in this case demonstrates that Defendant surpassed this standard by recklessly disregarding the falsity underlying the statements made about Professor Duncan, and, for that reason as well as the additional reasons discussed below, any privilege that might have applied to Defendant's Statements has been abused and/or is vastly outweighed by Professor Duncan's interest in not being defamed.

## II.    Defendant's Statements Convey a Defamatory Meaning as a Matter of Law

As a matter of law, the Defendant's statements convey only one meaning, namely that Professor Duncan committed certain crimes, which he did not, i.e., a defamatory meaning because they are intended to lower Professor Duncan's professional and personal standing—within both the general public and within specific professional circles. *See Celle v. Filipino Rep. Enters. Inc.*,

209 F.3d 163, 185 (2d Cir. 2000). Defendant was clear that, in making the statements about Professor Duncan, the goal was to "run him out of trans health" if possible, by "dragging him publicly," and damage a reputation that Defendant believed Professor Duncan did not deserve. (SOF ¶¶ 35-36; Lin Dec. Exs. 4, 6.) Although Professor Duncan is further along in his career (Duncan Dec. ¶ 9), Defendant made clear her belief that Defendant is "twice the scientist he is and 3x on Sunday." (SOF ¶ 36.)

In addition, the substance of and audience to whom Defendant directed the statements demonstrates that the purpose of Defendant's defamatory statements was to harm Professor Duncan both widely and professionally. *See Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) ("A written statement that charges a person with the commission of a crime or tends to disparage a person in the way of his office profession or trade is libel per se. Applying that standard here, the allegation that Meloff defrauded New York Life is libel per se.") (internal citations and quotations omitted). Defendant did not shy away, in her social media posts and her private messages, from throwing around criminal and sexual misconduct accusations about Plaintiff to harm his professional standing and reputation. Furthermore, Defendant uncritically accepts the Sawyer's accusations as true, ("I know it to be true" SOF ¶ 4) without any basis beyond the accusations of one she never met. And she further refused to investigate the serious allegations even while insinuating there were facts available ("…evidence out there if you want to investigate but I'm more interested in supporting Sawyer so I decided not to link those" SOF ¶ 4). Thus, these social media posts are defamatory as a matter of law.

The purpose of Defendant's statements was to diminish Professor Duncan's standing within two professional communities, which is precisely what courts have determined qualifies as defamatory. *See, e.g., Golub v. Enquirer/Star Grp., Inc.*, 89 N.Y.2d 1074, 1076, 681 N.E.2d 1282,

1283 (1997); *Lavazza Premium Coffees Corp. v. Prime Line Distributors Inc.*, 575 F. Supp. 3d 445, 477 (S.D.N.Y. 2021). Defendant perpetuated a campaign of targeting Plaintiff's professional standing. For instance, right after learning about Sawyer's accusations, Defendant contacted Professor Duncan's colleagues and began posting about them on social media, referencing their shared professional community. Additionally, one of Defendant's statements to Dr. Green concerns that a way to express displeasure with the IAPHS's response to Sawyer's accusations is to tell them that "all the trans people will resign if [Professor Duncan] doesn't." (SOF ¶ 23.) As set forth in the statement itself, the purpose is to harm Professor Duncan's standing in the community and deter people from associating with Professor Duncan, which is the hallmark of defamation. *See e.g., Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000).

As evidenced in the surrounding context, Defendant's statement here, and all her statements, are based on nothing more than Sawyer's false claims about Professor Duncan; Sawyer's accusations are the only basis and reason for her statement that "all the trans people will resign if [Professor Duncan] doesn't. (SOF ¶ 23.) Defendant's initial social media posts amplifying false accusations were made without any investigation or fact checking. And with respect to the July 17, 2023, email involving Dr. Samari and Dr. McLemore, Defendant states that her conclusion that a manuscript from Professor Duncan should be rejected "would be true without the unsavory but [sic] allegations that have been shared with me as well as communiques from Dustin's lawyers." (SOF ¶ 25.) The statement itself references Sawyer's accusations, and given that Dr. Samari had previously contacted Defendant about Sawyer's accusations on June 30, 2023 (SOF ¶ 17), the context further makes clear that Defendant repeated Sawyer's accusations as an independent factual basis supporting rejection of the manuscript at issue. Again, this falls squarely within what courts have considered defamatory or of defamatory character. *See Albert v. Loksen*,

239 F.3d 256, 271 (2d Cir. 2001). The factual record further supports the negative professional impacts Defendant's statements have had on Professor Duncan.  (SOF ¶¶ 10; 24.)

With respect to the social media posts in July and August, Defendant has argued that they are not capable of defamatory meaning because they are expressions of opinion.  (*See* Def. SJ at 18-21.)  That argument lacks merit.

Defendant's July post did not express an opinion; Defendant portrayed Sawyer's accusations as factual.  As stated in the post, Defendant's purpose was to reassure the public who had been aware of Defendant's previous statements regarding Professor Duncan that Defendant's "support hasn't waned."  (SOF ¶ 28.)  The purpose of this post was to maintain the false notion that Sawyer's accusations about Professor Duncan were true, but in a slightly more veiled way "to reduce my exposure for a lawsuit."  (*Id*.)  Similarly, when Defendant followed up with another post in August, Defendant again referenced Sawyer's false accusations and explained that the qualification of those accusations as "alleged" was for "legal reasons."  (SOF ¶¶ 29-30.)  The purpose of this post was again to present Sawyer's accusations as facts to be believed.  (*See id*.) Accordingly, all of the statements are defamatory and intended to be so.

### III.    No Privilege Shields Defendant from Liability

The focus of Defendant's defense is a combination of the following arguments: (A) Defendant's statements are conditionally privileged and (B) use of the messages Defendant produced through counsel violates a common interest privilege. [3] (*See* Def. SJ at 14, 23.)

Neither of Defendant's arguments regarding privilege has merit because, as can be seen in Defendant's previous summary judgment motion, Defendant's idea of privilege is overly broad. The Defendant bears the burden to demonstrate the existence of this privilege. *Konikoff v.*

---

[3] Defendant has also been adamant that actual malice is required however the Court has since held that this is not the case. *See* DKT. # 83.

*Prudential Ins. Co. of Am.*, No. 94CIV.6863(MBM)(MHD), 1999 WL 688460, at *13 (S.D.N.Y. Sept. 1, 1999), aff'd, 234 F.3d 92 (2d Cir. 2000). Starting with the common interest privilege, it is a conditional privilege that "extends to a communication made by one person to another upon a subject in which both have an interest. The common interest privilege is typically applied to statements that are published to an extremely limited, clearly defined group of private persons with an immediate relationship to the speaker, such as a family member or an employer's own employees." *Conti v. Doe*, 535 F. Supp. 3d 257, 276 (S.D.N.Y. 2021) (internal citations and quotations omitted).

It is clear as a matter of law that no privilege protects these statements. Defendant's argument about privilege appears to be limited to the messages exchanged with specific individuals; indeed, it could not plausibly be extended to public social media posts. (*See* Def. SJ at 14-15.) However, regarding Defendant's private messages this privilege is plainly inapplicable. Defendant lacks any common interest with Dr. Samari or Dr. Green: Defendant barely knows these parties, never met them in person, and beyond broad shared 'community' concerns has no shared interests.

Furthermore, Defendant and Dr. Green were communicating about how the IAPHS could respond to Sawyer's accusations against Professor Duncan, including Dr. Green resigning as a co-chair for the IAPHS conference, but to Defendant, "the IAPHS portion was so very unimportant to me after I resigned. That was Tiffany [Green]'s issue to deal with as she saw fit." (*Id.*) Finally, there is no connection between Defendant's amplification of Sawyer's accusations and participation in the IAPHS conference.[4]

---

[4]    To the extent that Defendant is claiming the common interest is general protection of and support of transgender people, Defendant's theory is hopelessly overbroad in that it would give Defendant *carte blanche* to make any statements about *any*one so long as it fit within Defendant's singular view of support for transgender people, without *any* consequences. (*See* discussion *infra* at 20.)

In Def. SJ, Defendant argues that the "community" or "common interest" covers "fellow members of the transgender community and/or Academic community concerned about the accusations that Plaintiff abused a transgender man." (*See, e.g.*, Def. SJ at 16.) But the law does not support the creation of the type of ambiguous and amorphous "community" Defendant claims. *Moraes v. White*, 571 F. Supp. 3d 77, 100 (S.D.N.Y. 2021) (holding post to "mom" Facebook groups could not be protected under the common interest privilege: "Given the groups' sizes, defendants' suggestion that Ms. White shared an "immediate relationship" with each member, or that each member shared the same interests, is unpersuasive."); *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99–100 (2d Cir. 2000) ("Courts applying New York law, however, have not extended the privilege to cover publication of defamatory statements through the media to the world at large."); *see also Conti v. Doe*, 535 F. Supp. 3d 257, 278 (S.D.N.Y. 2021).

No privilege covers them, and their use in this litigation is entirely justified.

In this case, a conditional privilege does not insulate Defendant from liability. Defendant claims that the interest that excuses her defamation is "Plaintiff's treatment of Trans people." (Def. SJ at 24.) There are no facts supporting the notion that Defendant was entitled to amplify Sawyer's accusations against Professor Duncan because of a *bona fide* interest in "Plaintiff's treatment of Trans people" that outweighs Professor Duncan's right not to be defamed. *See Boehner v. Heise*, 734 F. Supp. 2d 389, 399 (S.D.N.Y. 2010) ("Courts recognize a common interest privilege in instances where 'the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability outweighs the harm that may be done to the reputation of others.'") (quoting *Garson v. Hendlin*, 141 A.D.2d 55, 61, 532 N.Y.S.2d 776 (2d Dep't 1988)). The factual record in this case demonstrates that, before June 29, 2023, Defendant had never even heard of Sawyer. (SOF ¶ 13.) Defendant and Professor Duncan have never worked

together and are not peers or friends. (Duncan Dec. ¶ 9.) Defendant is seeking to bestow on herself an unfettered ability to insert herself into *any* issue involving *any* transgender person without *any* consequences. This Court should not expand a conditional privilege to cover Defendant.

Another key limitation on the application of any conditional privilege is that it is not abused. *Konikoff v. Prudential Ins. Co. of Am.*, No. 94CIV.6863(MBM)(MHD), 1999 WL 688460, at *13 (S.D.N.Y. Sept. 1, 1999), aff'd, 234 F.3d 92 (2d Cir. 2000). In this case, even if a conditional privilege were applicable, Defendant's statements exceeded and therefore abused any privilege.

*First*, even if a conditional privilege applied, no one has *carte blanche* to damage someone's reputation without consequence, so a key limitation is that a conditional privilege cannot shield malicious statements from liability. *See id.*; *see also Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 155 (S.D.N.Y. 2016). While Defendant argues that there is no actual malice, the factual record demonstrates otherwise. As an initial matter, Defendant's attempts to discount the antipathy toward Professor Duncan revealed in her messages,[5] asserting that "spite" or "harsh[]" language does not demonstrate actual malice for purposes of a defamation claim. (Def. SJ. at 16-18.) Defendant's assertion goes too far because actual malice can be demonstrated through circumstantial evidence, and relevant circumstantial evidence can include an ill will toward the defamed person. *See Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice.") Stated differently, while ill will alone in the total absence of other evidence does not establish actual malice, ill will is relevant and, with additional evidence, can demonstrate actual malice. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657,

---

[5]    As argued above, no common interest should shield or otherwise restrict the use Defendant's messages, particularly to the extent that reveal Defendant's contemporaneous thoughts of and attitude about Professor Duncan.

667 (1989). It is notable that Defendant does not dispute the existence of the ill will reflected in the messages she produced; Defendant simply excuses that ill will as "harsh" language. (*See* SOF ¶ 27.)  When Defendant's messages are considered with the additional undisputed evidence, the conclusion is clear: Defendant's knowledge of the availability of supporting evidence that she refused to look at, her receipt of contradictory information in the NYS Complaint *before* publishing her statements; and her failure to do any fact checking of an unknown individual's online posts before amplifying them, all paint a collective picture undeniably showing Defendant's total and reckless disregard for the truth.

The first piece of the collective picture is that, almost immediately upon learning about the accusations against Professor Duncan on June 29, 2023, Defendant leapt on them—despite the accusations coming from someone Defendant had never previously heard of and despite learning about them second-hand from Dolotina, another person with whom Defendant had no close connection.  (SOF ¶¶ 11-13.)  Defendant even understood there to be evidence concerning the allegations but still refused to look at it. (SOF ¶ 4). Defendant's quick decision to accept the second-hand accusations from a total stranger makes sense when considered with Defendant's message that she had always harbored a suspicion about Professor Duncan.  (SOF ¶ 14.)  This is consistent with the additional undisputed facts that Defendant considered herself a far superior scientist to Professor Duncan while also having to admit that Professor Duncan is further along in his career.  (SOF ¶ 36.)

The second piece is that, when Defendant had the opportunity to communicate with Sawyer directly, she made no attempt to verify or clarify any of his accusations, including after Defendant received the NYS Complaint.  Defendant instead took the opportunity to advise Sawyer to correct errors in his posts to make them less susceptible to critique.  (SOF ¶ 16.)

21

Third, even before mid-July 2023, Defendant had been provided video footage of Professor Duncan and Sawyer at Blick. (SOF ¶ 22.) Based upon her messages with Dr. Streed, Defendant appreciated that that video footage did not support the more serious accusations Sawyer was making; the footage simply showed the two individuals interacting at Blick. (*Id*.)

Fourth, Defendant was made aware that the University had begun an investigation into the accusations against Professor Duncan. The investigation, which was also disclosed in Professor Duncan's NYS Complaint, had only just begun as of early July 2023 and was ongoing.[6]

Fifth, less than two weeks after seeing the video footage from Blick, Defendant was provided with the NYS Complaint. The NYS Complaint confirmed what Defendant herself saw on the video footage—an unremarkable encounter between Sawyer and Blick. (Lin Dec. Ex. 1.) In the NYS Complaint, Professor Duncan acknowledged interacting with Sawyer at Blick, as Defendant herself saw on the video, and acknowledged sending him certain messages which were attached to the Complaint. (*See id*.) Professor Duncan unequivocally denied all of serious criminal acts he was being accused of, and, further to that, he demonstrated that on dates when Sawyer said Professor Duncan had stalked him through New York City, Professor Duncan was not physically anywhere near New York City or State. (Duncan Dec. ¶ 3.) Defendant appreciated this key aspect of the NYS Complaint. (SOF ¶ 19.) On top of all of this, Defendant had had the opportunity to communicate with Sawyer directly, at which Defendant purposefully avoided asking him any questions about the substance of his accusations, even after Defendant had the NYS Complaint. *See Harte-Hawks*, 491 U.S. at 692 (a "deliberate decision not to acquire knowledge of facts"

---

[6]    In September 2023, the University concluded its investigation and in writing informed Professor Duncan that there "was insufficient evidence to corroborate that the harassing, intimidating, and threatening Instagram messages [Sawyer] received were sent by you. In addition, the evidence gathered demonstrated that you were not in New York during particular alleged incidents, and there was no other evidence to support [Sawyer]'s claim." (Lin Dec. Ex. 19, NYS First Amended Complaint Ex. K.)

constitutes purposeful avoidance of the truth, supporting an inference of actual malice); *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S. Ct. 1323, 1326, 20 L. Ed. 2d 262 (1968)).  When all of these facts are paired with the obvious ill will Defendant has had toward Professor Duncan (*see* SOF ¶ 27), the entire picture comes into focus.[7]

This case aptly illustrates why courts have recognized that, although a party sued for defamation may insist on having had a subjective belief in their own good faith and/or honest belief in the truth of their defamatory statements, the objective circumstances override that insistence. *See St. Amant v. Thompson*, 390 U.S. 727, 733 (1968). The point here is that Defendant is only able to so insist because Defendant avoided the truth and recklessly disregarded the facts specifically presented to her that did not comport with Defendant's existing negative view of Professor Duncan. *See Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015). Accepting Defendant's argument that, in the face of all of the available information summarized above and the wasted opportunity to obtain additional information from Sawyer directly (*see* discussion *supra* at 22-24), she maintained a genuine subjective relief in the truth of Sawyer's accusations would mean that a determination of actual malice would be reserved for the rare defendant unable to come up with any post-hoc rationale for the defamation and the inability to repeat that rationale throughout the litigation.

## CONCLUSION

In light of the foregoing, Plaintiff respectfully requests that Motion be granted in its

---

[7]    The recklessness of Defendant's disregard of the facts sworn to in the NYS Complaint is further demonstrated because it stands in such stark contrast to the reaction Dolotina—the individual who first brought Sawyer's accusations to Defendant—testified to when Dolotina reviewed the Complaint.  (*See* SOF ¶ 33.)

entirety, and for such other and further relief this Court deems just and proper.

Dated: December 19, 2025
      Brooklyn, New York

                                      Respectfully submitted,

                                      By: */s/David D. Lin*
                                      David D. Lin, Esq. (*pro hac vice*)
                                      **LEWIS & LIN, LLC**
                                      77 Sands Street, 6th Floor
                                      Brooklyn, NY 11201
                                      Tel: (718) 243-9323
                                      Fax: (718) 243-9326
                                      Email: David@iLawco.com

                                      Alexis Roth
                                      **WOLF BALDWIN & ASSOCIATES PC**
                                      800 E. High Street
                                      Pottstown, PA 19464
                                      aroth@wolfbaldwin.com
                                      Tel: (610) 323-7436

                                      *Counsel for Plaintiff*