**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Dustin T. Duncan, ScD,<br><br>Plaintiff,<br><br>-against-<br><br>Elle Lett, PhD,<br><br>Defendant. | Civil Action No.: 23-cv-04284 (KBH) |

### DR. LETT'S OPPOSITION TO PLANTIFF'S STATEMENT OF MATERIAL FACTS

Defendant Dr. Elle Lett submits this response to Plaintiff's Statement of Material facts:

1.      In July 2023, Professor Duncan filed his initial complaint in New York State Court (the "NYS Complaint"), verified by Professor Duncan under oath, alleging a campaign of harassment and defamation.  (Lin Dec. Ex. 1, ¶ 8.)

**RESPONSE:** Agreed

2.      As set forth in the NYS Complaint, Professor Duncan had a brief encounter with Sawyer Allen ("Sawyer") at the Blick Art Materials store in Harlem ("Blick") in April 2023, followed by several messages exchanged between the two, attached to the NYS Complaint.  (Lin Dec. Ex. 1.)  After that brief in-person encounter and exchange of messages, Sawyer began levying false accusations, accusing Professor Duncan of serious crimes (Lin Dec. Ex. 1, ¶¶ 8-27 Sawyer also directed his false accusations at Professor Duncan's employer, Columbia University (the "University").  (Lin Dec. Ex. 1, ¶¶ 28, 32.)

**RESPONSE:** Agreed

1

3.      Part of Sawyer's campaign was the creation of fake messages purporting to be from Professor Duncan, but those messages were fabricated and were not sent by Professor Duncan. (Lin Dec. Ex. 1, ¶ 33.)

**RESPONSE: Agree**

4.      An additional part of Sawyer's campaign was to accuse Professor Duncan of following and stalking Sawyer throughout New York City on certain specific dates, but those claims were false. (Lin Dec. Ex. 1, ¶ 29.) On the dates Sawyer specified, Professor Duncan was traveling outside of New York State. (Lin Dec. Ex. 1; Duncan Dec. ¶ 12.). Immediately upon learning about Sawyer's campaign, Defendant began her own campaign to amplify Sawyer's accusations. On June 30, Defendant re-posted on her own Twitter account a copy of Sawyer's GoFundMe page, adding her own comments: "found out that a trusted colleague who studies trans people has done horrible things and victimized a vulnerable trans person and I'm really struggling on what Justice and courage looks like here. Like amplifying would put me at risk but not feels dirty. I know it to be true ...." Defendant further posted on June 30, "There are public details and evidence out there if you want to investigate but I'm more interested in supporting Sawyer so I decided not to link those."

**RESPONSE: Dispute. Dr. Lett did not immediately amplify Mr. Allen's accusations. Instead, Dr. Lett spoke with Dr. Duncan's Trans employee and other Trans colleagues to learn about the accusations were impacting Dr. Duncan's LGBTQ employees, to seek wisdom about how to support them and a purported victim of harm, and to seek support where she was personally triggered in learning that a trusted colleague had seemingly committed harm against a member of the Transgender community.**

5.      On July 14, 2023, Professor Duncan's counsel sent Defendant a copy of the NYS Complaint by email, and Defendant acknowledged having received it. (Lin Dec. Ex. 2.) In a follow-up email, Professor Duncan's counsel stated that the purpose of sending Defendant the

NYS Complaint was "to make available . . . information which disputes certain accusations that have circulated on social media, and which is, as of now, the only evidence that has been sworn as true in a court of law." (Lin Dec. Ex. 2.) Professor Duncan's counsel also invited Defendant to contact counsel if Defendant had additional questions, but Defendant did not raise any additional questions with counsel. (Lin Dec. ¶ 3 & Ex. 2.)

**RESPONSE:** Dr. Lett disputes this assertion, namely that "Defendant did not raise any additional questions with counsel." In response to David Lin's email, Dr. Lett sent David Lin the following message clearly raising questions of other allegations that would indicate a pattern of abuse on Plaintiff's part:

> *Hello Mr. Lin,*
> *I have deleted my tweets because I'd like to be left out of these unfortunate events any further. My only role was sharing publicly made available content by Sawyer and contributing to the gofundme. Independent of Sawyer, after sharing their posts, several colleagues in this space reached out with information about Dr. Duncan's experiences and behaviors at NYU, and the circumstances of his position change, which additionally gave me pause. I have also been contacted Regardless, I have no interest in being a part of or related to this continued dialogue.*
> *Kindest Regards, Elle Lett, PhD, AM, MBiostat [pronouns: Dr./she/her]*

6.      On November 6, 2023, Professor Duncan filed his initial complaint in this case, which Professor Duncan also verified under oath. (Lin Dec. Ex. 3; Duncan Dec. ¶ 17.)

**RESPONSE: Agreed**

7.      Years before this case and the events giving rise to it, Professor Duncan crossed paths with Defendant in 2021 on a professional basis because they are both academics, although Professor Duncan's career is more advanced than Defendant's. (Lin Dec. Ex. 3, ¶ 8; Duncan Dec. ¶ 9.)

**RESPONSE:** Agreed

8.      Professor Duncan and Defendant are not peers or friends and have never actually

3

worked together. (Duncan Dec. ¶ 9.) However, they are acquainted with some of the same academics, including Dr. Carl Streed, Dr. Goleen Samari, Dr. Tiffany Green, Dr. Avery Everhart and Dr. Arjee Restar. (Duncan Dec. ¶ 9.)

**RESPONSE:** Dispute, Plaintiff and Dr. Lett are colleagues as Public Health Researchers.

9. On June 30, 2023, shortly after Sawyer began defaming Professor Duncan, Defendant contacted Professor Duncan by email, voicing support for Sawyer. (Duncan Dec. ¶ 9.) Professor Duncan did not respond to Defendant. (*Id*.) In June 2023, when Defendant emailed Professor Duncan, Professor Duncan did not know how Defendant had come to be aware of Sawyer's accusations about Professor Duncan. (*Id*.)

**RESPONSE:** Dispute, the statement implies that Dr. Lett was voicing support for Sawyer as someone defaming Plaintiff and not as a victim of assault. Dr. Lett was supporting someone she believed to be a victim of harm.

10. As part of discovery in this case, Defendant produced correspondence between Defendant and Brett Dolotina ("Dolotina"). (Lin Dec. Ex. 15.) In a sworn declaration, Defendant testified that Dolotina contacted her on June 29, 2023. (Lin Dec. Ex. 16.) At her deposition, Defendant testified as follows regarding her level of knowledge of Brett Dolotina in June 29, 2023:

> Q. Now, at this time, so this would have been June 29, 2023, did you know who Brett Dolotina was?
> A. I did know who Brett was.
> Q. So you recognize -- so when you received this text message that you're referring to, you recognize that name; is that correct?
> A. I think I only recognize the name because Brett connected it to Columbia. I think he either -- excuse me -- they either said -- they said something in the text message that rang my memory of that's how I knew them. Outside of that, I don't think I would have likely recognized the name.

(Lin Dec. Ex. 4, Def. Tr. at 51:11-25.)

4

**RESPONSE:** Agreed

11.    Beginning at page 14, line 16 to page 15, line 11, Dolotina testified as follows:

Q.  Okay. Mx. Dolotina, do you know Sawyer Allen?
A. Yes.
Q. How were you first introduced to Sawyer Allen?

A.  I was first introduced -- I was first introduced online. We've never met in person nor formally met in any form. But I was introduced to them online.
Q.  Okay. Have you ever had a phone conversation with Sawyer Allen?
A.  No.
Q.  Have you ever had a text correspondence with Sawyer Allen?
A.  I don't recall.
Q. Have you ever had an Instagram, Signal exchange, or any other written -- email or any other written correspondence with Sawyer Allen?
A. To clarify, the question is pertaining to direct communication between me and Sawyer Allen?
Q.  Correct. Have you have -- have you had any direct written communication with Sawyer Allen?
A. I don't recall.

(Lin Dec. Ex. 5.)

**RESPONSE:** Agreed

12.    At pages 53 and 56 of her deposition, Defendant testified about being contacted by Dolotina and learning about Sawyer's accusations against Professor Duncan.  (Lin Dec. Ex. 5, Def. Tr. at 53:19-56:3.)

**RESPONSE:** Agreed

13.    Beginning at page 68, line 22 to page 69, line 4, Defendant testified as follows:

Q. Prior to this call in June of 2023, had you ever heard the name Sawyer Quinn or Sawyer Allen before?
A. I had not.
Q. Was Sawyer Allen or Sawyer Quinn known to you, in any way, prior to June of 2023?
A. No, he was not.

(Lin Dec. Ex. 1.)

**RESPONSE:** Agreed

14.     Before emailing Professor Duncan on June 30, 2023, Defendant had already republished Sawyer's accusations to Dr. Everhart and had followed that up with a message stating

> But really the way he [Professor Duncan] courted me . . like he
> could really help me optimize my career
> Which always felt condescending
> He always tickled my intuition as dangerous
> But couldn't place it
> But what I can say is that it's a special
> Bitch who studies black trans people
> and then preys on them.

(Lin Dec. Ex. 6, at Lett 00253.)

**RESPONSE:** Agreed

15.     Also before emailing Professor Duncan, Defendant already republished Sawyer's accusations on social media, with the statement

> I'm rarely pulled to post for mutual aid people I am not directly
> linked to. I am two trans people removed from this person. I will
> **not share details** for other reasons but if you believe in mutual aid
> and want to support someone **who has been harmed** . . . .

(Lin Dec. Ex. 7 (emphasis added).)

**RESPONSE:** Agreed

16.     On June 30, 2023, Defendant also contacted Sawyer directly, and part of Defendant's message to Sawyer states: "I wanted to let you know you misspelled Dustin's last name in the gofundme, a couple people have pointed it out and asked me about it. Might be worth an update." The last exchange between the two is dated July 2. (Lin Dec. Ex. 18.)

6

**RESPONSE:** Agreed

17.    On June 30, 2023, Dr. Goleen Samari and Dr. Tiffany Green separately contacted Defendant, each having seen social media posts amplifying Sawyer's accusations. (Lin Dec. Ex. 13, Amended Complaint, ¶¶ 32-34; Lin Dec. Exs. 9 & 10.) During her deposition, Defendant testified that, when Dr. Samari contacted her in June 2023, this was Defendant's "first interaction with Dr. Goleen [sic]." (Lin Dec. Ex. 4, Def. Tr. at 144-45.)

**RESPONSE:** Agreed

18.    In connection with the correspondence attached to the Def. SJ as Exhibit T (*see also* Lin Dec. Ex. 9), document Bates stamped Lett 00149, Defendant testified as follows at page 145, line 21 through page 146, line 18:

> Q. In any event, Dr. Samari is sending this e-mail that is Bates No.
> Lett 00149 --
> A. To both of us. Yes.
> Q. Okay.
> A. She did send that e-mail. And, to my knowledge, that could
> easily be Dr. McLemore's first introduction to Sawyer Allen's
> allegations against Dustin.
> Q. And below that, about two minutes later, you see that you reply
> back?
> A. Yes. Dr. Goleen -- Dr. Samari, excuse me -- if you could scroll
> back up – was talking about a manuscript that she was the
> associate editor on, that was submitted by Dr. Duncan. And she
> asked Dr. McLemore and I what to do with that manuscript. And I
> respond because I correct her and said, "This victimized person is
> not my friend but a fellow trans person. I don't really know the
> ethical stance on this but it's on trans people" -- I'm sure that's
> meant the [sic] say, "but if it's on trans people I can't stomach it
> being published."

(Lin Dec. Exs. 4 & 9.)

**RESPONSE:** Agreed

19.    With respect to the NYS Complaint, beginning on page 210, line 1 of Def. Tr. (Lin Dec. Ex. 4), Defendant testified about a "timeline" in in the Complaint that she "only skimmed."

Further on page 210, line 8 through 20, Defendant testified that: "And so all I got was that there was some dispute over those dates that Sawyer alleged things in, which I didn't have at the top of my head. Again, I didn't memorize Sawyer Allen's allegations. And that the dates that Duncan said about his travel schedule. I did not cross-reference them because, again, comparing Sawyer Allen's firsthand account and messages that claimed to be directly from Dr. Duncan, a legal document was not going to persuade me that all of this other stuff was not worth considering as evidence for Dr. Duncan having committed this crime."

(Lin Dec. Ex. 4.)

**RESPONSE:** Agreed

20.    In messages with Dr. Carl Streed exchanged on July 14, 2023, the day the NYS Complaint was filed and the day Defendant received it, Defendant informed Dr. Streed of the filing. (Lin Dec. Ex. 10.)  Dr. Streed commented to Defendant that the NYS Complaint: "Reads odd. Doesn't seem to address the origin of the 'false' messages or motivation.  Also why a personal lawyer and not Columbia if this is about personal reputation?  Filing alleges Columbia investigation determined it was all false but then no official document included in the appendices." (*Id.*)  In response, Defendant messaged "Yeah, I think he's relying on Sawyer not having resources  A tried and true tactic". (*Id.*)  After Dr. Streed went on to comment that the NYS Complaint was "dragging Blick in," Defendant indicated that she understood that fact in the NYS Complaint as well, commenting "small company." (*Id.*)

**RESPONSE:** Agreed

21.    In messages with Dr. Tiffany Green, exchanged later on July 14, 2023, Defendant repeated the substance of what Dr. Streed stated to Dr. Green: "Colleague pointed out that he's using a personal lawyer instead of a University lawyer and hasn't provide [sic] proof that the university investigate sided [sic] in his favor." (Lin Dec. Ex. 8.)

**RESPONSE: Agreed**

22.    In addition to the information Defendant had in the NYS Complaint, Defendant had been sent by Krish Bhatt ("Bhatt"), another staff member working for Professor Duncan at the University, video footage of the interaction between Professor Duncan and Sawyer at Blick. (Lin Dec. Ex. 12, at Lett 00018.)  Defendant sent that video to Dr. Streed on July 7, and Defendant stated that "they [the video clips] only confirm that Dustin [Duncan] was in the store. First interaction with sawyer, second when he [Professor Duncan] was banned. They don't really show anything else." (Lin Dec. Ex. 10, at Lett 00594-95.)

**RESPONSE: Agreed**

23.    In discovery, non-party Dr. Green produced messages she had exchanged with Defendant, which were attached to the Amended Complaint as Exhibit 8.  A portion of the messages is referenced in paragraph 49 of the Amended Complaint, and Defendant has admitted that these messages are "about [Sawyer's] public accusations." (Lin Dec. Ex. 13.)  In messages dated July 14, 2023, Dr. Green stated her intention to "express . . . displeasure" with the IAPHS "lack of response and tell them I'm resigning if needed," to which Defendant responds "Yeah also like all the trans people will resign if he doesn't." (Lin Ex. 8, Lett 00534.)  When asked by Dr. Green whether Defendant meant resignations "on his team," Defendant responded "No from the conference."  In this exchange, Dr. Green goes on to ask Defendant "are you okay with me raising that possibility with leadership," Defendant responded "Yes." (*Id.*)

**RESPONSE: A**greed

24.    Beginning at page 133, line 5 through line 11, Dr. Tiffany Green testified:

> Q. Had you not become aware of Sawyer Allen's accusations against Dr. Duncan, would have you had any reason to suggest that, he no longer be a co-chair on the IAPHS?
> A. Had I not become aware, no. I would have had no reason to suggest that.

(Lin Dec. Ex. 11.)  When Dr. Green decided to and informed Defendant that Dr. Green would

resign as co-chair of the IAPHS conference, Defendant testified the "IAPHS portion was so very unimportant to me after I resigned. That was Tiffany [Green]'s issue to deal with as she saw fit. (Lin Dec. Ex. 4, Def. Tr. at 221.)  Defendant also testified that, to her knowledge, she had never met Dr. Green in person, and Defendant was not certain what state Dr. Green resides in.  (Lin Dec. Ex. 4, Def. Tr. at 117-18.)

**RESPONSE:** Agreed

25.    On July 17, 2023, Defendant sent an email regarding a manuscript submitted in part by Professor Duncan to, *inter alia*, Dr. Monica McLemore and Dr. Goleen Samari, in which she recommends rejection of the manuscript. (Lin Dec. Ex. 9.)  Defendant states in relevant part that the manuscript "does not meet even the most basic standards for publication in the journal In the spirit of transparency, I comfortably recommend desk rejection and am embarrassed that it cites my paper. This would be true without the unsavory but [sic] allegations that have been shared with me as well as communiques from Dustin's lawyers.  In sum, the paper is underdeveloped, not theoretically sound, and not one that I would be willing to expend finite reviewer resources on." (Lin Dec. Ex. 9; Lin Dec. Ex. 13, ¶ 47.)  In response to this paragraph, Defendant's answer acknowledged that the correspondence referenced Sawyer's statements about Professor Duncan in stating "Further, Dr. Lett denies amplifying Mr. Allen's false statements where Dr. Lett reasonably these statements to be true at the time of sharing." (Lin Dec. Ex. 14.)

**RESPONSE:** Dispute. Dr. Lett's email responded to an email from Dr. McLemore inviting Dr. Lett to comment on the journal's decision to reject Plaintiff's manuscript where Columbia was questioning Dr. McLemore's integrity. Dr. McLemore's email, in part, stated:

> Dear Dr. Duncan: I have a 30 minute appointment scheduled with your Vice Dean of Research Strategy and Innovation at the Columbia Mailman School of Public Health who wrote me the following: "I handle research integrity issues for the School. I have also served as Editor for two academic journals. Dr. Duncan indicated that the journal was taking action based upon unsubstantiated allegations and I would like to discuss this with you." I have invited Dr. Le] to attend this meeting, since like you, I value

10

transparency and our work together is cited first in HEQ-2023-0161. My read of both of your manuscripts are attached and my desire to speak with you was related to the fact that two associate editors did not want to handle these manuscripts. I wanted to determine if you wanted me to proceed with finding one who did want to manage this and also inform you that there is significant delays at Health Equity because of the volume of manuscripts we receive with 2 current special editions that will be coming out soon. Also, I've been pretty public about my frustration with finding reviewers and I have been desk rejecting manuscripts once I ask between 12 and 15 people to review. I can appreciate your situation with "unsubstantiated claims" about you, which I'm happy to discuss but also know I read every paper that comes to Health Equity and feel free to read my annotated PDFs attached, which have nothing to do with any claims against you.

Exhibit N, Lett 176.

26.     On July 18, 2023, Defendant was contacted by Bhatt, who passed along information the University provided about the status of the investigation into Professor Duncan. (Lin Dec. Ex. 12, at Lett 00021.)  One of Bhatt's messages on that day includes the following information that Bhatt received at a meeting earlier that day: "Highlights: 'Dustin [Duncan] is fully cooperating with the university.' 'folks are not seeing the full story. it's not as clear as what's on social media.' 'at this point in time the allegations have not been confirmed'." (*Id*.) Bhatt also provided Defendant with an update on Professor Duncan's physical and mental condition in light of the ongoing University investigation.  (*Id*.)  Specifically, Krish Bhatt told Defendant that: "Dustin [Duncan] looked a wreck today. Until now he's been very smiley and normal and business as usual. Today he looked anxious and tired and angry."

**RESPONSE:** Dispute where this message is taken out of context. On July 18, 2023 prior to the above cited text, Bhatt also stated:

"Dustin seems to be an expert on DARVO because he's convinced a lot of people he's the victim here…I've spent a lot of today arguing with people and convincing them to be on Sawyer's side. It's wild that in 2023 in this state of me too, people are searching for any possible evidence to not believe survivors….they're finding every

excuse they possibly can. Anything they can think of is more believable than this man I work with is a predator even though statistically it is so much more likely than any of their contrived bs. All these people are scientists and they don't even follow the stats….I also don't believe survivors have to be perfect victims. I don't care if Sawyer embellished. I would too as a poor brown trans person going up against a wealthy respectable Professor. Even if Sawyer messaged first, flirted first, wanted to go on dates, etc., the reality is Dustin responded by targeting, harassing, stalking, and threating this Black trans man.

**Exhibit K, Lett 33 - 37**

27.     In response to a question about Defendant's awareness in July 2023 about the effect the Sawyer accusations were having on Professor Duncan, Defendant testified: "What I thought when I read [this] was Harvey Weinstein looked very sick when he was revealed to be an abuser.  That's the first thought that comes to my mind now and what came to my mind then." (Lin Dec. Ex. 4, Def. Tr. 226:4-8.

**RESPONSE: AGREED**

28.     On July 18, 2023, Defendant posted on social media about Professor Duncan, a

post that states in relevant part:

> There seems to be some confusion about where I stand on a recent
> incident involving a professor and a community member. To be
> unambiguous I donated to their fundraiser because I support them
> as a victim of harm. I deleted some tweets to reduce my exposure
> for a lawsuit but my support hasn't waned. I also note that their
> [sic] are questions about the voracity [sic] of claims. I'll share that
> being a perfect historian about dates of traumatic events is hard
> when in distress and that huge power imbalances facilitate doubt in
> victims . . . . I don't want to jump to conclusions nor change my
> convictions easily. We all have the capacity to be wrong but I
> haven't been convinced of that just yet.

(Lin Dec. Ex. 7.)

**RESPONSE: AGREED**

29.    On August 10, 2023, Defendant stated in an X post: "A couple people have asked me about IAPHS so I'm going to address it again here. There was an alleged harm committed by a senior person involved. I say alleged, not because I doubt the victim, but for legal reasons, I avoid naming that person for similar reasons." (Lin Dec. Ex. 7.)

**RESPONSE: AGREED**

30.    At page 232 of her deposition transcript, in response to being shown a post contained in Motion Exhibit I dated August 10, 2023, which referenced a "senior person," Defendant testified that the "senior person" was Professor Duncan. (Lin Dec. Ex. 4, Def. Tr. 232:5-24.).

**RESPONSE: AGREED**

31.    When asked how she became aware of Sawyer's accusations against Professor Duncan, Dr. Green testified:

> I think that I was on Twitter one day, and I followed several trans people in trans communities, several of them, and I cannot recall
>
> who exactly they all were, but they began posting about it, and I began, you know, following up on the links, that I saw. And the Go Fund Me, other like Facebook links, other things, other things on the internet.
> Q. Was one of the trans scholars you're referring to Dr. Lett?
> A. He was one of them, but not the only one.
> Q. Do you recall any of the others?
> A. I don't.
> Q. Do you recall, approximately how many there were, in addition to Dr. Lett?
> A. I don't.
> Q. Was Dr. Lett the only trans scholar that you were following on Twitter, that you had, at that point, that you had any kind of personal relationship with as well?
> A. I would say that I know Dr. Lett the best.

(Lin Dec. Ex. 11, Green Tr. 32:22-33:24.)

13

**RESPONSE: AGREED**

32.     At page 18, line 2 through line 8, Bhatt testified: "Krish, do you know Sawyer Allen?  Not personally.  Q. Okay. How were you first introduced to Sawyer Allen?  A. I was never introduced to Sawyer Allen.  Q. Okay." (Lin Dec. Ex. 17.)

**RESPONSE**:  Dispute Plaintiff's fact where it is misleading. Bhatt also testified as follows:

> *Q Do you know anyone who has a personal*
> *relationship with Mr. Allen?*
> *A I used to.*
> *Q Who did you know who had a personal*
> *relationship -- sorry. I'll say Mx. Allen. Do you --*
> *who did you know who had a --*
> *A My ex-partner.*

*Exhibit G, page 19.*

33.     Beginning at page 29, line 6 and through page 30, line 15, Dolotina testified as follows:

> Q.  Okay. How did Dr. Duncan's lawsuit against Mx. Allen, make you feel?
> A. Confused. And I didn't know much of the details. So mainly confused. Yeah.
> Q. Had you seen the lawsuit personally?
> A. The document of the -- of the lawsuit?
> Q. Yeah. Yes. The document.
> A. Yes. Yes.
> Q. Okay. Did you read the lawsuit?
> A. Not in depth, but I skimmed it.
> Q. Okay. What were your thoughts when you skimmed -- after skimming the lawsuit?
> A. Confusion as well. But in that lawsuit document what I did understand was Dr. Duncan was suing Mx. Allen for defamation.
> Q. Okay. Could you please describe more of what made you feel confused when you read the lawsuit?
> A. The details -- I don't remember much, but the details that were described were -- some of the details that were described were not
>
> matching up with what Sawyer presented online.  An example that I remember is location, and date, and time of some of the accusations that Sawyer was working with the actual location, date, and time of Dr. Duncan.  And so that made me confused

14

because, again, I believed everything that Sawyer posted because I believed that no person would make a post like this if it wasn't real to the extent of the detail of messages and screenshots that were posted.
Q. Okay. How did this lawsuit make you feel about Mx. Allen?
A. Also confused. I became confused about Mx. Allen and I began to question how much I could trust what they were saying.

(Lin Dec. Ex. 5.)

**RESPONSE:** Agreed

34.     During her deposition, Defendant testified that as December 2023 approached, her involvement with what Sawyer was saying about Professor Duncan "became a less important part of my life." (Lin Dec. Ex. 4, Def. Tr. 221:9-12.) Defendant testified as to one the reasons for that: "I was -- I thought I had reached the capacity of my usefulness. Krish and Brett had moved along in their processes and were sometime in August out of the lab. They had pursued as far as they could for protection and they had all been declined, from what Krish had told me. And that was really all that I was interested in, was protecting those trans people." (Lin Dec. Ex. 4, Def. Tr. 221:21-222:4.)

**RESPONSE:** Agreed

35.     During her deposition, upon being shown her correspondence with Dr. Tiffany Green (Lin Dec. Ex. 8, Lett 00552), showing a message that stated in part "I'm gonna be dragging him publicly for ever I will run him out of trans health if I can," Defendant testified that "him" is a reference to Professor Duncan. (Lin Dec. Ex. 4, Def. Tr. at 234:3-16.)

**RESPONSE:** Dispute. Plaintiff's citation is incomplete and misleading. Dr. Lett's quote in context is as follows:

*Q. And these are your messages on the left?*
*A. Yes. These are messages. Very flippant messages, as you can read from the content of them, between me and a friend. And it was about -- it was about Dustin, and I say, "I am going to be dragging him publically for ever." "I will run him out of trans health if*

15

*I can." "Maybe lol, sometimes I get tired of fighting and want to just do makeup and be pretty while my titties grow." I'm referencing the fact that I am on hormone therapy. And I'm also talking -- really venting about how frustrated I am that abusers of trans people have huge platforms and access to trans people. I didn't actually continue to comment publically. This was just me venting with a friend, which is why within the same minute I said, "Maybe, lol," and make a flippant reference to the effects of estradiol therapy for me as a trans woman.*

*See Ex. D. pg 234.*

36.    During her deposition, upon being shown her correspondence with Dr. Green (Lin Dec. Ex. 11); specifically, a message from Defendant stating "I'm twice the scientist he is and 3x on Sunday," Defendant testified:  "A.  I'm saying that I'm a better scientist than Dr. Duncan. And is that your belief?  A. It is my belief that I am a better scientist than Dr. Duncan."  (Lin Dec. Ex. 4, Def. Tr. at 11-20.)

**RESPONSE:** Agreed

> */s/ Pearlette V. Toussant*_____
> Pearlette V. Toussant, Esq.
> Law Office of Pearlette V. Toussant, PLLC
> 2917 W. Harper Street
> Philadelphia, PA, 19130
> pearlettetoussant@gmail.com
> Phone (215) 327 2900
> Fax: (267) 836 1133
>
> *Counsel for Defendant Dr. Elle Lett, MD, PhD., MA, Mbiostat*

DATED: January 15, 2026

16

18

23

25