# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

Dustin T. Duncan, ScD,

              Plaintiff,

      -against-

Elle Lett, PhD,

             Defendant.

Civil Action No.: 23-cv-04284 (KBH)

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Table of Contents

*PRELIMINARY STATEMENT* ...................................................................................... *1*

*STATEMENT OF FACTS* ............................................................................................. *1*

*ARGUMENT* ............................................................................................................... **6**

    **I.**    **No Anti-Slapp Law Applies.** ....................................................................... **7**

    **II.**    **Professor Duncan is not a Public Figure.** ................................................ **7**

    **III.**  **No Privilege Applies to Immunize Defendant's Statements from Liability.** ............. **16**

    **IV.**  **Defendant's Statements are not Protectable Opinions as a Matter of Law.** ............. **19**

*CONCLUSION* .......................................................................................................... *22*

## Table of Authorities

**Cases**

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287 (E.D.N.Y. 2015),
    aff'd, 670 F. App'x 731 (2d Cir. 2016) ...................................................................... 21

*Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015) ........................................................ 12, 13, 15

*Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466 (S.D.N.Y. 2024) ................................ 14

*Boehner v. Heise*, 734 F. Supp. 2d 389 (S.D.N.Y. 2010) ............................................ 18

*BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810 (S.D.N.Y. 2021) .................... 8

*Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163 (2d Cir. 2000) ............................. 14, 16

*Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001) ........................... 15

*Coleman v. Grand*, 523 F. Supp. 3d 244 (E.D.N.Y. 2021), aff'd, 158 F.4th 132 (2d Cir. 2025) .. 10,
    19

*Conti v. Doe*, 535 F. Supp. 3d 257 (S.D.N.Y. 2021) .............................................. 16, 17

*Friedman v. Bloomberg L.P.*, 884 F.3d 83 (2d Cir. 2017) ....................................... 20

*Garson v. Hendlin*, 141 A.D.2d 55, 532 N.Y.S.2d 776 (2d Dep't 1988) ...................... 18

*Gertz v. Robert Welch, Inc.*, 418 U.S. 324 (1974) ................................................. 8

*Gross v. New York Times Co.*, 82 N.Y.2d 146, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993) ........ 19

ii

*Harte-Hawks Communications, Inc. v. Connaughton*, 491 U.S. 657 (1989)................................. 13

*Khalil v. Fox Corp.*, 630 F. Supp. 3d 568 (S.D.N.Y. 2022) ........................................ 8, 9

*Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92 (2d Cir. 2000)................................ 17

*Konikoff v. Prudential Ins. Co. of Am.*, No. 94CIV.6863(MBM)(MHD), 1999 WL 688460
    (S.D.N.Y. Sept. 1, 1999), aff'd, 234 F.3d 92 (2d Cir. 2000) ................................ 18

*Lerman v. Flynt Distrib. Co.*, 745 F.2d 123 (2d Cir. 1984)............................................ 8

*Manno v. Am. Gen. Fin. Co.*, 439 F. Supp. 2d 418 (E.D. Pa. 2006) ............................... 6

*McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir. 1985).................................................. 9

*Mitre Sports Int'l Ltd. v. Home Box Off., Inc.*, 22 F. Supp. 3d 240 (S.D.N.Y. 2014) ..................... 8

*Monge v. Univ. of Pa.*, No. 22-2942 (E.D. Pa. May 18, 2023) ...................................... 9

*Monge v. Univ. of Pa.*, No. 22-2942, 2023 BL 205028, 2023 WL 4032661 (E.D. PA. June 13,
    2023) ............................................................................................ 11, 12

*Moraes v. White*, 571 F. Supp. 3d 77 (S.D.N.Y. 2021) .............................................. 17

*Naantaanbuu v. Abernathy*, 816 F. Supp. 218 (S.D.N.Y. 1993) .................................... 11

*Pisani v. Staten Island Univ. Hosp.*, No. 06-CV-1016 JFB MLO, 2008 WL 1771922 (E.D.N.Y.
    Apr. 15, 2008) ..................................................................................... 11

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705 (S.D.N.Y. 2014) ................ 21

*Rudolph v. Safari Club Int'l*, 2:12-CV-01710-CRE, 2018 WL 3145716 (W.D. Pa. June 27, 2018)9

*Sprague v. Am. Bar Ass'n*, 270 F. Supp. 2d 365 (E.D. Pa. 2003) .................................... 6

*St. Amant v. Thompson*, 390 U.S. 727, 88 S. Ct. 1323, 1326, 20 L. Ed. 2d 262 (1968) ... 13, 14, 15

*Torain v. Liu*, 279 F. App'x 46 (2d Cir. 2008) ......................................................... 21

*Zuckerbrot v. Lande*, 75 Misc. 3d 269, 167 N.Y.S.3d 313 (N.Y. Sup. Ct. 2022) ......................... 15

**Statutes**

Federal Rules of Civil Procedure 56 ............................................................... 6

## PRELIMINARY STATEMENT

Plaintiff Dustin T. Duncan, ScD ("Plaintiff" or "Professor Duncan"), by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to Defendant Elle Lett ("Defendant")'s fourth motion for summary judgment.

Defendant's fourth attempt for summary judgment ("Def. SJ") should be denied as the bases upon which Defendant's motion are based are deeply flawed. While Defendant states in her motion that there are ten bases why summary judgment should be granted in her favor, (Def. SJ at 1) her brief only makes four arguments: (1) New York or Pennsylvania anti-Slapp law applies here, requiring actual malice, which is absent; (2) Professor Duncan is a public figure and thus actual malice is required and not proven; (3) Defendant's statements are protected by privilege; and (4) Defendant's statements are unactionable opinions. Each of these proffered arguments are deeply flawed for the reasons explained below and thus, Defendant's motion should be denied in its entirety.

## STATEMENT OF FACTS

Prior to the filing of this case, Professor Duncan was the victim of an online defamation campaign initiated by a person using the name Sawyer Allen ("Sawyer"), after Professor Duncan had a brief encounter with Sawyer at Blick while Professor Duncan was attempting to have some artwork framed in April of 2023. (Lin Dec. Ex. 1.)[1] Using social media, Sawyer falsely accused Professor Duncan of serious crimes, including harassing and stalking. (*Id.*) In addition to defaming Professor Duncan on social media, Sawyer directed his defamation to Professor Duncan's employer, Columbia University (the "University"). Two people working for Professor Duncan at the University, Krish Bhatt ("Bhatt") and Brett Dolotina ("Dolotina"), learned about Sawyer's

---

[1] Previously filed as well at ECF No. 68, attached to Plaintiff's Opposition to Defendant's third summary judgment motion.

accusations as well.  (Lin Dec. Exs. 12, 15.)

Professor Duncan did not initially appreciate the extent to which Sawyer was publicly and falsely accusing Professor Duncan of criminal behavior.  (Lin Dec. Ex. 1.)  To Professor Duncan, his interactions with Sawyer were brief and of no particular import.  (*Id*.) Professor Duncan had no interest in making his interactions with Sawyer and Sawyer's subsequent defamation of him a matter of wide public discussion. (Duncan Dec. ¶¶ 5-6.)[2] However, given the seriousness of what Sawyer was accusing him of and the efforts Sawyer made to publish those false accusations to, *inter alia*, Columbia, in or about the beginning of July 2023, Professor Duncan began looking into the legal avenues he could pursue to clear his name and show the falsity of Sawyer's accusations. (*See id*. ¶ 9.)

In late June 2023, shortly before the Fourth of July weekend, Dolotina contacted Defendant because Dolotina had also heard about Sawyer's accusations.  (Lin Dec. Ex. 15, at Lett 00002.) Dolotina did not know Sawyer directly (Lin Dec. Ex. 5, Dolotina Tr. at 14-15), and Defendant did not know Sawyer in June 2023 (Lin Dec. Ex. 5, Def. Tr. at 68-69).  Nonetheless, Dolotina repeated Sawyer's accusations to Defendant, and Defendant then went on to publish them to specific professional colleagues also known to Professor Duncan as well as more broadly on social media. (*See generally* Lin Dec. Exs. 6-10.)

From this District, Defendant almost immediately began amplifying Sawyer's accusations, broadening their reach to other people in her professional and/or personal circle, including Dr. Avery Everhart, Dr. Arjee Restar and Dr. Carl Streed.  (*See generally id*.)  Almost immediately after Defendant began publishing and amplifying Sawyer's accusations, they began having their desired effect.  For example, Dr. Tiffany Green, who was, in June of 2023, working with Professor

---

[2] Previously filed as well at ECF No. 68, attached to Plaintiff's Opposition to Defendant's third summary judgment motion.

Duncan as a co-chair for the Interdisciplinary Association for Population Health Sciences ("IAPHS") Conference, saw one of Defendant's June 2023 social media posts regarding Sawyer's accusations. Dr. Green almost immediately began efforts to have Professor Duncan removed as a co-chair for that Conference (*see* Lin Dec. Ex. 8, at Lett 00528), and, as Dr. Green testified at her deposition:  "Q.  Had you not become aware of Sawyer Allen's accusations against Dr. Duncan, would you have had any reason to suggest that he no longer be a co-chair on the IAPHS?  A.  Had I not become aware, no.  I would have had no reason to suggest that."  (Lin Dec. Ex. 4, Green Tr. at 133.) Also in June of 2023, an associate editor of the Health Equity Journal, Dr. Goleen Samari, became aware of Defendant's social media posts, at a time when that Journal was reviewing a manuscript in which Professor Duncan was listed as the lead author. (Lin Dec. Exs. 9, 10, 13)

In messages with some of the professional colleagues to whom Defendant was republishing Sawyer's accusations against Professor Duncan, Defendant revealed an antipathy toward Professor Duncan, including a message stating that Professor Duncan "had always tickled my intuition as dangerous" and indicating that she was only too willing to believe and spread negative information about him.  (Lin Dec. Ex. 6)

Defendant's social media posts about Professor Duncan at the end of June referenced "details" and "evidence" that would support Sawyer's accusations against Professor Duncan (Lin Dec. Ex. 7), indicating that there were "facts" that Defendant was deliberately *not* disclosing that would support her statements about Professor Duncan. Indeed, in one social media post, Defendant specifically says:

> There are **public details and evidence out there if you want to investigate** but I'm more interested in supporting Sawyer so **I decided not to link those**.

(*Id*., at DD_318 (emphasis added).)

3

The University informed Professor Duncan on July 7, 2023, that it had begun a formal investigation about Sawyer's accusations.  (Lin Dec. Ex. 1, ¶ 57.)  On July 12, 2023, Professor Duncan filed his initial complaint against Sawyer and his employer in the NYS Case (the "NYS Complaint"), and a copy of that complaint was subsequently sent to Defendant in mid-July.  (Lin Dec. Exs. 1-2.)  That complaint, which was verified by Professor Duncan (Duncan Dec. ¶ 13), made clear that Professor Duncan was disputing the veracity of the claims being made by Sawyer.  In her deposition, Defendant testified that she "only skimmed" that complaint after she was sent a copy.  (Lin Dec. Ex. 4, Def. Tr. at 210.)  Even by "only skimm[ing]" the complaint, Defendant was able to appreciate that the NYS Complaint included facts that, on dates that Sawyer was claiming he was stalked and followed by Professor Duncan throughout New York City, Professor Duncan was traveling outside of New York State.  (Lin Dec. Ex. 1, at ¶ 29.)  Defendant remained impervious to that information.  Specifically, Defendant testified:

> [A]ll I got was that there was some dispute over those dates that Sawyer alleged things in, which I didn't have at the top of my head. Again, I didn't memorize Sawyer Allen's allegations. And that the dates that [Professor] Duncan said about his travel schedule.  I did not cross-reference them because, again, comparing Sawyer Allen's firsthand account and messages that claimed to be directly from Dr. Duncan, **a legal document was not going to persuade me** that all of this other stuff was not worth considering as evidence for Dr. Duncan having committed this crime.

(Lin Dec. Ex. 4, Def. Tr. at 210 (emphasis added).)  Also in mid-July, Defendant commented on the video footage showing Professor Duncan and Sawyer interacting at Blick, which did not show any inappropriate conduct. As Defendant explained, "they [the video clips] only confirm that [Professor Duncan] was in the store. First interaction with sawyer, second when he [Professor Duncan] was banned. They don't really show anything else."  (Lin Dec. Ex. 10, at Lett 00594-95.)

Nonetheless, in another social media post on July 18, while recognizing that questions had

arisen about the truthfulness of Sawyer's accusations, Defendant announced that she remained

impervious, stating:

> There seems to be some confusion about where I stand on a recent
> incident involving a professor [Professor Duncan] and a
> community member [Sawyer].  To be unambiguous I donated to their fundraiser
> because I support them as a victim of harm.  I deleted some tweets
> to reduce my exposure for a lawsuit **but my support hasn't waned**.
> I also note that their [sic] are questions about the voracity [sic] of
> claims.  I'll share that being a perfect historian about dates of
> traumatic events is hard when in distress and that huge power
> imbalances facilitate doubt in victims  . . . .
> I don't jump to conclusions nor change my convictions easily.  We
> all have the capacity to be wrong but I haven't been convinced of
> that just yet.

(Lin Dec. Ex. 7, at DD 36 (emphasis added).)

Also on July 18, Defendant substantively repeated the sentiment above, acknowledging to

Bhatt that "Yeah I mean there are definite holes in sawyer's story but they come down to dates

and that's just not convincing to me."  (Lin Dec. Ex. 12, at Lett 00036.)  Even when Bhatt

summarized for Defendant the update he and his colleagues received about the progress of the

University's investigation and its effects on Professor Duncan, including the facts that:  (A)

Professor Duncan was fully cooperating with that investigation; (B) there was more to the story

than what was circulating on social media and (C) that Professor Duncan was appearing "anxious

and tired and angry," Defendant remained impervious, testifying:  "What I thought when I read

[this] was Harvey Weinstein looked very sick when he was revealed to be an abuser. **That's the

first thought that comes to my mind now and what came to my mind then**."  (Lin Dec. Ex. 4,

Def. Tr. at 226 (emphasis added).)

Nonetheless, in another social media post in August, Defendant published this:

"A couple people have asked me about IAPHS so I'm going to address it again here.  There was

an alleged harm committed by a senior person involved.  I say alleged, not because I doubt the

victim, but for legal reasons, I avoid naming that person for similar reasons." (Lin Dec. Ex. 7.) Defendant testified that the "senior person" referenced is Professor Duncan. (Lin Dec. Ex. 4, Def. Tr. at 232.) In a message with Dr. Green on August 23, Defendant neatly summed up her attitude toward Professor Duncan and her repeated publication of Sawyer's accusations against Professor Duncan, which was to "be dragging him [Professor Duncan][3] publicly for ever. I will run him out of trans health if I can." (Lin Dec. Ex. 8, at Lett 00552.).

## ARGUMENT

Defendant's motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under the Federal Rules as applied in this Circuit, Plaintiff, as the non-moving party, is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts. *See Manno v. Am. Gen. Fin. Co.*, 439 F. Supp. 2d 418, 422 (E.D. Pa. 2006); *see also Sprague v. Am. Bar Ass'n*, 270 F. Supp. 2d 365, 367 (E.D. Pa. 2003) ("Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.") (citation omitted).

As an initial matter, this Court has already held that New York substantive defamation law applies. (ECF No. 83, 86, 100). Defendant inexplicably cites both New York and Pennsylvania law indiscriminately in her summary judgment motion. Plaintiff will use the appropriate New York law, and will refer to Pennsylvania law only where necessary to respond to Defendant.

---

[3]    During her deposition, Defendant testified that the "him" in this message referred to Professor Duncan. (Lin Dec. Ex. 4, Def. Tr. at 234.)

6

Furthermore, Defendant spends a significant portion of her motion weaving in narratives and rhetoric regarding the transgender community, minority rights, and doing the right thing to protect victims. While stating important concerns, for the most part it is legally irrelevant and transparently attempts to emotionally persuade as opposed to setting forth coherent legal arguments. This opposition will, for the most part, not respond to these distractions.

## I.      No Anti-Slapp Law Applies.

Defendant argues that either Pennsylvania or New York's anti-Slapp law applies to this case. (Def. SJ 5-7). Defendant argues that one of these laws protects her speech and entitles her to attorneys' fees. *Id.* at 5-7, 25. This is incorrect. This Court has already held that neither Pennsylvania nor New York's anti-Slapp law applies. ECF No. 83. Defendant has provided no reason why this Court should disregard its previous holding, and in fact fails to even acknowledge that the Court already ruled on the inapplicability of these anti-Slapp laws. Thus, Defendant's arguments regarding the anti-Slapp laws are completely irrelevant and provide no basis for granting summary judgment in favor of Defendant. Likewise, there is no valid basis to provide Defendant attorneys' fees under these statutes as the Court has held them inapplicable.

## II.     Professor Duncan is not a Public Figure.

Defendant unsuccessfully argues that Professor Duncan is a public figure for the clear purpose of applying an actual malice standard. However, Defendant is not a public figure, and failing to demonstrate that Professor Duncan is a public figure deflates any remaining basis Defendant may have had to allege that actual malice is required, considering this Court has already held that no anti-Slapp law applies. (ECF No. 83). Even if Professor Duncan was a public figure, requiring actual malice, this standard has been met here, or at the very least cannot be determined in Defendant's favor on summary judgment.

Defendant conflates the concept of a public figure with the basic common understanding of publicity. This explains Defendant's continued focus on Professor Duncan's academic work and his effort and success in his field. This, however misses the mark on what the law requires in order to determine that a party is a general or limited purpose public figure. There is no basis for determining that Professor Duncan is a general public figure, and Defendant does not seriously contend that he could be such a figure, as he is not a widely-recognized or known individual. *Mitre Sports Int'l Ltd. v. Home Box Off., Inc.*, 22 F. Supp. 3d 240, 249 (S.D.N.Y. 2014) ("A general purpose public figure must have 'general fame or notoriety in the community and pervasive involvement in ordering the affairs of society.'")(quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 324, 345 (1974)).

Defendant argues instead that Professor Duncan is a limited purpose public figure. "A limited public figure is one who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'" *Khalil v. Fox Corp.*, 630 F. Supp. 3d 568, 583 (S.D.N.Y. 2022) (quoting *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 819 (S.D.N.Y. 2021)). Under New York law "in order to hold the plaintiff to be a limited-purpose public figure 'a defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.'" *Khalil v. Fox Corp.*, 630 F. Supp. 3d 568, 583–84 (S.D.N.Y. 2022) (quoting *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136-37 (2d Cir. 1984)). While this test is slightly different than the test in Pennsylvania and the Third Circuit, as quoted by Defendant, both jurisdictions' inquiries require a connection between the public attention the

party has invited and the allegedly defamatory remarks. *See Id.*; *Rudolph v. Safari Club Int'l*, 2:12-CV-01710-CRE, 2018 WL 3145716, at *8 (W.D. Pa. June 27, 2018). This connection is fatally missing here. The alleged defamation and Professor Duncan's activities pointed to by Defendant are not related in any legally relevant way. So even if the other requirements were met, which they are not, Professor Duncan could not be considered a limited public figure for this case. Professor Duncan's academic work is unrelated to his dispute with Sawyer, which Defendant, not Professor Duncan, ultimately chose to publicly post about and discuss. The fact that Professor Duncan's work relates to transgender people and his private dispute involved a transgender person is not a sufficient legal connection to make him a public figure. *See Khalil v. Fox Corp.*, 630 F. Supp. 3d 568, 584 (S.D.N.Y. 2022) ("Khalil did not draw public attention to his views to influence others regarding the election of 2020 nor insert himself into a public controversy related to the defamatory statements against him. He only became involved in the conversation because of the statements by Dobbs and Powell. He has not maintained regular and continual access to the media. He is not a limited public figure."). Defendant fails to explain how Professor Duncan placed himself in the public eye for this controversy, instead relying exclusively on his career, while failing to address the fact that his career and these events are not related.

Even the cases cited by Defendant acknowledge the requirement that the defamatory statements be sufficiently related to how the Plaintiff has thrust themselves into the public eye. *See Monge v. Univ. of Pa.*, No. 22-2942 (E.D. Pa. May 18, 2023) ("a 'limited public figure' is someone who is considered a public figure with respect to a specific public controversy. *See McDowell v. Paiewonsky*, 769 F.2d 942, 948-51 (3d Cir. 1985) (concluding that plaintiff's actions were 'sufficient to transform him into a public figure for the limited purpose of his work on publicly financed building projects—the subject of the allegedly defamatory remarks').").

Furthermore, Defendant has failed to adequately explain what active public controversy Professor Duncan voluntarily inserted himself into before Defendant defamed him. The factual record in this case shows that there was no active public controversy until Sawyer began falsely accusing Professor Duncan of criminal behavior and Defendant republished those accusations. Defendant took it upon herself to expand a dispute that would otherwise have been confined to Professor Duncan on the one hand and Sawyer and Blick on the other into a public debate. Now, with the possibility of facing legal consequences for the effects of her statements, Defendant seeks to recast the controversy as one for the protection of transgender people, and points to Professor Duncan's career as the basis to hold him out as a limited purpose public figure. However, this misconstrues the legal framework – whatever state's law is applied. Defendant fails to cite any case that would allow this broad reading of what constitutes a public controversy and who can be thus considered a public figure. Instead, Defendant makes broad statements concerning transgender and LGBTQ individuals and points to cases regarding Title VII as the basis to create a public controversy here (Def. SJ. 9). Professor Duncan does not dispute the concerns regarding these communities raised by Defendant; however, these are not legally relevant here. According to Defendant's logic any activities that involve transgender individuals are related to an active public controversy and any interaction Professor Duncan may happen to have with an individual who is transgender would be related to that controversy and to his work – making him a limited public figure for every single one of those possible interactions. However, that is not what the law allows. Instead, the public controversy must be more succinct than that and the party's conduct more related. *See Coleman v. Grand*, 523 F. Supp. 3d 244, 256 (E.D.N.Y. 2021), aff'd, 158 F.4th 132 (2d Cir. 2025) ("There is no evidence that, prior to Grand's email, Coleman successfully sought public attention and influence for his views on matters arguably related to this litigation, such as

10

his relationships, relationships generally or sexual harassment allegations. The record reflects only that Coleman sought and received attention for making music."); *Pisani v. Staten Island Univ. Hosp.*, No. 06-CV-1016 JFB MLO, 2008 WL 1771922, at *15–16 (E.D.N.Y. Apr. 15, 2008) ("because plaintiff's purported prominence was wholly unrelated to the topic of the Hospital's statement, the Court finds defendants' argument inapposite and concludes that […] as a matter of law that plaintiff was not a limited purpose public figure"). Absent a live public controversy and a close connection between the controversy alleged and the voluntary public behavior of the party, the party is simply not a public figure. *See Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 225 (S.D.N.Y. 1993) ("the "controversy" into which a plaintiff has allegedly entered is defined as the event that the defamatory statements describe. The controversy in this case is not the publication of the Book; nor is it, as the defendants seem to argue, the extent or nature of the plaintiff's role in the civil rights movement throughout her lifetime. Rather, the "controversy" is the question of the events that took place on the last night of King's life. […] The plaintiff's actions and high profile in her community might arguably make her a public figure if this litigation concerned statements made, for example, about the nature of her conduct as a civil rights activist […]Under the facts of this lawsuit, however, the controversy and the voluntary behavior are not closely connected enough to render Naantaanbuu a limited purpose public figure.").

Furthermore, the cases cited by Defendant, albeit applying the wrong state's law, do not even support her proposition. The cases cited consist of individuals who participated in a public controversy and then were spoken about in relation to that same controversy – not the broad claim Defendant tries to make here. *See* Def. SJ 11, 12. For instance, Defendant cites, *Monge v. Univ. of Pa.*, No. 22-2942, 2023 BL 205028, 2023 WL 4032661 (E.D. PA. June 13, 2023), a case where a professor wrote about a topic and was then the subject of discussion in relation to that topic and

was found to be a limited public figure. (Def. SJ 11); *see also Monge v. Univ. of Pennsylvania*, No. CV 22-2942, 2023 WL 4032661, at *6 (E.D. Pa. June 14, 2023) (the allegedly defamatory statements referred to Plaintiff's academic work with the MOVE bombing, thus, "[Plaintiff] is a limited public figure with respect to the MOVE bombing and the identification of the MOVE remains—both of which are public controversies—and she became a limited public figure in 2019 when she published her course on the Coursera online platform."). An appropriate analogy here would be if Defendant made statements regarding Professor Duncan's work or career, however that is not the case here. This case is one in which Professor Duncan and Sawyer were involved in a private dispute stemming from a routine encounter at Blick having nothing whatsoever to do with Professor Duncan's work, thus he cannot be found to be a limited purpose public figure without doing away with the distinction between a limited purpose and general public figure.

In summation, Professor Duncan has a career, and it is in some ways public facing. However, his career is not what this controversy is about. Instead, the statements Defendant made about him were about his private interactions with an individual he met at an art store while seeking to frame some of his personal art. This is not a public controversy, and it does not relate to his work. Thus, Professor Duncan is not a limited purpose public figure.

Even if Professor Duncan was a limited purpose public figure, Defendant has failed to prove that as a matter of law the actual malice standard has not been met. Actual malice requires the defendant made statements with "knowledge that the statements were false or with reckless disregard as to their falsity." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015). Defendant fails as a matter of law to show that this standard has not been met and thus cannot meet the standard required to succeed on summary judgment.

The evidence here shows that there was a plethora of facts that, even if Defendant subjectively believed Sawyer's allegations as she claims, her statements were made with reckless disregard for the truth. In other words, even statements made with staunch belief can be made with actual malice where that staunch believe is based on a reckless disregard for the truth. The first piece of the collective picture is that, almost immediately upon learning about the accusations against Professor Duncan on June 29, 2023, Defendant leapt on them—despite the accusations coming from someone Defendant had never previously heard of and despite learning about them second-hand from Dolotina, another person with whom Defendant had no close connection. (*See generally* Lin Dec. Exs. 6-10). Next, Defendant even understood, as indicated by her private conversations and public social media posts, that there was evidence concerning the allegations to be found, however, Defendant failed to inquire or even look further, instead choosing to blindly believe a random post she read on the internet. (Lin Dec. Ex. 7). Furthermore, when Defendant had the opportunity to communicate with Sawyer directly, she made no attempt to verify or clarify any of his accusations, including after Defendant received the NYS Complaint. (Lin Dec. Ex. 18). This decision to turn a blind eye, ignore evidence, and trust unreliable sources is actual malice. *See Harte-Hawks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989)(a "deliberate decision not to acquire knowledge of facts" constitutes purposeful avoidance of the truth, supporting an inference of actual malice); *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S. Ct. 1323, 1326, 20 L. Ed. 2d 262 (1968)). Defendant instead took the opportunity to advise Sawyer to correct errors in his posts to make them less susceptible to critique. This conduct is inexcusable.

13

Defendant cites cases that support the proposition that a failure to investigate "in and of itself is insufficient to show actual malice." *Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466, 474 (S.D.N.Y. 2024); (Def. SJ 15). However, this is far from the scenario here. First, the failure to investigate is not the only factor, but in fact one of many that lead to a finding of actual malice, and second, there were indicators, such as the inconsistencies in Sawyer's claims, including the fact that Professor Duncan was not in New York on certain dates Sawyer claimed (Duncan Dec. ¶ 13) , all of the information coming through second-hand sources or people Defendant did not know well or at all, such as Sawyer (Lin Dec. Ex. 5, Dolotina Tr. At 14-15; Lin Dec. Ex. 5, Def. Tr. at 68-69), and the on-going court case and investigations, that made the veracity of the facts and claims doubtful, which Defendant actively chose to simply ignore. So while it is correct that a failure to investigate on its own is not sufficient, that combined with many factors, including Defendant's own admission that other facts were out there that she chose to ignore (Lin Dec. Ex. 7; Lin Dec. Ex. 4, Def. Tr. At 210; Lin Dec. Ex. 12, at Lett 00036), makes it impossible for the Court to hold no actual malice is present here on summary judgment.

Courts have recognized that, although a party sued for defamation may insist on having had a subjective belief in their own good faith and/or honest belief in the truth of their defamatory statements, the objective circumstances override that insistence. *See St. Amant v. Thompson*, 390 U.S. 727, 733 (1968). Here, Defendant is only able to so insist because she avoided the truth and recklessly disregarded the facts specifically presented to her that did not comport with Defendant's existing negative view of Professor Duncan. *See Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) (finding actual malice based on ill will and personal animosity between the parties, doubt about the veracity of the statements, even where defendant claimed pure believe, and a failure to investigate; the court explained "Actual malice can be established through the

14

defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of the story among other circumstantial evidence […] Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice.") (cleaned up and citations omitted); *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) ("We recognize that although '[f]ailure to investigate does not in itself establish bad faith,' reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice") (quoting *St. Amant v. Thompson*, 390 U.S. at 733); *Zuckerbrot v. Lande*, 75 Misc. 3d 269, 297, 167 N.Y.S.3d 313, 335–36 (N.Y. Sup. Ct. 2022) ("Plaintiffs sufficiently allege that Gellis acted with actual malice. The Complaint asserts that Gellis relied on 'unverified, anonymous source[s]', without further investigation […] ignored 'obvious reasons to doubt the veracity of the informant or the accuracy of [her] reports', including the findings in an independently-verified certificate of analysis […] Finally, Gellis's alleged personal animus toward Zuckerbrot provides further circumstantial evidence of actual malice.") (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001)).

Defendant argues that it was reasonable, as opposed to reckless, for her to believe Sawyer's statements because it was based on "a reliance on the trustworthiness of the convictions of Dr. Duncan's employees who desperately reached out for help." Def. SJ. 15. The fact that other people believed Sawyer's statements or contacted Defendant to discuss the accusations has no legal bearing on whether Defendant personally acted with reckless disregard for the truth. However, the narrative Defendant creates here is not based on the factual record or the law. First, the messages and interactions between Defendant and Professor Duncan's colleagues do not in fact show an unwavering believe in Sawyer's allegations. Lin. Dec. Exs. 4, 10, 12, 15. Furthermore, it is clear

from these interactions, that none of the individuals speaking had firsthand knowledge about the veracity of these claims and none of them personally knew Sawyer. *Id.* The fact that Defendant spent time discussing these allegations with others does not mean she was not reckless in her attitude towards learning the truth. Specifically, where there were holes in Sawyer's accusations, which other colleagues acknowledged, (Lin Dec. Exs. 10, 12), Defendant remained steadfast in her convictions, refusing to even consider other information, even when coming from her colleagues, such as an update regarding the investigation received from a colleague at Columbia University. Lin Dec. Ex. 12. As stated above, the law does not allow such reckless avoidance of the truth, this remains true even if other people appear to believe the claims in the face of doubt and a reckless avoidance of the truth as well. *See Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000). For these reasons, Defendant has failed to prove that Professor Duncan is a public figure and has failed to show as a matter of law that actual malice has not been proven.

### III.    No Privilege Applies to Immunize Defendant's Statements from Liability.

Defendant fails to show under the appropriate legal framework how her statements are protectable under a common interest privilege. Instead of contending with the relevant legal standard, Defendant makes broad generalizations about her relationships with the individuals she messaged and baselessly claims protection for the transgender community at large. Furthermore, Defendant does not demonstrate how each of her statements is in furtherance of and limited to furthering whatever interest or privilege is being claimed. Thus, for these reasons, more fully expanded upon below, no privilege immunizes Defendant's statements.

The common interest privilege is a conditional privilege that "extends to a communication made by one person to another upon a subject in which both have an interest." *Conti v. Doe*, 535 F. Supp. 3d 257, 276 (S.D.N.Y. 2021). Such a privilege is "typically applied to statements that are

published to an extremely limited, clearly defined group of private persons with an immediate relationship to the speaker, such as a family member or an employer's own employees." *Id.* (internal citations and quotations omitted). Defendant's messages to people within the academic and transgender communities, as Defendant claims, fails to meet this standard. First, Defendant lacks any common interest with Dr. Samari or Dr. Green: Defendant barely knows these parties, never met them in person, and beyond broad shared 'community' concerns has no shared interests. Lin Dec. Exs. 4, 5, 6; Lin Dec. Ex. 4, Def. Tr. At 144-45 (Defendant testified that this was her "first interaction with Dr. Goleen [sic]"). This holds true for a majority of the individuals Defendant messaged, some of which Defendant acknowledges not knowing or remembering their names before the interactions at issue here. Lin Dec. Ex. 4, Def. Tr. at 51:11-25 ("I think I only recognized the name because Brett connected it to Columbia. I think he either – excuse me – they either said – they said something in the text message that rang my memory …"); Lin Dec. Ex. 5. This is a far cry from the close relationships Defendant tries to argue for here for the first time.

Next, Defendant tries to argue that a large amorphous LGBTQ community with shared interests exists that immunizes her conduct. But the law does not support the creation of this type of ambiguous and amorphous "community". *Moraes v. White*, 571 F. Supp. 3d 77, 100 (S.D.N.Y. 2021) (holding post to "mom" Facebook groups could not be protected under the common interest privilege: "Given the groups' sizes, defendants' suggestion that Ms. White shared an "immediate relationship" with each member, or that each member shared the same interests, is unpersuasive."); *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99–100 (2d Cir. 2000) ("Courts applying New York law, however, have not extended the privilege to cover publication of defamatory statements through the media to the world at large."); *see also Conti v. Doe*, 535 F. Supp. 3d 257, 278 (S.D.N.Y. 2021).

Defendant has presented no facts supporting the notion that she was entitled to amplify Sawyer's accusations against Professor Duncan to other academics and professional colleagues, whom she barely knew, (Lin Dec. Exs. 4, 5, 6) because of a bona fide interest in "Plaintiff's treatment of Trans people" – these loose, undefined concerns certainly do not outweigh Professor Duncan's right not to be defamed. *See Boehner v. Heise*, 734 F. Supp. 2d 389, 399 (S.D.N.Y. 2010) ("Courts recognize a common interest privilege in instances where 'the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability outweighs the harm that may be done to the reputation of others.'") (quoting *Garson v. Hendlin*, 141 A.D.2d 55, 61, 532 N.Y.S.2d 776 (2d Dep't 1988)). The factual record in this case demonstrates that, before June 29, 2023, Defendant had never even heard of Sawyer and some of the individuals she spoke about his allegations with. Lin Dec. Ex. 4 Def. Tr. at 51, 53-56, 68-69, 144-45. To the extent that Defendant is claiming the common interest is the general protection of and support of transgender people, Defendant's theory is hopelessly overbroad in that it would give Defendant carte blanche to make any statements about anyone so long as it fit within Defendant's singular view of support for transgender people, without any consequences.

Another key limitation on the application of any conditional privilege is that it is not abused. *Konikoff v. Prudential Ins. Co. of Am.*, No. 94CIV.6863(MBM)(MHD), 1999 WL 688460, at *13 (S.D.N.Y. Sept. 1, 1999), aff'd, 234 F.3d 92 (2d Cir. 2000). In this case, even if a conditional privilege were applicable, Defendant's statements exceeded this privilege and therefore abused any privilege. This is clearly seen above in Defendant's reckless disregard for the truth and public amplification of these falsehoods.

**IV.    Defendant's Statements are not Protectable Opinions as a Matter of Law.**

Defendant's arguments claiming her statements are protected opinions is unavailing as a matter of law. Defendant claims her tweets from July and August are opinions (Def. SJ 20), however these tweets are legally not opinions. In determining if statements are opinions, as Defendant cites, courts look to "'(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Coleman v. Grand*, 523 F. Supp. 3d 244, 262 (E.D.N.Y. 2021), aff'd, 158 F.4th 132 (2d Cir. 2025) (quoting *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993)).

However, Defendant downplays all these factors in favor of focusing simply on the context of the statement. Defendant overly relies on the context of her statement, such as the statement's forum, to protect her from liability, however the context of the statements does not support Defendant. The relevant tweets read as follows:

> There seems to be some confusion about where I stand on a recent incident involving a professor [Professor Duncan] and a community member [Sawyer]. To be unambiguous I donated to their fundraiser because I support them as a victim of harm. I deleted some tweets to reduce my exposure for a lawsuit **but my support hasn't waned**. I also note that their [sic] are questions about the voracity [sic] of claims. I'll share that being a perfect historian about dates of traumatic events is hard when in distress and that huge power imbalances facilitate doubt in victims . I'm 31 years old, I've seen and experienced my own harassment and trauma.
> I don't jump to conclusions nor change my convictions easily. We all have the capacity to be wrong but I haven't been convinced of that just yet.

(Lin Dec. Ex. 7 (emphasis added).)

> A couple people have asked me about IAPHS so I'm going to address it again here. There was an alleged harm committed by a

> senior person involved. I say alleged, not because I doubt the victim,
> but for legal reasons, I avoid naming that person for similar reasons.

(Lin Dec. Ex. 7)

The whole tweet, its forum, and her other statements, clearly communicates that Defendant is stating facts i.e., that Sawyer's accusations are true, making Defendant's claims that they are opinions implausible. First, Defendant's statements proclaimed to communicate facts about Professor Duncan, and she clearly intended her statements to be understood as such. The crucial point here is that her statements have a precise meaning, can be proven true or false, and taken in the full context of her other posts make clear her communication of what she perceives to be facts. *See Friedman v. Bloomberg L.P.*, 884 F.3d 83, 96 (2d Cir. 2017) (finding statements actionable where the words have precise meaning, can be proven, and would be perceived as such). Using certain buzz words, in an attempt to shield liability does not turn facts into opinions. Defendant points to cases about similar words followed by one's own personal experiences as indicators of opinion, however that is clearly distinct from this case. Defendant's post-lawsuit claim that she intended her statements to merely communicate her beliefs is not sufficient to turn her provable statements into opinions. The law does not protect factual statements, even if couched in opinion language – it only protects actual opinions i.e., statements that cannot be proven true or false or lack clear meaning. Defendant's own citations acknowledge as much. *See* Def. SJ. 19 ("*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) ('A statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.')").

Here, while Defendant is correct that the entire context of the statements matter, the statements and all the context points to these statements being statements of fact and intended to be taken as facts – not as opinions. First, Defendant cites case law stating that online forums are

often intended for opinions, and thus, statements online are protected. Def. SJ 22. However, even the cases cited recognize that "these aforementioned cases do not stand for the proposition that no comments posted on an online forum can ever be found to be defamatory." *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015), aff'd, 670 F. App'x 731 (2d Cir. 2016). It is clear here that the Defendant is using her Twitter as a forum to speak to other individuals in her community and that people have inquired other about this matter to which she now responds. Lin Dec. Ex. 7 ("A couple people have asked me …"). The context is not an arbitrary internet forum, where opinions fly around. Instead, the context of these Tweets is more similar to a newsletter or targeted announcement intended to convey an important update to others, and not mere idle musings. Which taken in the full context of her tone and her previous tweets, which reference other undisclosed evidence and purport to be factual, would be read as facts, not opinion. Such online statements are routinely found to be actionable facts. *See Restis v. Am. Coal. Against Nuclear Iran, Inc*., 53 F. Supp. 3d 705, 721 (S.D.N.Y. 2014) ("The statements are alleged to have been made as part of a sophisticated and coordinated international campaign in letters, press releases, Facebook posts, and tweets drafted by communications professionals and former diplomats. Defendants presumably meant what they said and intended their words to be understood in accordance with their plain meaning. In addition, Defendants' accusations are grounded in assertions of fact about Plaintiffs' business activities and are not framed in hyperbole, but rather purport to rely on documents that establish the existence …"). Furthermore, the serious tone of the tweets and Defendant's previous tweets, which reference undisclosed facts, taken together portray Defendant's intention that her statements be taken as true. *See Torain v. Liu*, 279 F. App'x 46 (2d Cir. 2008) ("At bottom, the inquiry is whether a reasonable listener is likely to have understood the statements as conveying provable facts about the plaintiff.").

Defendant's use of qualifying words, such as: "to reduce my exposure for a lawsuit" and "for legal reasons" is immaterial. Def. SJ. 20.  The clear intention here was for the audience to believe these statements as true, that Sawyer's accusations were true, and for Defendant to claim that she as well believes them as true. Stating it is my opinion before stating a fact does not relieve a party of reliability, hence the court relies on the above factors instead to distinguish between facts and opinions. Here Defendant's claims regarding Professor Duncan can be proven true or false, in fact were proven false, and are thus, not merely opinions that warrant protection.

## CONCLUSION

In light of the foregoing, Plaintiff respectfully requests that Defendant's motion for summary judgment be denied in its entirety, and for such other and further relief and this Court deems just and proper.

Dated: January 23, 2026
       Brookyln, New York

Respectfully submitted,

 /s/ David D. Lin
David D. Lin, Esq. (*pro hac vice*)
**LEWIS & LIN, LLC**
77 Sands Street, 6th Floor
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326
David@ilawco.com

Alexis Roth
**WOLF BALDWIN & ASSOCIATES PC**
800 E. High Street
Pottstown, PA 19464
aroth@wolfbaldwin.com
Tel: (610) 323-7436

*Counsel for Plaintiff*