**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DUSTIN T. DUNCAN, ScD,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **ELLE LETT, PhD,** | **NO.  23-4284** |
| **Defendant.** | |

**MEMORANDUM**

**HODGE, J.**                                                    **August 7, 2026**

In this action, Plaintiff Dr. Dustin T. Duncan, Sc.D. ("Plaintiff") asserts one claim of

defamation per se against Defendant Dr. Elle Lett, Ph.D. ("Defendant"). (ECF No. 45.) Before the

Court are Plaintiff and Defendant's renewed motions for summary judgment (ECF Nos. 102, 103,

104) and the responses thereto (ECF Nos. 105, 106, 107, 108, 110). For the reasons that follow,

the Court denies Plaintiff's renewed motion for summary judgment and denies Defendant's

renewed motion for summary judgment in part and grants it in part.

**I.      BACKGROUND**

      **A.      Factual Background[1]**

            **1.      Defendant's Statements Prior to the NYS Complaint**

The following facts are either undisputed, as reflected in the parties' respective statements

of material facts and responses thereto (ECF Nos. 102-2, 104-2, 105-1, 106-1), or are otherwise

supported by the record, as cited by the parties in accordance with Federal Rule of Civil Procedure

56(c)(1).[2] Both Plaintiff and Defendant work in academia on transgender health issues. (*See* ECF

---

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

[2] Under Federal Rule of Civil Procedure 56(c)(1), the "party asserting that a fact cannot be or is
genuinely disputed must support the assertion by . . . citing to particular parts of materials in the
record." Where Plaintiff and Defendant have failed to comply with this rule by neglecting to

No. 106-1 ¶ 9.) Specifically, during the events leading up to this lawsuit and at the time this action was filed, Plaintiff was an Associate Professor of Epidemiology at Columbia University who conducted "predominantly . . . intersectional and health equity-based research focusing on Black gay, bisexual and other sexual minority men and transgender women of color using a social and spatial epidemiologic lens." (*Id.* ¶ 1, ¶ 1 n.2.) Defendant is a Black transgender woman, medical student, doctoral recipient, researcher at the University of Pennsylvania, and Clinical Assistant Professor at the University of Washington whose research "applies the theory and principles of Black feminism to understanding the health impacts of systemic racism, transphobia, and other forms of discrimination on oppressed populations in the United States." (ECF No. 102-10 ¶¶ 3–4.) Both Plaintiff and Defendant were participants in a professional organization called the Interdisciplinary Association for Population Health Science ("IAPHS").[3] (ECF No. 106-1 ¶ 42.)

While Plaintiff and Defendant have never worked together, they have crossed paths professionally. (ECF No. 105-1 ¶ 7.) In December of 2022, Plaintiff extended an offer to Defendant to join the investigative team of his study on transgender women of color. (ECF No. 102-11 at 5–6.) Defendant initially accepted the offer that same day, but on May 26, 2023, she emailed Plaintiff to let him know that she would no longer be able to join the team because she had to prioritize her clinical training. (*Id.* at 34.)

In April 2023, Plaintiff met Sawyer Allen ("Allen"), a transgender man, at the Blick Art Store in Harlem ("Blick Store"). (ECF No. 105-1 ¶ 2; ECF No. 106-1 ¶ 16.) Plaintiff and Allen exchanged several messages after they met. (ECF No. 105-1 ¶ 2.) Thereafter, Allen began falsely

---

provide particular pincites for evidence supporting material facts that are in dispute, the Court has not considered that evidence, as it has not been identified in the record.

[3] As explained *infra*, there is a genuine issue of material fact as to whether Defendant was part of IAPHS during the events that gave rise to this lawsuit. (*See* ECF No. 104-8; ECF No. 106-11; ECF No. 108 at 8.)

accusing Plaintiff of serious crimes and directed these accusations at Plaintiff's employer, Columbia University. (*Id.*) For example, in an Instagram post created on June 23, 2023, Allen posted a screenshot of Plaintiff's Columbia University photo and stated "[t]his man has been stalking & harassing me for nearly three weeks." (ECF No. 102-15 at 3; ECF No. 106-1 ¶ 28.) Allen also included in his social media posts messages of a threatening nature that were purportedly from Plaintiff, such as one that stated "I hope now you're really scared because once I find you. Trust me, you would have wanted to pick just talking to me." (ECF No. 102-15 at 8; ECF No. 105-1 ¶ 3.) Multiple people tagged @columbia and @columbiapublichealth on Allen's posts to bring the matter to the University's attention. (ECF No. 102-15 at 11; ECF No. 106-1 ¶ 28.) Allen also posted a GoFundMe page requesting financial help because Plaintiff's actions had made him feel "unsafe to leave [his] house" and had "taken a huge toll on [him] finically [sic]." (ECF No. 102-15 at 21.)

On June 29, 2023, Defendant became aware of Allen's allegations against Plaintiff, when Brett Dolotina ("Dolotina"),[4] who worked for Plaintiff at his lab, contacted Defendant to speak about "serious news [that] came out [that] weekend about [Defendant]." (ECF No. 102-12 at 9; ECF No. 102-13 at 2–7; ECF No. 105-7 at 4.) Dolotina testified that Allen was a mutual friend of their unnamed coworker, and Dolotina had met Allen online but "never met in person nor formally met in any form." (ECF No. 105-1 ¶ 11; ECF No. 105-7 at 5.) While Defendant recognized Dolotina's name, she did not know Dolotina well at the time that they reached out to her. (ECF No. 105-1 ¶ 10.) Dolotina shared with Defendant Allen's Instagram and Facebook posts regarding Plaintiff's alleged harassment of Allen, Allen's CashApp information, and his GoFundMe page, which linked to a YouTube video wherein Allen shared that he was "literally scared to have anyone

---

[4] Dolotina testified that they use the pronouns they/them. (ECF No. 105-7 at 2.)

3

around [him] and or even leave [his] house." (ECF No. 102-10 ¶ 9; ECF No. 102-13 at 2–7; ECF No. 102-15 at 26–27; ECF No. 106-1 ¶ 36.)

The same day that she became aware of Allen's allegations, June 29, 2023, Defendant shared them with Dr. Avery Everhart ("Everhart"), an assistant professor who works in transgender health and human rights, and Dr. Arjee Restar ("Restar"), a professor of epidemiology, in a group text. (ECF No. 105-1 ¶ 14; ECF No. 110 at 6 n.1; ECF No. 102-25 at 3; ECF No. 104-8 at 83, 93.) In the message to Everhart and Restar, Defendant wrote the following:

> But really the way he [Plaintiff] courted me . . . like he could really help me optimize my career
> Which always felt condescending
> He always tickled my intuition as dangerous
> But couldn't place it
> But what I can say is that it's a special Bitch who studies black trans people and then preys on them.

(ECF No. 105-1 ¶ 14; ECF No. 106-9 at 6.) Defendant also separately texted Dr. Asa Radix ("Radix"), a Black trans identity researcher, on the same date linking Allen's allegations. (ECF No. 102-23 at 2.) Later in her conversation regarding Plaintiff's alleged behavior, Defendant wrote to Radix, "Yeah he did it. This is really challenging my heart." (*Id.* at 4.)

On June 30, 2023, Defendant shared Allen's GoFundMe page on X (formerly known as Twitter), along with the following statements:

PUBLIC STATEMENT ONE:

> Found out that a trusted colleague who studies trans people has done horrible things and victimized a vulnerable trans person and I'm really struggling on what Justice and courage looks like here. Like amplifying would put me at risk but not feels dirty. I know it to be true . . . .

PUBLIC STATEMENT TWO:

> I'm rarely pulled to post for mutual aid people I am not directly linked to. I am two trans people removed from this person. I will not share details for other reasons but if you believe

in mutual aid and want to support someone who has been harmed by the power assembled in our wheelhouse of a [sic] academic privilege, please donate to this gofundme by [Allen].

PUBLIC STATEMENT THREE:

There are public details and evidence out there if you want to investigate but I'm more interested in supporting [Allen] so I decided not to link those.

PUBLIC STATEMENT FOUR:

I'd really like to see this goal reached today. I gave 100. Can you match?

(ECF No. 102-16 at 2–3; ECF No. 105-1 ¶ 15.) After posting these statements, Defendant messaged Allen privately on Instagram the same day, introducing herself and letting him know that he "misspelled [Plaintiff's] last name in the gofundme." (ECF No. 102-22 at 2; ECF No. 105-1 ¶ 16.) Defendant also stated in the message to Allen, "Sorry you are going through this. Let me know if you need anything." (ECF No. 102-22 at 2.) Allen replied, thanking Defendant for her message and her support. (*Id.* at 2–3.)

That evening, after messaging Allen, Defendant emailed Plaintiff, writing that in "transparency, I am publicly supporting [Allen's] gofundme based on the harms you have done to him. I am in community with people only a few degrees removed from him since o [sic] I am not doing so without comfortably verifying the situation. I don't expect you to respond or reach out, but should you wish to, in honesty and transparency, I am here." (ECF No. 102-11 at 26.) Plaintiff never responded to Defendant's June 30, 2023 email. (ECF No. 104-3 ¶ 8.)

"Sometime in June" of 2023 "through Twitter," Dr. Tiffany Green ("Green"), a public health scientist and member of IAPHS, became aware of the allegations against Plaintiff through various social media posts, including the aforementioned posts by Defendant. (ECF No. 102-6 at 13–15; ECF No. 110 at 6 n.1.) Green knew Plaintiff on a professional level and had recommended in 2020 or 2021 that he serve as co-chair alongside her and another person for an IAPHS

5

conference that was to take place in fall of 2023. (ECF No. 102-6 at 3–8, 17, 32; ECF No. 106-1 ¶ 8.) On June 30, 2023, Green texted Defendant to let her know she had seen Allen's allegations and that she was working to "find info now given the iaphs conference."[5] (ECF No. 105-1 ¶ 17; ECF No. 104-12 at 6.) Around this time, Green also sent an email to other IAPHS members expressing concern that the accusations against Plaintiff were serious and would be a distraction for the upcoming IAPHS conference. (ECF No. 105-1 ¶ 31; ECF No. 102-6 at 13–18.) In the email, Green recommended that Plaintiff step down as co-chair of the conference. (ECF No. 102-6 at 15–18.) Green testified that if she had not become aware of Allen's allegations against Plaintiff, she would not have had any reason to suggest that he no longer be a co-chair of the IAPHS conference. (ECF No. 105-1 ¶ 24.)

On July 2, 2023, Defendant messaged Allen again on Instagram asking "Was ur update from new messages? Like is he still messaging you[?]," to which Allen replied, "Lol ofc he is."[6] (ECF No. 102-22 at 4.) On July 5, 2023,[7] Krish J. Bhatt ("Bhatt"), an employee of Plaintiff's at Columbia University, initiated a text message conversation with Defendant asking her to speak about Allen's allegations.[8] (ECF No. 102-12 at 9; ECF No. 102-14 at 5.) Bhatt also shared with Defendant video footage from the Blick Store that they received from Allen of Plaintiff's interaction with Allen in the store in April.[9] (ECF No. 102-12 at 9; ECF No. 102-14 at 8.) On July

---

[5] Plaintiff does not allege that these messages between Green and Defendant were defamatory. (*See* ECF No. 45 ¶ 32.)

[6] Based on the parties' briefs and record citations, it is unclear what "update" Defendant is referring to.

[7] The answer to this interrogatory misstates the date as July 5, 2024. However, when read in context, the 2024 date is a scrivener's error, and the correct date is July 5, 2023. (*See* ECF No. 102-12 at 9.)

[8] As Defendant testified, Bhatt uses the pronouns they/them. (ECF No. 105-5 at 49.)

[9] Bhatt testified that they did not know Allen personally, but that Bhatt's ex-partner did have a personal relationship with Allen. (ECF No. 105-1 ¶ 32.)

7, 2023, Defendant sent the same video to Dr. Carl Streed ("Streed"), a physician and researcher with whom Defendant has worked on several published manuscripts. (ECF No. 105-1 ¶¶ 8, 22; ECF No. 104-8 at 139.) In her message, Defendant stated that the video clips only confirmed that Plaintiff was in the store, but "don't really show anything else." (ECF No. 105-1 ¶ 22.) In the same conversation, Streed told Defendant that there were "allegations" against Plaintiff while he was at NYU, but the "investigation didn't proceed as he jumped over to Columbia." (ECF No. 102-24 at 5.)

###### 2.    Defendant's Statements Following Her Receipt of the NYS Complaint

On July 12, 2023, Plaintiff filed a complaint in New York state court (the "NYS Complaint") against Allen for his allegedly defamatory statements.[10] (ECF No. 104-4 ¶ 2; ECF No. 105-1 ¶ 1.) The NYS Complaint included facts sworn by Plaintiff that (1) the accusations by Allen that Plaintiff was stalking and harassing him were all false, including because Plaintiff was not in New York City on the dates that Allen claimed he had stalked him; (2) Plaintiff had very limited interaction with Allen; and (3) the threatening messages Allen claimed were sent from Plaintiff were fabricated. (ECF No. 104-5; ECF No. 104-3 ¶ 13.)

Two days after Plaintiff filed the NYS Complaint, on July 14, 2023, Plaintiff's attorney, David Lin ("Lin"), sent Defendant the NYS Complaint via email, writing that "it squarely disputes the accusations that have been leveled against [Plaintiff] recently and that are being circulated on social media, including on your Twitter account." (ECF No. 102-18 at 4–5.) Defendant responded

---

[10] There are certain facts included in the parties' statements of material facts that reference allegations in the NYS Complaint. (*See, e.g.*, ECF No. 106-1 ¶¶ 17–23.) While the Court has accepted as undisputed that these allegations are contained in the NYS Complaint, where the parties have not included outside evidence in support of these facts the Court has not accepted them as part of the factual record. *See Jerri v. Harran*, No. CV 13-1328, 2016 WL 3453203, at *3 (E.D. Pa. June 23, 2016) ("Pleadings are not documents that can support factual assertions at summary judgment." (citing *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))).

to Lin acknowledging her receipt of the NYS Complaint. (*Id.* at 2.) When asked about whether she ever read the entire NYS Complaint in her deposition, Defendant testified she only "only skimmed" it because she "already had [a] firsthand account from [Allen] and messages that claimed to be directly from [Plaintiff]," and that "a legal document was not going to persuade [her] that all of this other stuff was not worth considering as evidence for [Plaintiff] having committed this crime." (ECF No. 105-1 ¶ 19; ECF No. 104-8 at 194–95.) Defendant further testified that the only thing she "really remember[ed] from the lawsuit was that it disputed the timeline of things." (ECF No. 105-1 ¶ 19; ECF No. 104-8 at 196–97.)

Defendant emailed Lin later on July 14, 2023 to notify him that she had deleted her tweets pertaining to Allen's allegations against Plaintiff because she would "like to be left out of these unfortunate events any further." (ECF No. 102-18 at 2.) In the same message to Lin, Defendant wrote that "[i]ndependent of [Allen], after sharing their posts, several colleagues in this space reached out with information about [Plaintiff's] experiences and behaviors at NYU, and the circumstances of his position change, which additionally gave me pause." (*Id.*)

Also on July 14, 2023, Green corresponded with Defendant regarding Allen's accusations and stated her intention to "express . . . displeasure" with the IAPHS if they failed to respond to the accusations against Plaintiff, including the possibility that she would resign if IAPHS failed to respond. (ECF No. 105-1 ¶ 23; ECF No. 102-26 at 11.) Defendant responded that "like all trans people will resign if [Plaintiff] doesn't." (ECF No. 105-1 ¶ 23; ECF No. 102-26 at 11.) Later in the conversation, Defendant said, "I'll be honest, just reading the complaint I would second guess stuff, if I didn't hear directly from his staff, who is partnered to someone who is friends with [Allen], saw video of [Plaintiff] in the store interacting with [Allen], and hadn't had colleagues

8

independently reach out to me to say that they have been told that this sort of behavior is why he left NYU. EVERYBODY not Lying . . . ." (ECF No. 102-26 at 12.)

On July 15, 2023, Bhatt texted Defendant asking if she had received "the email from [Plaintiff]," referencing the NYS Complaint that he filed against Allen. (ECF No. 102-12 at 10.) Defendant indicated that she had, and she and Bhatt discussed the lawsuit. (*Id.*) Later on in the conversation, Defendant texted Bhatt that her "intuition is that [Allen] is telling the truth . . . do you think they are?" to which Bhatt responded, "I think they are . . . but I don't think Columbia will take their side. I think [Plaintiff] is going to get away with this." (ECF No. 102-14 at 20.)

On July 18, 2023, Bhatt messaged Defendant to ask her why she had deleted the tweets related to Allen's allegations, to which Defendant replied, "I'm trying to avoid also getting sued . . . . But I stand on supporting [Allen]." (*Id.* at 23.) Bhatt also texted Defendant that day some "highlights" of an update they received from Columbia University regarding their investigation into Allen's allegations. (ECF No. 105-1 ¶ 26.) Bhatt wrote that Plaintiff "is fully cooperating with the university"; "folks are not seeing the full story. It's not as clear as what's on social media"; and "at this point in time the allegations have not been confirmed." (ECF No. 106-15 at 32.)

After Bhatt asked about why Defendant had deleted her tweets supporting Allen, Defendant posted the following to X that same day:

PUBLIC STATEMENT FIVE:

> There seems to be some confusion about where I stand on a recent incident involving a professor and a community member. To be unambiguous I donated to their fundraiser because I support them as a victim of harm. I deleted some tweets to reduce my exposure for a lawsuit but my support hasn't waned. I also note that their [sic] are questions about the voracity [sic] of claims. I'll share that being a perfect historian about dates of traumatic events is hard when in distress and that huge power imbalances facilitate doubt in victims . . . . I don't want to jump to conclusions nor change my convictions easily. We all have the capacity to be wrong but I haven't been convinced of that just yet.

(ECF No. 105-1 ¶ 28; ECF No. 102-16 at 4–5.)

On August 10, 2023, Defendant posted the following on X:

PUBLIC STATEMENT SIX:

> A couple people have asked me about IAPHS so I'm going to address it again here. There was an alleged harm committed by a senior person involved. I say alleged, not because I doubt the victim, but for legal reasons, I avoid naming that person for similar reasons.

(ECF No. 105-1 ¶ 29.) Defendant testified that the "senior person" referenced in the tweet was Plaintiff. (*Id.* ¶ 30.)

"Sometime in August," Plaintiff resigned as co-chair of the IAPHS conference. (ECF No. 102-6 at 30–31.) On August 23, 2023, Defendant and Green were texting about the IAPHS conference and Plaintiff's resignation as co-chair. (ECF No. 104-12 at 28.) Defendant told Green that Plaintiff "is and was one of the most convincing abusers I've met." (*Id.* at 29.) Later in the conversation, Defendant stated, "I'm gonna be dragging [Plaintiff] publicly for ever [sic]. I will run him out of trans health if I can. Maybe lol . . . ." (*Id.* at 30; ECF No. 104-8 at 234–35.)

### 3.    Defendant's Statements to Editors of the Health Equity Journal

On June 30, 2023, Dr. Goleen Samari ("Samari"), editor in chief of the Health Equity Journal, emailed Dr. Monica McLemore ("McLemore") and Defendant, both of whom were editors of the Health Equity Journal, writing, "I saw [Defendant's] tweets about the horrible harassment of her friend by a Columbia faculty member . . . . I am reaching out wearing my [Associate Editor] hat for Health Equity because I'm currently overseeing the review of a manuscript where that faculty member is a senior author. Do you want me to pull the manuscript out of review? . . . Let me know how the journal would like to proceed." (ECF No. 104-13 at 3; ECF No. 104-8 at 145; ECF No. 104-13 at 29; ECF No. 104-1 at 11.) Defendant responded a few minutes later, "The victimized person is not my friend but a fellow trans person. I don't really know the ethical stance on this but I'd [sic] it's on trans people I can't stomach it being published

. . . ." (ECF No. 104-13 at 3.) The three continued discussing Plaintiff's manuscript and his other work over the course of the next two weeks.

On July 17, 2023, Defendant emailed McLemore and Samari in a separate email chain, which includes an additional two unidentified email addresses, and recommended that the Health Equity Journal reject Plaintiff's manuscript because the article did "not meet even the most basic standards for publication in the journal." (ECF No. 104-13 at 29–30.) After further explanation of why the article did not meet her standards for academic publications, Defendant noted that her rejection "would be true without the unsavory but [sic] allegations that have been shared with me as well as communiques from [Plaintiff's] lawyers." (ECF No. 104-13 at 29.)

## B.    Procedural History

Plaintiff filed his Complaint against Defendant in this Court on November 6, 2023, asserting one claim of defamation per se (Count I) and one claim of intentional infliction of emotional distress (Count II). (ECF No. 1.) On January 31, 2024, Defendant partially moved to dismiss Count II for intentional infliction of emotional distress pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 9.) Plaintiff subsequently filed a Notice of Voluntary Dismissal of Count II (ECF No. 10), and this Court dismissed Count II of the Complaint without prejudice. (ECF No. 12.)

Defendant filed a Special Motion for Summary Judgment on June 28, 2024 (ECF No. 23), which this Court dismissed without prejudice for failure to comply with this Court's Policies and Procedures. (ECF No. 26.) Defendant filed a Second Motion for Summary Judgment on September 5, 2024. (ECF No. 35.) On September 13, 2024, Plaintiff filed a Motion to Amend the Complaint, which this Court granted on October 3, 2024. (ECF No. 44.) The Amended Complaint brings a single claim for defamation per se against Defendant. (ECF No. 45.)

On January 17, 2025, Defendant filed a Third Motion for Summary Judgment. (ECF No. 67.) Plaintiff filed his First Motion for Summary Judgment on February 18, 2025. (ECF No. 69.) On July 9, 2025, upon consideration of Defendant's Third Motion for Summary Judgment and Plaintiff's First Motion for Summary Judgment, the Court issued a determination that neither New York nor Pennsylvania's Anti-SLAPP statutes are applicable in the present case. (ECF No. 83.) Furthermore, the Court ordered briefing from the parties on choice of law in this action and held that, unless the parties agreed that Pennsylvania law applies, New York law is applicable to the present action. (*Id.*) After receiving the parties' responses, which disagreed about the applicable law, the Court ordered the parties to refile any motions for summary judgment applying New York law. (ECF No. 86.)

On December 18, 2025, Defendant filed her Fourth Motion for Summary Judgment. (ECF No. 103 ("Defendant's Motion for Summary Judgment").) Plaintiff filed his Second Motion for Summary Judgment on December 19, 2025. (ECF No. 104 ("Plaintiff's Motion for Summary Judgment").) The parties timely filed their respective oppositions (ECF Nos. 105, 106), and Defendant filed a timely Reply in Further Support of her Motion for Summary Judgment (ECF No. 107). After receiving an extension to file his Reply in Further Support of his Motion for Summary Judgment, Plaintiff filed his response six days after the extended deadline. (ECF Nos. 108, 109.) Defendant informed the Court of Plaintiff's tardiness but chose not to pursue a motion to strike. (ECF No. 109.) Defendant then filed a Surreply in Further Opposition to Plaintiff's Summary Judgment Motion one week late. (ECF No. 110.) The Court has considered all of the parties' briefs on the pending motions for summary judgment.[11]

---

[11] The Court has considered all of the parties' briefs because neither party moved to strike the others' untimely filing. However, the Court emphasizes to both parties the importance of adherence to deadlines.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit, given the applicable substantive law, and a dispute is genuine if the evidence presented is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing G*oodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)). Therefore, if after making all reasonable inferences in favor of the non-moving party, the court determines there is no genuine dispute as to any material fact, then summary judgment is appropriate. *Wisniewski v. Johns Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

These summary judgment rules do not apply any differently where there are cross-motions for summary judgment pending. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

The Third Circuit has stated that "[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   DISCUSSION

There is currently only one claim brought against Defendant in this case, defamation per se. (ECF No. 45.) Plaintiff asserts that Defendant's defamation was "two-pronged"—one prong used social media to tarnish Plaintiff's professional reputation and the other targeted his fellow academics. (ECF No. 104-1 at 5.)

This Court has previously determined that New York's defamation law shall apply to this action, but neither New York nor Pennsylvania's Anti-SLAPP laws will apply. (ECF No. 83.) Under New York law, there are four elements that a plaintiff must establish in order to prevail on a defamation claim: "(1) a written [or spoken] defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Miller v. James*, 751 F. Supp. 3d 21, 35 (N.D.N.Y. 2024) (citation modified). Statements that are defamatory per se in New York include those "(i) charging [the] plaintiff with a serious crime;" and "(ii) that tend to injure another in his or her trade, business or profession," as Plaintiff has alleged here. *Id.* (internal quotations omitted).

As described in his Amended Complaint and Plaintiff's Motion for Summary Judgment, and as summarized by this Court in Section I of this memorandum, Plaintiff's defamation claim is based on the following statements made by Defendant:

- Defendant's June 29, 2023 text messages to Everhart and Restar;

14

- Defendant's June 29, 2023 text messages to Radix;

- Public Statements One through Four, which Defendant published to X on June 30, 2023;

- Defendant's July 14, 2023 and August 23, 2023 text messages to Green;

- Defendant's emails from June 30, 2023 through July 17, 2023 to Samari and McLemore;

- Public Statement Five, which Defendant published to X on July 18, 2023; and

- Public Statement Six, which Defendant published to X on August 10, 2023.

Although Plaintiff includes in his Complaint and Motion for Summary Judgment references to Defendant's messages with Bhatt, Dolotina, and Streed, he does not argue that those statements were defamatory. (*See generally* ECF No. 45; ECF No. 104-1.) Nor can he. Bhatt and Dolotina were the ones who shared the information regarding Allen's allegations with Defendant in the conversations cited by Plaintiff, and neither Bhatt nor Dolotina is a defendant here. With respect to Defendant's statements to Streed, Plaintiff uses these statements to show that Defendant "acknowledged that the [surveillance] video showed only that [Plaintiff] interacted with [Allen] at Blick" and that Defendant had a "greater understanding of the NYS Complaint than she testified to at her deposition." (ECF No. 104-1 at 12–13.) Plaintiff does not reference with any specificity what, if any, defamatory statements Defendant made to Streed. Because Plaintiff fails to carry his burden to show that any of Defendant's statements to Dolotina, Bhatt, or Streed were defamatory in nature, this Court dismisses the defamation claim to the extent it relies on statements made by Defendant to those individuals. *See Wang v. Educ. Comm'n for Foreign Med. Graduates*, No. 05 Civ. 1862, 2009 WL 3083527, at *6 (E.D.N.Y. Sept. 17, 2009) (granting summary judgment where it was "unclear exactly what statements Plaintiff claims were defamatory"). Defendant's

15

statements to Bhatt, Dolotina, and Streed, may be considered, however, to show Defendant's state of mind and level of fault for her allegedly defamatory statements.

Plaintiff's Motion for Summary Judgment argues that he is entitled to summary judgment because (1) there is no factual dispute that Defendant published the statements at issue and that they were about Plaintiff, (2) Defendant's statements convey a defamatory meaning as a matter of law because they accused Plaintiff of a serious crime and were aimed to "lower his professional and personal standing," (3) Public Statements Five and Six did not express opinions, and (4) no privilege shields Defendant from liability. (*See generally* ECF No. 104-1.) Defendant has not presented evidence that refutes Plaintiff's first contention—that Defendant published the statements at issue and that they were about Plaintiff. As for Plaintiff's second argument, Defendant has also not disputed that her statements accused Plaintiff of a serious crime and lowered his professional and personal standing, although the Court does not agree with Plaintiff's contention that from these facts flows a logical conclusion that the statements were defamatory as a matter of law. The Court addresses Plaintiff's third and fourth arguments in support of his Motion below.

Defendant's Motion for Summary Judgment argues that there is no genuine dispute of material fact that: (1) Plaintiff is a public figure and Plaintiff cannot present evidence that Defendant's statements were made with actual malice; (2) Public Statements Five and Six are nonactionable opinions; (3) Defendant's private messages with colleagues are protected by the common interest privilege; and (4) Defendant's statements are protected by the public concern

16

privilege.[12] (*See generally* ECF No. 103.) The Court addresses each of Defendant's arguments herein.

### A.      Plaintiff is a Private Figure

The applicable fault standard for a defamation claim depends on whether the plaintiff is a public or a private figure.[13] "Whether or not a person or an organization is a public figure is a question of law for the court to decide." *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 666 n.3 (S.D.N.Y. 1991) (citation modified). To establish defamation when a plaintiff is a public figure, he must show that the defendant acted with "'actual malice,' meaning that the plaintiff must allege sufficient facts to support a reasonable inference that the defendant made the statement with reckless disregard for the truth." *Holder v. Bobb*, 797 F. Supp. 3d 134, 146 (E.D.N.Y. 2025) (citation modified). By contrast, where a plaintiff is a private figure, he need only show that the defendant was negligent in making the defamatory statements. *Id.*

There are two categories of public figures—general purpose and limited purpose public figures. The defendant in a defamation action carries the burden of proof "with respect to the status of the plaintiff." *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298 (N.Y. App. Div. 1981). "General purpose public figures are those who 'occupy positions of such persuasive power and influence that they are deemed public figures for all purposes.'" *Coleman v. Grand*, 523 F. Supp. 3d 244, 255 (E.D.N.Y. 2021), *aff'd*, 158 F.4th 132 (2d Cir. 2025) (citing *Gertz v. Robert Welch,*

---

[12] Defendant also argues that her speech is protected under Pennsylvania's Anti-SLAPP statute and that she is entitled to attorney's fees and damages based on New York's and Pennsylvania's Anti-SLAPP statutes, even though this Court previously found that both are inapplicable. (ECF No. 83; ECF No. 103 at 16, 37.)

[13] Plaintiff asserts in his Motion for Summary Judgment that in its order at ECF No. 83 this Court resolved the issue of what fault standard applies to Defendant's statements and that actual malice is not required. (ECF No. 104-1 at 18, 21 n.3.) That is not so. This Court's order only held that New York defamation law applies to Plaintiff's claims; it did not resolve the issue of whether Plaintiff is a public or private figure, and therefore what standard of fault applies to Defendant's conduct.

*Inc.*, 418 U.S. 323, 345 (1974)). To qualify as a general purpose public figure, the person must be a "household name on a national scale." *Id.* (citation modified).

Under New York law, a limited purpose public figure is one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *BYD Co. v. VICE Media LLC*, 531 F. Supp. 3d 810, 819 (S.D.N.Y. 2021), *aff'd*, No. 21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022). To prove that a plaintiff is a limited purpose public figure, "a defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." *Khalil v. Fox Corp.*, 630 F. Supp. 3d 568, 584 (S.D.N.Y. 2022) (quoting *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir. 1984)). Both general and limited purpose public figures must show that the defendant acted with actual malice to successfully claim defamation. *Coleman*, 523 F. Supp. 3d at 255–56.

Defendant puts forth arguments that Plaintiff is both a general public figure and a limited purpose public figure. [14] (ECF No. 107 at 2; ECF No. 103 at 21.) Defendant's argument that Plaintiff is a general public figure is based on Plaintiff's sought and attained influence as a public health scholar, including Plaintiff's self-promotion in his public biographies as a "widely recognized" researcher whose work has been featured in various major media publications. (ECF No. 103 at 20–21.)

---

[14] Defendant cites to both Pennsylvania and New York law in her public figure analysis, despite this Court's order that New York defamation law applies. (*See* ECF No. 83.)

Based on the record, this Court finds that Plaintiff is not a general public figure. Although the record demonstrates that Plaintiff's work has been widely circulated and publicized, there is no evidence that his recognition has risen to a level whereby he has become a "household name on a national scale." *Coleman*, 523 F. Supp. 3d at 255. Plaintiff's fame must go beyond public health academic circles, and Defendant has failed to offer clear evidence of "general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Gertz*, 418 U.S. at 352. Rather, Defendant's proffered evidence leads the Court to believe that Plaintiff engages in work typical of a professor—i.e., publishing his research, receiving funding for that research, writing books, and receiving awards. (ECF No. 103 at 20–21.) Defendant's characterization of Plaintiff as a general public figure would dilute the term such that virtually every successful professor and academic would be deemed a general public figure.

Defendant's argument that Plaintiff is a limited purpose public figure also fails. For purposes of the limited purpose public figure analysis, "the 'controversy' into which a plaintiff has allegedly entered is defined as the event that the defamatory statements describe." *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 225 (S.D.N.Y. 1993). Defendant's purportedly defamatory statements describe Plaintiff's alleged harassment of Allen. They do not, as Defendant argues, describe the amorphous "treatment" of transgender people by society at large. Indeed, it is hard to imagine how statements generally regarding the treatment and human rights of transgender people could be defamatory. Instead, the relevant public controversy for purposes of the limited purpose public figure analysis is particular to Plaintiff's alleged stalking, harassment, and mistreatment of Allen.

Defendant must not only show a public controversy that is the subject of the litigation, but that Plaintiff "voluntarily injected himself into [that] public controversy." *Khalil*, 630 F. Supp. 3d

at 568. However, Defendant has not introduced any evidence that Plaintiff "voluntarily injected himself" into the public controversy involving his private interactions with Allen. Defendant provides no evidence that Plaintiff came forward publicly to describe his version of the events that transpired with Allen besides filing his lawsuits, and such action does not constitute his voluntary injection into the public controversy. *See Time, Inc. v. Firestone*, 424 U.S. 448, 457 (1976) (finding that the majority of participants in litigation are "drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them").

Even if the relevant public controversy related to this litigation could be expanded to Plaintiff's relationships with or treatment of transgender individuals at large, as Defendant argues, Defendant could not show that Plaintiff "voluntarily injected himself" into that controversy. (ECF No. 107 at 4–5, 8); *see Naantaanbuu*, 816 F. Supp. at 225. Defendant has not introduced any evidence that Plaintiff sought public attention for his personal relationships with transgender individuals, at his workplace or otherwise. *See Coleman*, 523 F. Supp. 3d at 256 ("There is no evidence that . . . [plaintiff] successfully sought public attention and influence for his views on matters arguably related to this litigation, such as his relationships, relationships generally or sexual harassment allegations."). While the record does reflect that Plaintiff sought public attention for his public health research of LGBTQ populations, the subject matter of that research is not the controversy at the heart of this litigation. [15]

---

[15] *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013), which Defendant asserts supports her arguments that Plaintiff is a limited purpose public figure, demonstrates the missing link in Defendant's arguments here. (*See* ECF No. 103 at 24; ECF No. 107 at 5–8.) In *Biro*, plaintiff was a "leading authority" in the field of art authentication, and the allegedly defamatory statements arose from a magazine article questioning his evaluation of paintings that he had authenticated. 963 F. Supp. 2d at 269–276. Thus, there was a clear link in *Biro* between the plaintiff's voluntary conduct (his art authentication work) and the public controversy related to the litigation (the article questioning his art authentication). Here, the link between Plaintiff's voluntary conduct (his public

In sum, there is simply no nexus between Plaintiff's voluntary behavior and the controversy surrounding Allen's allegations, and Plaintiff therefore cannot be characterized as a limited purpose public figure.[16] Because Plaintiff is neither a general nor limited purpose public figure, he is therefore a private figure, and Defendant's statements are defamatory only if they were made negligently.

### B.  Defendant's Statements Are Not Subject to a Qualified Public Interest Privilege

Defendant argues that her allegedly defamatory statements are protected by a public interest privilege because they concerned "questions of LGBTQ rights and the national 'Me Too' movement." (ECF No. 103 at 18–20; ECF No. 105 at 27–28.) However, Defendant fails to set forth any discernable theory under New York law as to why such a privilege should apply. This Court has already held that New York law applies to Plaintiff's defamation claim, so the Pennsylvania case law Defendant cites is inapplicable. Moreover, much of the New York case law Defendant cites is also inapposite. (*See* ECF No. 103 at 19 (citing *Feist v. Paxfire, Inc.*, No. 11 CIV. 5436, 2017 WL 177652, at *4 (S.D.N.Y. Jan. 17, 2017) (applying a qualified privilege in the context of "attorney communications with the press about the imminent filing of a complaint"); *Rosenberg v. MetLife, Inc.*, 866 N.E.2d 439, 442–44 (N.Y. 2007) (applying absolute privilege to statements made during the investigative stage of a quasi-judicial process)); ECF No. 105 at 27

---

health research of LGBTQ populations) and the public controversy related to this litigation (Plaintiff's alleged harassment of a transgender individual he met at an art store) is missing.

[16] Defendant's citations to *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013) do not support her arguments that Plaintiff's voluntary behavior was connected to the public controversy. (ECF No. 103 at 24; ECF No. 107 at 5–8.) Plaintiff in *Biro* was a "leading authority" in the field of art authentication, and the allegedly defamatory statements arose from a magazine article questioning his evaluation of paintings that he had authenticated. 963 F. Supp. 2d at 269–276. Thus, there was a clear link in *Biro* between the plaintiff's voluntary conduct (his art authentication work) and the public controversy related to the litigation (the article questioning his art authentication).

(citing *Flamm. v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 149–50 (2d Cir. 2000) (discussing an approach "akin to a 'common interest' privilege for matters of public concern" whereby "in a suit by a private plaintiff involving a matter of public concern . . . allegedly defamatory statements must be provably false, and the plaintiff must bear the burden of proving falsity")).) Defendant fails to clearly articulate what public interest privilege she claims applies and its requirements.

New York law does recognize a qualified privilege entitling a media defendant to a higher standard of fault in a defamation action where the content of the allegedly defamatory statements relates to a legitimate matter of public concern. *See Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 200 (N.Y. 1975). In such cases, New York courts apply a "gross irresponsibility" standard to the defendant's statements. *Id.* However, whether the *Chapadeau* qualified privilege applies to non-media defendants is an unsettled question of New York law. *See Verdi v. Dinowitz*, 232 A.D.3d 31, 44 (N.Y. App. Div. 2024), *leave to appeal denied*, 43 N.Y.3d 907 (N.Y. 2025). When a federal court is faced with unsettled state law, the court is "obligated to carefully predict how the state's highest court would resolve the uncertainty or ambiguity . . . apply[ing] what [it] find[s] to be the state law after giving proper regard to relevant rulings of other courts of the State." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020) (citation modified); *State Farm Mut. Auto Ins. Co. v. Rosenthal*, 484 F.3d 251, 253 (3d. Cir. 2007). Although the New York Court of Appeals has not explicitly determined that the *Chapadeau* privilege is "limited to media defendants," the context of other Court of Appeals holdings "lends support" to this conclusion. *Verdi v. Dinowitz*, 232 A.D.3d 31, 44 (N.Y. App. Div. 2024), *leave to appeal denied*, 43 N.Y.3d 907 (N.Y. 2025). Therefore, this Court finds that this standard is inapplicable to Defendant, as she is not affiliated with the media.

**C.      Defendant's Private Statements and the Common Interest Privilege**

"New York law grants a qualified 'common interest' privilege to 'defamatory communications made by one person to another upon a subject in which both have an interest.'" *Hodges v. Lutwin*, 595 F. Supp. 3d 12, 19 (S.D.N.Y. 2022) (citing *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir. 2001)), *aff'd*, No. 22-974-CV, 2023 WL 3362836 (2d Cir. May 11, 2023). This privilege is "'broadly applied' such that '[t]he parties need only have such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information.'" *Hodges*, 2023 WL 3362836, at *2. The "decision as to whether, under the circumstances, a privilege exists, is for the court and not the jury." *Stewart v. Florence Nightingale Health Center/Carnegie Partners, Inc.*, No. 97 CIV. 6977, 1999 WL 179373 (S.D.N.Y. March 31, 1999) (citations omitted). "The defendant bears the burden of proof to demonstrate the facts on which the privilege depends." *Id.*

Defendant's allegedly defamatory statements fall into two categories: her social media statements and her statements to fellow academics. (*See* ECF No. 104-1 at 5.) She argues that the latter statements—her private messages with Everhart, Green, McLemore, Samari, Radix, and Restar—are subject to the common interest privilege. (ECF No. 103 at 28–29.) Defendant asserts that these individuals were friends of hers and/or were academics with whom she had a professional relationship by nature of their common membership in professional organizations and "as fellow members of the Trans community and/or Academia concerned about the accusations that Plaintiff abused a Trans man." (ECF No. 103 at 29.)

Defendant has failed to show that common interest can be shown through vague assertions of friendship or mentorship, or that common membership in the transgender community at large is sufficient to invoke the common interest privilege. Indeed, Defendant cites to no pertinent case law to support that such broad associations give rise to a common interest privilege under New

York law. As such, the Court cannot and thus has not considered evidence of Defendant's friendships with the below individuals or their common membership in the transgender community as part of its common interest privilege analysis. However, this Court does find that extending the common interest privilege to members of a professional organization is appropriate. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 437–38 (N.Y. 1992) (explaining that the common interest privilege has been applied to "employees of an organization, members of a faculty tenure committee, and constituent physicians of a health insurance plan"); Restatement (Second) of Torts § 596 (1977) ("Persons associated together in professional activities are likewise within the rule stated in this Section."). The Court summarizes Defendant's relevant relationships with the individuals to whom she made allegedly defamatory statements below.

- **Everhart:** Everhart was a fellow with Defendant at the Center for Applied Transgender Studies. (ECF No. 106-1 ¶ 42; ECF No. 104-8 at 144.) Everhart also published at least one article on transgender health with Defendant. (ECF No. 105 at 27 n.4.)

- **Green:** Green and Defendant were both participants in IAPHS, although it is unclear whether Defendant was a member of IAPHS when she made the statements that are the subject of this litigation. (ECF No. 106-1 ¶ 42; ECF No. 106-11 at 5.)

- **McLemore:** McLemore is the editor in chief of the Health Equity Journal, and Defendant is an associate editor for the Health Equity Journal. (ECF No. 104-8 at 145; ECF No. 104-13 at 29.)

- **Samari:** Samari is an editor at the Health Equity Journal. (ECF No. 104-1 at 11.) Both Defendant and Samari are part of the Health Equity Journal. (ECF No. 104-13 at 29.)

- **Radix:** Radix was a fellow with Defendant at the Center for Applied Transgender Studies. (ECF No. 106-1 ¶ 42; ECF No. 104-8 at 144.)

- **Restar:** Restar was a fellow with Defendant at the Center for Applied Transgender Studies. (ECF No. 106-1 ¶ 42; ECF No. 104-8 at 144.) Restar also published at least one article on transgender health with Defendant. (ECF No. 105 at 27 n.4.)

Defendant's common membership in professional organizations—the Health Equity Journal and the Center for Applied Gender Studies—with Samari, McLemore, Everhart, Radix, and Restar supports that these communications should receive protection under the common interest privilege. Defendant shared a common interest with McLemore and Samari in the authorship of the articles published in the Health Equity Journal, and in protecting the reputation of the Journal. Defendant also has a common interest with Everhart, Radix, and Restar as a fellow member of the Center for Applied Transgender Studies in their concern regarding accusations that a fellow academic abused a transgender man.

With respect to Plaintiff's communications with Green, the Court finds that Plaintiff has raised a genuine issue of material fact as to whether Defendant and Green were part of the same organization at the time Defendant made her relevant statements to Green in July and August of 2023. Plaintiff has put forth evidence that in April 2023 Defendant stated she would "probably be pulling out of iaphs" (ECF No. 106-11 at 5) and testified that the "IAPHS portion was so very unimportant to me after I resigned." (ECF No. 104-8 at 222; ECF No. 108 at 8.) Based on the parties' briefs and citations to the record, it is unclear to the Court whether Defendant was part of the IAPHS at the time of her conversations with Green. Defendant's briefing fails to explain or provide evidence for when Defendant resigned from IAPHS. (ECF No. 105 at 25.) Although Defendant asserts that her April 2023 message was "referencing not attending the IAPHS conference because of rotations," and she states that she "is still a member of IAPHS," the provided citations to the record do not clearly show that either is true. Indeed, where Defendant argues in her Motion for Summary Judgment that she was a participant in IAPHS, the website she cites does not include any mention of her participation in IAPHS. (ECF No. 103 at 29 n.7.) Thus, in the absence of clear evidence supporting the Defendant's status as being a member of IAPHS at the

time of her communications with Green, Defendant has failed to meet her burden to show that her statements to Green are protected by the common interest privilege.

The common interest privilege is qualified, not absolute. The privilege "may be overcome if plaintiffs can show that the defamatory statements were excessively published or motivated by malice." *Sullivan v. Aircraft Servs. Grp., Inc.*, No. 19-CV-6500, 2025 WL 676027, at *17 (E.D.N.Y. Mar. 3, 2025). "Malice can take two forms: (1) common law malice, *i.e.*, 'spite or ill will,' or (2) actual malice, *i.e.*, 'knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not.'" *Hodges*, 2023 WL 3362836, at *3 (citing *Liberman*, 80 N.Y.2d at 437–38). To successfully defeat the common interest privilege by asserting common law malice, plaintiff must show that malice is "the one and only cause for the publication." *Konikoff v. Prudential Ins. Co.*, 234 F.3d 92, 98–99 (2d Cir. 2000). "If the defendant's statements were made to further the [common] interest protected by the privilege, it matters not that defendant also despised plaintiff." *Sullivan*, 2025 WL 676027, at *17.

Turning attention to Defendant's text conversations with Everhart, Restar, and Radix on June 29, 2023 wherein she shared Allen's statements, as well as the email chain with McLemore and Samari, which spanned from June 29, 2023 through July 17, 2023, there is no evidence that these statements were excessively published, as they were communicated in private emails and texts.[17] Therefore, the Court looks to whether the statements were made with malice.

Plaintiff argues that Defendant's statements were made with actual malice because she had "knowledge of the availability of supporting evidence that she refused to look at," she received

---

[17] There are two additional individuals included on the July 17, 2023 email message from Defendant to McLemore and Samari, but neither party provides information as to who these individuals or entities are, and Plaintiff does not argue that their inclusion on the email chain amounts to excessive publication. (ECF No. 104-13 at 29.) Therefore, the Court assigns no consideration to the inclusion of these two unidentified individuals/entities on the emails.

"contradictory information in the NYS Complaint before publishing her statements," and she failed "to do any fact checking of an unknown individual's online posts before amplifying them." (ECF No. 104-1 at 25.) The Court is unpersuaded. First, Plaintiff fails to point to what "supporting evidence" Defendant refused to look at prior to publishing her statements. The only direct evidence of falsity that Plaintiff offers is his NYS Complaint, which Defendant did not receive until July 14, 2023, and the update Defendant received from Bhatt on Columbia University's investigation, which she did not receive until July 18, 2023. (*See* ECF No. 106 at 16, 19.) Defendant's June 29, 2023 texts to Everhart, Restar, and Radix happened before she received the NYS Complaint and Bhatt's update on Columbia University's investigation. Although Defendant had received the NYS Complaint when she recommended that the Health Equity Journal reject Plaintiff's manuscript, Defendant explicitly wrote in her email that her negative view of the manuscript "would be true without the unsavory but [sic] allegations that have been shared with me as well as communiques from [Plaintiff's] lawyers." (ECF No. 104-13 at 29.) Besides, a plaintiff cannot establish actual malice on the basis that a defendant refused to consider plaintiff's own "account of the events underlying the allegedly defamatory statements." *Hodges*, 2023 WL 3362836, at *4.

Nor can Plaintiff establish actual malice based on Defendant's "fail[ure] to conduct [her] own investigation" without more to show that "defendant in fact entertained serious doubts as to the truth of the publication." *Id.* (citing *Konikoff*, 234 F.3d at 99.) Plaintiff has failed to show that Defendant harbored any "serious doubts" as to the truth of Allen's allegations. Defendant first became aware of Allen's allegations when Dolotina, who worked with Plaintiff, reached out to her. Defendant received further information about Allen's allegations from Bhatt, who also worked with Plaintiff. Plaintiff has offered no reason why Defendant's reliance on the information that Dolotina and Bhatt shared with her was not to be trusted or merited further investigation. Although

27

Defendant recognized that the video footage that Bhatt shared with her on July 5, 2023, and which Defendant later shared with Streed on July 7, 2023, did not "really show anything else" besides the fact that Allen and Plaintiff interacted at the Blick store, these statements do not express her doubt as to the allegations. In fact, when Defendant discussed the NYS Complaint with Bhatt on July 15, 2023, she wrote that her "intuition is that [Allen] is telling the truth . . . do you think they are?" (ECF No. 102-14 at 20.) Bhatt responded, "I think they are . . . but I don't think Columbia will take their side. I think [Plaintiff] is going to get away with this." (*Id.*) These statements tend to show that Defendant was not wavering in her belief that Allen's allegations were truthful.

Defendant's outreach to Allen and Plaintiff on June 30, 2023 also supports this Court's finding that her statements were not made with actual malice. Defendant's message to Allen expressed her support of him, which strengthens the argument that she honestly held the belief that his allegations of harassment were true. Indeed, Defendant asserts that her belief in Allen's accusations was "rooted in a reliance on the trustworthiness of the convictions of [Plaintiff's] employees . . . as well as Allen's compelling posts." (ECF No. 103 at 27.) Defendant's email to Plaintiff letting him know she was publicly supporting Allen further supports that she believed Allen's statements to be true. Defendant gave Plaintiff the opportunity to "respond or reach out . . . in honesty and transparency," but Plaintiff never responded to tell Defendant that the allegations were untrue. (ECF No. 102-11 at 26.)

Plaintiff also cannot demonstrate malice based on Defendant's purported "ill will" toward Plaintiff. Plaintiff argues that Defendant's private messages reveal she "has long held a hostile view of [Plaintiff]," including because Defendant considered herself a "far superior scientist to [Plaintiff] while also having to admit that [Plaintiff] is further along in his career." (ECF No. 104-1 at 15, 25.) Defendant's "ill will" toward Plaintiff, however, must be the "one and only cause for

28

the publication" in order to defeat the common interest privilege. *Konikoff*, 234 F. 3d at 98–99. Plaintiff has failed to carry his burden in this respect. Indeed, Defendant's June 29, 2023 statements to Restar and Everhart state that Plaintiff "tickled her intuition as dangerous," which supports that she thought the allegations were true and she was alerting members of her organization that protected transgender rights to someone who had been accused of harming a transgender man. Defendant's email to Samari and McLemore also demonstrates that Defendant did not act solely based on ill will because it directly notes that her distaste for Plaintiff's manuscript "would be true without the unsavory but [sic] allegations that have been shared with me as well as communiques from [Plaintiff's] lawyers." (ECF No. 104-13 at 29.)

Because Defendant has demonstrated that her communications to Everhart, Radix, Restar, Samari, and McLemore served a common interest, and because Plaintiff has failed to show that these communications were made with malice, the common interest privilege applies.

### D.    Public Statements Five and Six Are Inactionable Opinions

Defendant argues that her two July and August tweets are personal opinions and therefore not subject to liability for defamation. (ECF No. 103 at 31–34.) To determine whether statements are opinions, courts look to "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proved true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Coleman*, 523 F. Supp. 3d at 262 (quoting *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153 (1993)). "New York courts have consistently protected statements made in online forums as statements of opinion rather than fact." *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015) (collecting cases), *aff'd*, 670 F. App'x 731 (2d Cir. 2016). "When, however, the statement of

29

opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is actionable." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (N.Y. 1986). It is plaintiff's burden to "establish that in the context of the entire communication a disputed statement is not protected opinion." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000). "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact." *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 719 (S.D.N.Y. 2014) (internal quotations omitted).

Defendant's July and August statements, published to X, read as follows:

PUBLIC STATEMENT FIVE:

> There seems to be some confusion about where I stand on a recent incident involving a professor and a community member. To be unambiguous I donated to their fundraiser because I support them as a victim of harm. I deleted some tweets to reduce my exposure for a lawsuit but my support hasn't waned. I also note that their [sic] are questions about the voracity [sic] of claims. I'll share that being a perfect historian about dates of traumatic events is hard when in distress and that huge power imbalances facilitate doubt in victims . . . . I don't want to jump to conclusions nor change my convictions easily. We all have the capacity to be wrong but I haven't been convinced of that just yet.

PUBLIC STATEMENT SIX:

> A couple people have asked me about IAPHS so I'm going to address it again here. There was an alleged harm committed by a senior person involved. I say alleged, not because I doubt the victim, but for legal reasons, I avoid naming that person for similar reasons.

(ECF No. 105-1 ¶¶ 28–29; ECF No. 102-16 at 4–5.)

When read in their full context, this Court finds that the statements are inactionable opinions. Public Statement Five uses multiple phrases signaling an opinion, such as "where I stand," "I support," "I don't want to jump to conclusions," and "I haven't been convinced." While Public Statement Five shares some facts (i.e., "I donated to their fundraiser" and "I deleted some tweets"), those facts are true and therefore not subject to liability for defamation. *See Crowley v.*

30

*Billboard Mag.*, 576 F. Supp. 3d 132, 148 (S.D.N.Y. 2021) ("[S]tatements that are substantially true cannot be defamatory."). Public Statement Six also contains "substantially true" facts. It is true that Allen "alleged harm" committed by Plaintiff, a "senior person involved" in the IAPHS.

Plaintiff's argument that "Defendant portrayed [Allen's] accusations as factual" in Public Statements Five and Six is belied by the statements themselves. (*See* ECF No. 104-1 at 21.) Both statements contain phrases signaling that there is debate regarding whether Allen's allegations are true. These are not the types of "statements . . . capable of being proved true or false." Although Defendant refers to Allen as a "victim of harm" in Public Statement Five, when read in context, she acknowledges that there "are questions about the voracity [sic] of [Allen's] claims." This phrase acknowledges there was public debate regarding the truth of the allegations and supports that Defendant was providing her opinion on a public forum as to what she *believed* to be true with respect to that debate. Defendant's statement in Public Statement Six that she does "not . . . doubt the victim" also reflects her opinion in the public controversy. In reading Public Statements Five and Six, a reasonable reader would view the statements as part of the online public debate surrounding the veracity of Allen's allegations, and as Defendant giving her viewpoint on that debate. The statements are nonactionable opinions.

### E.    Whether Defendant Was Negligent is a Question for the Jury

The remaining statements not protected by the common interest privilege and not dismissed as opinions are Public Statements One through Four, as well as Defendant's statements to Green on July 14, 2023 and August 23, 2023. As discussed *supra*, because Plaintiff is not a public figure and no public interest privilege applies to Defendant's statements, Plaintiff must show Defendant was negligent in making the remaining statements. *Gottwald v. Sebert*, 40 N.Y.3d 240, 251 (2023). "Under New York law negligence is defined as the 'lack of ordinary care,' or a 'failure to use that degree of care that a reasonably prudent person would have used under the same circumstances.'"

31

*Senchyshyn v. BIC Sport N. Am., Inc.*, No. 6:17-CV-0162, 2022 WL 5240586, at *9 (N.D.N.Y. Oct. 6, 2022) (citation modified). "[S]ummary judgment is highly unusual in a negligence action where the assessment of reasonableness generally is a factual question to be addressed by the jury." *King v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2d Cir. 1997).

This Court finds that both parties have raised a genuine issue of material fact as to whether Defendant was or was not negligent in issuing the remaining statements. For example, Defendant wrote in Public Statement One that "a trusted colleague who studies trans people has done horrible things and victimized a vulnerable trans person . . . I know it to be true." (ECF No. 102-16 at 2–3; ECF No. 105-1 ¶ 15.) The record shows that Defendant's basis for making this statement was the social media publications from Allen that Dolotina had shared with her. Defendant argues that she was reasonable in believing Allen's allegations because Dolotina, Plaintiff's colleague, also believed them. (ECF No. 103 at 26; ECF No. 107 at 11.) However, a reasonable jury could also find that Defendant writing that she "kn[e]w [the allegations] to be true" based entirely on secondhand information from Dolotina, with whom she had no close connection, and Allen, a man she had never met, exhibited a lack of ordinary care. Furthermore, Defendant's failure to verify Allen's allegations when she did communicate with him could also be construed by a reasonable jury as negligent. (*See* ECF No. 106 at 16.)

Similarly, there is a genuine dispute of material fact as to whether Defendant's statements to Green on July 14, 2023 and August 23, 2023 were made negligently. When Defendant made these statements, she was in receipt of the NYS Complaint, which controverted certain details of the harassment as detailed by Allen in his public posts. Defendant acknowledged in her message to Green that in "just reading the complaint [she] would second guess stuff, if [she] didn't hear directly from his staff [Bhatt], who is partnered to someone who is friends with [Allen], saw video

32

of [Plaintiff] in the store interacting with [Allen], and hadn't had colleagues independently reach out to me to say that they have been told that this sort of behavior is why he left NYU." (ECF No. 102-26 at 12.) Defendant had further information that could have caused her to doubt the allegations as of August 23, 2023, when she told Green that Plaintiff "is and was one of the most convincing abusers I've met." (ECF No. 104-12 at 28.) This additional information included Bhatt's July 18, 2023 update regarding Columbia University's investigation, in which Bhatt told Defendant that Columbia University had said "folks [were] not seeing the full story," "it's not as clear as what's on social media," and "at this point in time the allegations have not been confirmed." (ECF No. 106-15 at 32.) In short, there exist genuine issues of material fact as to whether Defendant's Public Statements One through Four and her messages with Green were made negligently, and those issues are best left to a factfinder to decide.

IV.    **CONCLUSION**

For the reasons discussed above, Plaintiff's Motion for Summary Judgment is denied. Defendant's Motion for Summary Judgment is granted with respect to Defendant's statements to McLemore, Samari, Everhart, Radix, Restar, and Streed, and Public Statements Five and Six, as discussed herein. Plaintiff's defamation claim based on Defendant's statements to Green, as well as Public Statements One through Four, may proceed to trial. An appropriate Order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**
